

1  S. Patrick Mendel
2  1319 Washington Ave, #163
   San Leandro, CA  94577
3  Carpartners1@gmail.com
4  Ph. 415-812-8507

RECEIVED
2019 JUN -7 P 4: 08
SUSAN Y. SOONG
CLERK, US DISTRICT COURT
HO. DIST. OF CA

FILED
JUN -7 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

5
## UNITED STATES DISTRICT COURT
6
7
## NORTHERN DISTRICT OF CALIFORNIA
8  S. PATRICK MENDEL,,

9          Plaintiff,

10
11 vs.

12 **ELAINE CHAO,** in her official capacity
13 as **U. S. Secretary of Transportation,**;

14
15 **XAVIER BECERRA**, in his official
16 capacity as Attorney General of the State
17 of California;

18
19 **RAYMOND MARTINEZ,** in his
20 official capacity as **Administrator,**
   Federal Motor Carrier Safety
21 Administration,

22
23
24 **LORETTA BITNER**, in her official
   capacity as **Chief, Office of**
25 **Enforcement and Compliance**, Federal
26 Motor Carrier Safety Administration,

27
28

CV NO. **19  3244**

**JSW**

## VERIFIED COMPLAINT:

**HEARING DATE:** TBD
**TIME:** TBD
**DEPT.** COURTROOM TBD
**JUDGE:** TBD

**Administrative Procedures Act**, 5 U.S. Code § 702-706 Right of Review (Federal officials);

**Deprivation of Rights** (42 U.S.C. §§1983, 1988)(State  Officials);

**Sherman Antitrust Act** - Violations of 15 U.S.C.§§1 and 2;(15 U.S.C. §§4 and 15) and Clayton Act;

**Private Enforcement of Federal Transportation Law** (Title 49, U.S.C. §14704) Failure to comply with 49 U.S.C. §§13904(d), 13404(f), 14102, 14303, 14501(b), 14501(d);

COMPLAINT- 1

**MICHAEL PICKER,** in his individual and official capacity as **President, Commissioner,** California Public Utilities Commission,

**CARLA J. PETERMAN**, in her individual and Official Capacity **as Commissioner,** California Public Utilities Commission,;

**LIANE M RANDOLPH,** in her individual and official capacity as **Commissioner,** California Public Utilities Commission,

**CLIFFORD RECHTSCHFFEN,** in his individual and official capacity as **Commissioner,** California Public Utilities Commission,

**MARTHA GUZMAN ACEVES,** in her individual and official capacity as **Commissioner,** California Public Utilities Comm.,

**MARITZA PEREZ,** in her individual AND official capacity as **Section Supervisor** Badge #11, Transportation License Section, California Public Utilities Commission **;**

**Private Enforcement of Federal Registration Requirements** (Title 49 U.S.C. §14707) 49 U.S.C.§§13901-13902, 13904(d), 13904(f) and 49 U.S.C. §31138;

**STATE LAW CLAIMS**

**California Unfair Practices Act**; (California Bus. and Prof. Code §§17043-17044);

**Unfair Competition Law** (UCL) (Business and Professions Code §§17200 et seq.);

**Unlawful Deductions From Wages** (Labor Code §221 and IWC Wage Order No. 9);

**Reimbursement of Business Expenses** (Labor Code §2802);

**Minimum Wage** (Labor Code §§ 1182.11, 1194, et seq. IWC Wage Order No. 9, Minimum Wage Order);

**Overtime Wages (Labor Code §510)**

COMPLAINT- 2

**California Public Utilities Commission DOES 1-20** in their individual and official capacity as employees, agents, officers acting in concert with or for the California Public Utilities Commissioner Defendants;

**UBER TECHNOLOGIES, INC., RAISER-CA, LLC;**
**UBER USA, LLC; and**

**TRAVIS KALANICK, Board Member, former CEO; and GARRETT CAMP, Board Member and Founder; and**

**RYAN GRAVES, Board Member, former CEO; and**

**UBER DOES 1-300,** Officers, Directors, Employees, Agents acting in concert with Uber Technologies, Inc. and its subsidiaries RAISER-CA, LLC and UBER USA, LLC;

**LYFT, Inc. ; and**

**LOGAN GREEN,** CEO of Lyft, and Board Member; and

**JOHN ZIMMER,** President of Lyft and Board Member; and

TORT LAW - UBER-LYFT
BREACH OF CONTRACT;

QUANTUM MERUIT;

CONSTRUCTIVE FRAUD;

NEGLIGENT MISREPRESENTATION;

CONVERSION;

ATTORNEY MALPRACTICE

BREACH OF FIDUCIARY DUTY

**DEMAND FOR JURY TRIAL**

COMPLAINT- 3

1
2
3  **LYFT DOES 1-50** Officers, Directors,
4  Employees, Agents of LYFT Inc., acting
   in concert with Lyft, Inc.; and
5
6  **LICHTEN & LISS-RIORDAN P.C, a**
7  **law firm; and**
8
   **SHANNON LISS-RIORDAN**, Attorney
9  of the law firm Lichten & Liss-Riordan,
10 P.C.; and
11
   **ADELAIDE PAGANO**, Attorney of the
12 law firm Lichten & Liss-Riordan, P.C ;
13 and
14
   **ANNE KRAMER,** Attorney of the law
15 firm Lichten & Liss-Riordan, P.C.
                    Defendant
16
17
                    **TABLE OF CONTENTS**
18
19 **PRELIMINARY STATEMENT** ...................................................................... **14**

20          NATURE OF THE SUIT ............................................................................ 14

21          *Plaintiff S. Patrick Mendel brings this complaint to stop senseless acts of*
22
23 *violence – the murder, rape, assaults - and theft of private property, perpetrated on Plaintiff,*

24 *and other innocent drivers and passengers*........................................................... *14*

25 I.    **INTRODUCTION – A WARNING UPFRONT:** ................................................ **19**
26
27          *DISRUPTION* MEANS **UBER AND LYFT** *VIOLATE* **THE LAW!** ..................... 19
28
                                        COMPLAINT- 4

**A.     THE ENTIRE UBER - LYFT BUSINESS MODEL IS ILLEGAL** ............................. **21**

*The Uber and Lyft Contracts are for an **illegal** Purpose* ............................... *21*

**B.     FEDERAL LAW PREEMPTS THE STATE OFFICIALS CONDUCT** .................... **28**

**C.     CONSTITUTIONAL RIGHTS VIOLATIONS** ............................................................. **30**

42 U.S.C. §1983 - CIVIL ACTION FOR DEPRIVATION OF RIGHTS .................... *30*

**D.     THE UBER – LYFT ILLEGAL ARBITRATION CONTRACTS** ............................. **34**

*Uber and Lyft Drivers are by Law Exempt from Arbitration* ......................... *34*

**E.     EMPLOYING TECHNOLOGY –** ................................................................................... **38**

HOW TO STRATEGICALLY MONOPOLIZE PASSENGER TRANSPORTATION AND

EVADE GOVERNMENT INTERFERENCE ............................................................... *38*

*P.T. Barnum, Ponzi and J. P Morgan evolved...* ............................................ *38*

*Meet Travis Kalanick and Company* ............................................................... *38*

***Follow the Money*** .......................................................................................... *40*

**F.     GAME THEORY, FINANCIAL MODELING AND ARTIFICIAL INTELLIGENCE**

**41**

COMPUTER PROGRAMS - IBM PROVED THEY WIN AT CHESS AND POKER... *41*

1.     UBER AND LYFT USE COMPUTER PROGRAMS TOO... ........................... *41*

*The Difference – Uber and Lyft's Purpose is Illegal!* ................................. *41*

2. UBER AND LYFT, SEPARATE ENTITIES - ONE MONOPOLY ...................... *42*

3. DRIVERS ARE CONTROLLED LIKE ROBOTS ................................... *46*

*Real World Example - Algorithm Driver Earnings* .................................... *48*

COMPLAINT- 5

**4. THE THREE PHASES OF MONOPOLIZATION** ................................. 53

*Misrepresenting the Cost Benefit of AI Cars* ................................. 53

*Game Theory and Artificial Intelligence* ................................. 56

**G.     THE NEW YORK CITY DIFFERENCE** ........................................ 58

Proper Vehicle and Driver Regulation Saves Lives ........................... 58

*Regulated as "Prearranged Ground Transportation" for a Reason* ........... 59

**H.     GOVERNMENT OFFICIAL'S BETRAYAL OF OFFICE** ......................... 62

*The Public Safety Requires Active Actual Federal Supervision* ............... 62

*Federal Official Indifference Contributed to Death and Injury* ............... 63

**I.     THE STATE OFFICIALS UNLAWFUL CONDUCT** ................................ 66

The Beginning – CPUC Creates *Frankenstein* TNC Permits ............. 66

**Violates Federal Preemption of State Interference** ............................... 66

*Violating Plaintiff's Fourteenth Amendment Rights* ................................ 72

**J.     ANTITRUST VIOLATIONS – INCLUDE TITLE 49 U.S.C. §14303** ............. 77

[   *"I like a little competition." – J. P. Morgan*   ] ................................ 77

**1.     RELEVANT MARKETS - Service Products** ........................... 81

**2. MARKET POWER** ................................................................. 82

**3. HARM TO COMPETITION** ...................................................... 82

*Violations of Federal Law 49 U.S.C. §14303* ................................ 83

**K.     UBER AND LYFT "FEE COMMISSIONS" ARE UNLAWFUL** .............................. 89

*UNJUST ENRICHMENT* .................................................................. 89

COMPLAINT- 6

*The Uber and Lyft Contracts are Unconscionable* ..................................... *90*

*Inefficient Overhead and Physics Explain the Massive Losses* ................. *91*

*Artificial Intelligence Cannot Restore Commercial Wear on Machines* .... *92*

L.   UBER / LYFT UNCONCIONABLE DRIVER CONTRACTS – ................................. **93**

M.   THE ATTORNEYS – GOVERNMENT – AND PRIVATE ........................................ **99**

    1.   MALPRACTICE BY DELIBERATE OMISSION AND LACK OF CANDOR ....... 101

    N.   THE CONSEQUENCES... .................................................................... 106

THE HEART OF THE COMPLAINT ...................................................................... **107**

    *Driver Contracts – DECISIONS – FED-STATE Agreements* .................. *107*

II.   THE PARTIES .......................................................................................... **107**

    THE PLAINTIFF ....................................................................................... 107

    *PLAINTIFF'S STANDING* ...................................................................... *107*

    THE DEFENDANTS ................................................................................. 110

    *U.S DEPARTMENT OF TRANSPORTATION - Federal Officials* ......... *110*

    *CALIFORNIA EXECUTIVE BRANCH - State Officials* ......................... *113*

    *CALIFORNIA PUBLIC UTILITIES COMMISSION -* ........................... *114*

    UBER DEFENDANTS ............................................................................... 116

    *ADDITIONAL FACTUAL BACKGROUND OF UBER* ......................... *118*

    LYFT DEFENDANTS ............................................................................... 122

    *ADDITIONAL FACTUAL BACKGROUND OF LYFT* ......................... *124*

    THE PLAINTIFF'S ATTORNEY DEFENDANTS ...................................... 128

COMPLAINT- 7

III.   DAMAGES ........................................................... 129

IV.   JURISDICTION ................................................... 130

VENUE ...................................................... 131

V.   STATUTORY AND REGULATORY FRAMEWORK .......................... 132

INDUSTRY REGULATION AND BUSINESS REFORM......................... 132

*The Motor Carrier Act* ............................................. 133

VI.   THE PUBLIC SAFETY AND FEDERAL SOLUTION ................... 134

*Brokering - Ridesharing as a Business or Occupation is illegal.*.............. 134

VII.   THE FEDERAL REGULATORY PASSENGER SCHEME...................... 136

PRELIMINARY INTRODUCTION ................................... 136

*The Federal Transportation Regulations*................................. 137

VIII. CLAIMS FOR RELIEF ............................................. 149

COUNT ONE –VIOLATIONS OF APA –............................................. 149

*Failure to Administer and Enforce Transportation laws.* ........................ 149

*Elaine Chao, U.S. Secretary of Transportation, Raymond Martinez,*

*Administrator, Loretta Bitner, Chief Enforcement, FMCSA*................................. 149

COUNT TWO - VIOLATION OF APA – (ARBITRARY AND CAPRICIOUS)............. 152

*Elaine Chao, U.S. Secretary of Transportation, Raymond Martinez,*

*Administrator, Loretta Bitner, Chief Enforcement* ........................................... 152

**WHEREFORE**, PLAINTIFF PRAYS THAT FOR COUNTS ONE AND TWO THAT FINAL JUDGMENTS BE ENTERED AGAINST EACH DOT Defendant DECLARING, ORDERING, AND ADJUDGING THAT:.................................................................................. 153

**COUNT THREE – VIOLATION OF COMMERCE CLAUSE ........................................ 154**

      *Against Defendant Xavier Becerra, Attorney General.................................. 154*

      **WHEREFORE**, PLAINTIFF PRAYS FOR COUNT THREE THAT FINAL JUDGMENT BE ENTERED AGAINST DEFENDANT AND SUCCESSORS DECLARING, ORDERING, AND ADJUDGING THAT:.................................................................................................. 156

**COUNT FOUR – VIOLATION OF DORMANT COMMERCE CLAUSE....................... 157**

      *Defendant CPUC Commissioners' Maritza Perez and CPUC Does 1-20 .. 157*

**COUNT FIVE – PLAINTIFF'S FOURTEENTH AMENDMENT RIGHTS..................... 163**

      *(42 U.S.C. §1983, 1988)........................................................................... 163*

      *Defendant CPUC Commissioners' Maritza Perez and CPUC Does 1-20 .. 163*

      **WHEREFORE,** PLAINTIFF PRAYS FOR COUNT FOUR AND FIVE THAT FINAL JUDGMENT BE ENTERED AGAINST EACH DEFENDANT DECLARING, ORDERING, AND ADJUDGING THAT:.................................................................................................. 169

**COUNT SIX – ANTITRUST SHERMAN ACT §1 ................................................ 171**

      ***Defendants UBER and LYFT*................................................................ 171**

      **WHEREFORE,** PLAINTIFF PRAYS, FOR COUNT SIX THAT FINAL JUDGMENT BE ENTERED AGAINST EACH DEFENDANT DECLARING, ORDERING, AND ADJUDGING THAT: .......... 173

**COUNT SEVEN – PRIVATE ENFORCEMENT OF REGISTRATION ......................... 174**

(49 U.S.C.§§13901. 13904(D),13904(F), 14501(D),  AND 14707(A)).............. 175

*Defendants UBER and LYFT*........................................................ *175*

**DEFENDANTS UBER** ................................................................. **184**

**COUNT EIGHT REIMBURSEMENT OF BUSINESS EXPENSES** .................................. **184**

DEFENDANTS UBER - (LABOR CODE § 2802) ............................................. 184

**COUNT NINE  UNLAWFUL DEDUCTIONS FROM WAGES**....................................... **185**

*(LABOR CODE § 221 AND IWC WAGE ORDER NO. 9, § 8)*.................... *186*

**COUNT TEN FAILURE TO PROVIDE OFF-DUTY MEAL PERIODS** ......................... **187**

*(LABOR CODE §§ 226.7, 512, IWC WAGE ORDER NO. 9)*...................... *187*

**COUNT ELEVEN - MINIMUM WAGE** ...................................................... **189**

(LABOR CODE §§ 1182.11, 1194, ET SEQ., IWC WAGE ORDER NO. 9,

MINIMUM WAGE ORDER)................................................................. 189

**COUNT TWELVE - FAILURE TO TIMELY PROVIDE CODE-COMPLIANT WAGE

STATEMENTS** ........................................................................ **191**

(LABOR CODE § 226) DEFENDANTS UBER ................................................ 191

**COUNT THIRTEEN - VIOLATIONS OF THE UNFAIR COMPETITION LAW (UCL)**

.................................................................................... **192**

(BUSINESS & PROFESSIONS CODE §§ 17200-09) .................................... 192

**PRAYER FOR RELIEF – DEFENDANTS UBER** .................................... **196**

**DEFENDANTS LYFT**................................................................... **199**

COMPLAINT- 10

**COUNT FOURTEEN – LYFT REIMBURSEMENT OF BUSINESS EXPENSES .......... 199**

*Defendants LYFT - (LABOR CODE § 2802) ............................................. 199*

**COUNT FIFTEEN - UNLAWFUL DEDUCTIONS FROM WAGES ................................. 200**

*(LABOR CODE § 221 AND IWC WAGE ORDER NO. 9, § 8).................... 200*

**COUNT SIXTEEN - FAILURE TO PROVIDE OFF-DUTY MEAL PERIODS ............. 202**

*(LABOR CODE §§ 226.7, 512, IWC WAGE ORDER NO. 9)..................... 202*

**COUNT SEVENTEEN - FAILURE TO PROVIDE OFF-DUTY PAID REST PERIODS203**

*(LABOR CODE §§ 226.7, IWC WAGE ORDER NO. 9).............................. 203*

*Defendants LYFT............................................................................. 203*

**COUNT EIGHTEEN - MINIMUM WAGE ........................................................ 204**

(LABOR CODE §§ 1182.11, 1194, ET SEQ., IWC WAGE ORDER NO. 9,

MINIMUM WAGE ORDER)........................................................................ 204

**COUNT NINTEEN - FAILURE TO TIMELY PROVIDE CODE-COMPLIANT WAGE**

**STATEMENTS ........................................................................................ 206**

(LABOR CODE § 226)  DEFENDANTS LYFT ................................................ 206

**COUNT TWENTY - VIOLATIONS OF THE UNFAIR COMPETITION LAW (UCL). 207**

(BUSINESS & PROFESSIONS CODE §§ 17200-09) ..................................... 207

**PRAYER FOR RELIEF – DEFENDANTS LYFT ..................................... 211**

**COMMON COUNTS - DEFENDANTS UBER AND LYFT ................................. 214**

**COUNT TWENTY-ONE – .................................................................... 214**

COMPLAINT- 11

CALIFORNIA UNFAIR PRACTICES ACT ............................................... 214

(California Business and Professions Code §§17043, 17044) .................... 214

PRAYER FOR RELIEF – UBER AND LYFT UPA CLAIM ................... 217

WHEREFORE, Plaintiff request COUNT TWENTY-ONE relief as

follows: ......................................................................................................... 217

COUNT TWENTY-TWO – BREACH OF CONTRACT..................................... 217

COUNT TWENTY-THREE QUANTUM MERUIT ........................................ 221

UNJUST ENRICHMENT ............................................................... 221

COUNT TWENTY-FOUR  CONVERSION ...................................... 222

COUNT TWENTY-FIVE - CONSTRUCTIVE FRAUD................................. 222

COUNT TWENTY-SIX - UNTRUE OR MISLEADING ADVERTISING— .................. 223

BUSINESS AND PROFESSIONS CODE § 17500 ................................. 223

PRAYER FOR RELIEF – UBER AND LYFT COUNTS 22, 23, 24, 25, 26 ...................... 224

WHEREFORE, Plaintiff request relief equitable and legal relief and

damages for Breach of Contract, Quantum Meruit, Conversion, Fraud, and

Misleading Advertising, as follows: ........................................................ 224

COUNT TWENTY-SEVEN – LEGAL MALPRACTICE ............................... 226

(Legal Malpractice against Defendants Lichten & Liss-Riordan P.C,

Shannon Liss-Riordan, Adelaide Pagano, Anne Kramer)............................ 226

COUNT TWENTY-EIGHT – BREACH OF FIDUCIARY DUTY ..................... 230

COMPLAINT- 12

(Breach of Fiduciary Duty against Defendants Lichten & Liss-Riordan P.C, Shannon Liss-Riordan, Adelaide Pagano, Anne Kramer) .................................... 230

**WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANT ATTORNEYS, AND EACH OF THEM, AS SET FORTH BELOW; ............................... 236**

      **FOR COUNT TWENTY-SEVEN** ................................................................ 236

      **FOR COUNT TWENTY-EIGHT** ............................................................... 236

**IX.    CONCLUSION** ........................................................................................ **237**

      **IT'S A SIMPLE PROBLEM:** ................................................................ 237

**VERIFICATION** ........................................................................................ **240**

COMPLAINT- 13

**PRELIMINARY STATEMENT**

**Nature of the Suit**

Plaintiff S. Patrick Mendel brings this complaint to stop senseless acts of violence – the murder, rape, assaults - and theft of private property, perpetrated on Plaintiff, and other innocent drivers and passengers.

It has been illegal to provide passenger transportation to private motor vehicles for compensation, *rideshare,* under federal law since 1942.

The exemption for "share-expense" passenger transportation was removed to prevent the abandonment and injury to traveling passengers. The entire purpose of Congress was to prohibit "brokers" [Uber and Lyft] from conducting unlicensed travel bureau business with private vehicles rather than with State - Federal authorized motor carriers, *California v. Zook*, 336 U.S. 725 (1949).

California, the first to create a "TNC" permit, knew or should have known what they were creating would result in an opportunity for mayhem upon the public.  They never even consulted with federal authorities, apparently California's constant attempts to act as if it is not part of the United States is more important than the safety of the traveling public. California was not always irresponsible. *California v. Thompson*, 313 U.S. 109 (1941).

COMPLAINT- 14

If not for the improper conduct of the Defendant government officials, and Attorney malpractice, Defendants Uber and Lyft would never have been able to start, much less advance across the country, a federally prohibited and illegal passenger transportation enterprise propelling preventable carnage across America.

Defendant Uber and Lyft nationally run an illegal *interstate* passenger *broker* and *motor carrier* transportation enterprise which uses and abuses computer technology to avoid and violate federal transportation laws, destroying the safe, efficient, competitive goals of the national transportation scheme and its policies.

Uber and Lyft violate and disable the purpose of federal transportation laws to enable enough criminal misconduct to render the historical reputations of history's greatest monopolists, gangsters, con artists, swindlers and human smugglers, such as J. P. Morgan, Al Capone, Charles Ponzi, Bernie Madoff and professional Coyotes into the ranks of obscure inept amateurs.

Plaintiff, (like other drivers), was deceived into contracting with Uber and Lyft because of their misrepresentations of authority to legally conduct a for-profit passenger transportation business.

The Defendant government officials bolstered Uber and Lyft's deceit, by their ostensible authorization of Uber and Lyft's authority to contract with Plaintiff to conduct regulated *interstate* and *intrastate* passenger transportation.

COMPLAINT- 15

The Defendant <u>federal</u> officials sat on the sidelines, ignoring and abandoning their obligation to carry out their primary statutory, administrative, regulation and enforcement obligations, insuring the safety of the American people; rather their improper inaction added credibility to Uber and Lyft's illegal[1] business.

The Defendant California <u>State</u> officials actively ignored and purposely violated their obligations to conform their official conduct to California's agreements with the federal government, by enacting incompatible State transportation laws and rules contrary to federal transportation registration laws and regulations as required.

Plaintiff was assaulted by passengers, deprived of a legitimate competitive market place, cheated and deceived out of his labor and property, deprived of his fundamental rights and finally driven out of his own legal livery business.

---

[1] Black's Law Dictionary defines "<u>unlawful</u>" as not authorized by law, and it defines "<u>illegal</u>" as forbidden by law.
    Plaintiff uses these terms, as so defined, throughout this document under those definitions to describe <u>factual conduct of a defendant actor</u>, not as a "legal conclusion."
    Example: the law requires particular form of action or behavior and the actor does not comply, the conduct is described as "unlawful" or non-compliant conduct related to the law; - the law forbids particular conduct and the actor does what the law forbids, this conduct Plaintiff describes as illegal because the law forbids the conduct. These are not legal conclusions to be ignored, but proper descriptions of conduct in relation to laws and regulations.
    The complaint subject matter concerns highly regulated transportation and business laws. The final determination as to whether the alleged unlawful or illegal actions, (1) did or did not occur (2) caused harm (3) and entitle Plaintiff to relief are judicial and jury decisions.

COMPLAINT- 16

This occurred because the Defendant federal officials did nothing to insure compliance by California's of its Agreement to continue to receive MCSAP grant funds.

This was followed by the California Commissioners' abusing their authority. They fashioned an illegal TNC Permit, improperly lobbied for by Uber and Lyft, who were then allowed to operate a federally illegal passenger broker transportation business. Defendants Uber and Lyft added to their illegal business with prohibited predatory *maximum* pricing fixing contracts with their independent contractor driver tradesmen violating the purpose of the antitrust laws for the free play of prices by market forces.

By written contract, Uber and Lyft with dominant market position restrained the competitive market and plundered Plaintiff's labor, property and customers, When combined with the Defendant Commissioners', who through their agents illegally demanded Plaintiff's money and private papers, unlawfully suspended and revoking his TCP Permit, destroyed his ability to legally earn a living and his business.

It is the failure of the Defendant Government Officials to lawfully carry out their primary official duties, which enabled Defendants' Uber and Lyft's disruptive law breaking to occur and continue to occur.

COMPLAINT- 17

The Defendant Government Officials failed to carry out their primary official duties, in a lawful manner, even after confronted with Uber and Lyft's misconduct. The result is Uber and Lyft were and are allowed to illegally ***disrupt*** the federally regulated passenger transportation environment, attracting and inviting unscrupulous individuals, both drivers and passengers, who murdered, raped and assaulted innocent passengers and drivers, including Plaintiff.

Some drivers were driven, by Uber and Lyft's misconduct, to such financial desperation; they committed suicide.

In a final victory, Uber, Lyft, and their insiders, including former government officials, who failed to arrest the misconduct, sold stock to the public for enormous gains for an illegal, unprofitable business enterprise that literally enables criminal murder, rape while they continue looting the Plaintiff (and other drivers') of their labor and property.

All this carnage because the government officials failed to carry out the federal regulatory transportation scheme, designed to prevent, this very same conduct, which previously occurred in California and the rest of the nation from 1935 through 1942, when the Interstate Commerce Commission, originally withdrew the exemption for "Rideshare," to prevent the aforementioned carnage.

COMPLAINT- 18

Plaintiff alleges Defendants' did and are responsible for the conduct/misconduct against him and resulting injuries, including but not limited to violations of transportation, labor and antitrust laws, Plaintiff's Constitutional and statutory rights, and Plaintiff seeks multiple forms of equitable and legal relief and damages, as explained herein.

## I.   **INTRODUCTION – A Warning Upfront:**

1. This stuff gets confusing; sometimes Uber and Lyft, and their hired guns, intentionally want to muddle the distinctions between workers and contractors, per se antitrust violations, and who the consumer is, and twisting transportation regulation distinctions.   This is very important in the legal realm but rarely of interest to ordinary people.

   But understanding all this is a key to grasping Uber and Lyft's *disruption* and the nature of their illegal conduct in the internet age, computer engineers' proficient in game theory, algorithms, financial modeling and how the government lags woefully behind.

### ***Disruption* means UBER AND LYFT *Violate* THE LAW!**

2. The following is a partial list of federal and State laws and regulations that are being violated by the defendants:

   - The Supremacy Clause of the United States Constitution
   - The dormant Commerce Clause of the United States Constitution

COMPLAINT- 19

- 49 CFR §350.201 States Agreed to act Compatible, and Comply and Enforce Federal Transportation Laws
- 49 CFR §372.101 Arranging, selling passenger transportation to private vehicles for compensation prohibited
- 49 CFR Part 376 Lease of Vehicles - Requirements
- 49 CFR Subpart B Motor Carriers of Passengers Insurance
- 49 CFR §392,9a  Operating authority required
- 9 U.S.C. §1  Drivers are exempt from arbitration
- 15 U.S.C. §§1-2 Sherman Antitrust Act violations
- 15 U.S.C. §15 Clayton Act Suits by person injured
- 49 U.S.C. §13506 Motor Carrier Exemptions
- 49 U.S.C. §13506(b)(1) and (2)  TNC conduct illegal
- 49 U.S.C. §13901-13902 Motor Carrier Registration
- 49 U.S.C. §13904(f) Passenger Broker's Bonds and Insurance
- 49 U.S.C. §13904(d) Passenger Brokers must register as motor carriers
- 49 U.S.C. §14102 Leased Motor Vehicles
- 49 U.S.C. §14303 Surface Transportation Board must approve contracts to operate property of another motor carrier
- 49 U.S.C. §14501 Federal Authority over Intrastate Transportation
- 49 U.S.C. §14501(b) Federal limit on State regulation of Brokers
- 49 U.S.C. §14501(d) Prearranged Ground Transportation
- 49 U.S.C.§14704 Private Right of Enforcement of Transportation laws

COMPLAINT- 20

- 49 U.S.C. §14707 Private right to Enforce Federal Registration
- 49 U.S.C. §14901 General Civil Penalties for no passenger motor carrier registration $25,000.00 per violation
- 49 U.S.C. §31138 Insurance Requirements
- California Public Utilities Code §421 Fees for Transportation permits
- California Public Utilities Code §§5430-5439 TNC Enactments
- California Labor Code §221 Unlawful Wage Deductions
- California Labor Code §226.7  Failure to Provide Paid Rest Periods
- California Labor Code §970 Solicitation of Employee by Misrepresentation
- California Labor Code §972 Solicitation of Employee by Misrepresentation, double damages
- California Labor Code §§1182.11, 1194 Minimum Wages
- California Labor Code §2802 Failure to reimburse Expenses
- California Unfair Practices Code §§17043-17044 Selling below cost, unlawful to sell as a loss leader
- California Unfair Competition Code §17200 Unfair Competition
- California Wage Order No. 9 Transportation workers - drivers' to have Employee Status and Workmen's Compensation.

## A. THE ENTIRE UBER - LYFT BUSINESS MODEL IS ILLEGAL

<u>The Uber and Lyft Contracts are for an *illegal* Purpose</u>

3.    Since 1942, followed by the 1995 Motor Carrier Act deregulation, it has been illegal for "passenger brokers" to arrange and sell transportation to private motor vehicles for compensation as an occupation or business.

4.    A passenger broker, which is what Uber and Lyft do, may only "broker" (sell and arrange) interstate and intrastate passenger transportation to registered passenger motor carriers who, own, rent or lease and commercially insure, the vehicles and drivers they utilize.

5.    Federal law also specifically prohibits the selling or arranging, by anyone, of passenger transportation to private vehicles for compensation or as an occupation or business. (49 U.S.C. §13506(b)(2) and 49 CFR§372.101)

6.    Defendants Uber and Lyft and the CPUC TNC permits they operate under allow Uber and Lyft to sell and arrange transportation to private vehicles in direct violation of the federal registration requirements. The TNC permit is State authority to do what federal law specifically prohibits.

7.    Just as a contract for murder is for an illegal purpose, the Uber and Lyft contracts with the TNC drivers is for an illegal purpose.

8.    The entire Uber and Lyft business is for an illegal purpose and the contracts cannot be enforced in any court of law, by Uber, Lyft or the TNC drivers as a matter of law.

COMPLAINT- 22

**Violation of Supremacy and Commerce Clauses**

**Dormant Commerce Clause and Equal Application Clause Violations**

9.   This case challenges DOT's violation of the Administrative Procedure Act ("APA") in failing to administer and enforce the wholesale violation of federal transportation laws and regulations by California, the California Public Utilities Commission and Defendant Business entities Uber Technologies, Inc., and Lyft, Inc., and their subsidiaries, Officers', Directors, Agents, and employees.

10.  Since at least 2013, the media has reported dozen of murders, hundreds of rapes and uncountable assaults by Uber and Lyft drivers and passengers. The media has also regularly reported Uber and Lyft drivers providing passenger transportation traveling long distance trips across several states, obviously appearing as interstate transportation.

11.  In 2016, the major media, ABC, NBC and CBS, reported on Uber Passport, a service provided by Uber for passenger transportation from San Diego, California into Mexico, obviously appearing as foreign transportation commerce.

12.  Plaintiff Mendel served complaints on the U.S. Secretary of Transportation, and the Federal Motor Carrier Safety Administration staff, including its

COMPLAINT- 23

Chief enforcement officer, and other department specialists including

engaging in email and teleconference communications.

13. None of these "alerts", media reports or complaints received any

intervention or investigation.  As a result of the failure of the Department of

Transportation to act, the federal transportation scheme was, and continues

to be evaded, violated, and rendered useless.

14. The entire purpose of the federal transportation laws were designed to

prevent senseless acts of violence, insure the traveling safety of the

American people, including Plaintiff, and provide for adequate financial

responsibility for property damage and bodily injury. The failure of the

Department of Transportation and the Secretary to act in compliance with

U.S. policy under 49 U.S.C. §13101, has rendered the passenger

transportation policy goals of the United States ineffective.

15. The entire purpose of Congress' 84 year constant amendment of the federal

regulation of *interstate* and *intrastate* passenger transportation, including the

*passenger brokering* of that transportation ineffective for its intended

purpose - the safe travel of passengers, in a competitive, level playing field

environment, throughout the United States, has been rendered worthless.

COMPLAINT- 24

16.  As a result Plaintiff has unnecessarily suffered physical injury, been illegally pushed out of his 30 plus year profession of choice and had his rights violated, property and labor taken and business destroyed.

17.  The Commerce Clause, as set forth in Article I, Section 8 of the United States Constitution, expressly grants Congress the power "[t]o regulate commerce with foreign Nations, among the several States, and with the Indian Tribes."

18.  The Dormant Commerce Clause is inherent in the power granted to Congress under the Commerce Clause and provides that, even if federal law is silent on an area of interstate commerce, states may not enact legislation that discriminates against or impermissibly burdens interstate commerce. See, e.g., *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 338 (2007).

19.  State laws that discriminate against interstate commerce face a virtually per se rule of invalidity under the Commerce Clause. The Supreme Court has explained that "discrimination" in this context "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).

COMPLAINT- 25

20. State laws that are facially neutral nevertheless violate the Commerce Clause if they impermissibly burden interstate commerce in practice. See Healy, 512 U.S. at 194-95. 52. The Supreme Court has repeatedly held that, in all but the narrowest of circumstances, state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests. *Granholm v. Heald*, 544 U.S. 460, 466 (2005); *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994).

21. The congressional Motor Carrier Act and its amendments, <u>requires active actual federal supervision</u>. Including insuring State compliance with federal law they agreed to comply with.  The Defendant Federal officials abandoned these official obligations.

22. The Defendant Federal Officials had a duty to properly administer their departments and personnel.  They also have a mandated duty under federal transportation law to exercise administrative and enforcement mechanisms to insure the federal transportation polices, especially Safety are carried out. These officials should have acted under federal regulations (49 CFR 392.9a) when informed by Plaintiff's complaint, reporting the illegal transportation businesses of Uber and Lyft. They did nothing!

23. Both the State and Federal Defendant Officials should have, because the law requires them to - to immediately order both Uber and Lyft "out of service,"

at a minimum. (not to mention the enormous fines over $25,000.00 per trip occurrence) Again, they did nothing!

24. The Defendant Federal Officials hold the historic records and I.C.C. agency decisions and knew or should have known: Uber and Lyft's, ***passenger brokering*** business to private vehicles for-hire, was illegal and would and has led to criminal carnage, including murder and rape, in the streets!

25. The named Federal Officials also have a duty and obligation to protect the safety of the American public, including Plaintiff. They neglected and abandoned their duties and purpose, by their inaction.

26. Uber and Lyft's selling and arranging transportation for compensation to motor vehicles (private vehicles), not motor carriers (registered), as a regular occupation or business is prohibited by 49 CFR §372.101.

27. In 1949 the Supreme Court explained in detail back then, describing the same criminal and civil misconduct experienced then and re-occurring today, (i.e. murders, rape, assaults, abandoned passengers) by Defendant Officials allowing Uber and Lyft's, illegal, federally non-compliant interstate and intrastate transportation to continue.

28. The named Federal Officials also failed to enforce against the Defendant California Public Utilities Commissioners' their non-compliance with

COMPLAINT- 27

federal regulations, (49 CFR §350.201) which the State of California had committed it would comply with, by accepting MCSAP (highway) funds.

29. The California Commissioners' abused their authority by overreaching into federal *intrastate* and interstate transportation jurisdiction in creating their "new" TNC Permit. *It isn't new it is and has been illegal.*

## B. FEDERAL LAW PREEMPTS THE STATE OFFICIALS CONDUCT

30. The California Commissioners' failed to comply with federal law, which prohibits, under 49 CFR §372.101, their creation of a "new" Transportation Network Company, "TNC" Permit, allowing Uber and Lyft to sell or arrange transportation to private vehicles as a regular business or occupation.

31. The only thing *new* is the Defendant Commissioners' bold unlawful grant of authority to Uber and Lyft, and others, via their *new* TNC Permits, to use modern technology to operate a federally prohibited and illegal passenger broker business, which has essentially been outlawed since 1942.

32. The TNC Permit is essentially an intrastate broker permit, which at a minimum, by the Commissioners' own rules and 2013 DECISION, regulates conduct related to intrastate broker services and is specifically preempted by (49 U.S.C. §14501(1)(b) federal law preempting State interference *related to* ANY [passenger] broker's *intrastate* passenger rates routes and services.

COMPLAINT- 28

33. Additionally, the TNC permit holder, who also sells passenger transportation for compensation, (is a motor carrier) is prohibited from owning vehicles or fleets of vehicles, a "related to" passenger broker service with *unlawful* State limitation on intrastate broker's activities, the Commissioners' may not enact this provision having the force and effect of law under 49 U.S.C. §14501(1)(b).

34. Under federal law motor carriers must own, rent or lease the vehicles they use. Motor carriers provide transportation for compensation, which is what Uber and Lyft do.  A broker connects (arranges and sells) a passenger with a motor carrier.  Companies can do both, broker and motor carrier, but shall also register as both, to do both.

35. TNC's Uber and Lyft do both, they provide passenger broker and passenger motor carrier services, but have not federally registered to do either.

36. Defendants Uber and Lyft, under illegal California TNC permits, sell and arrange passenger transportation to private vehicles with the consent of the State of California in direct violation of federal laws and regulations which prohibit and fine 49 U.S.C. §14901, such occupation or business conduct.

37. A California TNC Permittee cannot comply with California's prohibition of vehicle and fleet ownership and Federal motor carrier law (49 U.S.C. §13902) which requires vehicle ownership responsibility. This conflict

COMPLAINT- 29

presents an impossible situation.  When such a conflict occurs the State TNC

Permit should be pre-empted. Plaintiff with a federal statutory right of

enforcement seeks the relief here.

## C. CONSTITUTIONAL RIGHTS VIOLATIONS

### 42 U.S.C. §1983 - Civil action for deprivation of rights

38.   The Equal Protection Clause, as set forth in the Fourteenth Amendment,

prohibits a state from denying its residents equal application of the law. The

U.S. Supreme Court has held the Commerce Clause confers "rights,

privileges, or immunities" within the meaning of § 1983. In addition to

conferring power on the Federal Government, the Clause is a substantive

restriction on permissible state regulation of interstate commerce. And

individuals injured by state action violating this aspect of the Clause may

sue and obtain injunctive and declaratory relief.

39.   The three considerations for determining whether a federal statute confers a

"right" within the meaning of § 1983 -- that the provision creates obligations

binding on the governmental unit, that the plaintiff's interest is not too vague

and amorphous to be beyond the judiciary's competence to enforce, and that

the provision was intended to benefit the plaintiff -- also weigh in favor of

COMPLAINT- 30

recognition of a right under the Clause. *Dennis v. Higgins*, 498 U.S. 439 (1991).

40. The Ninth Circuit has recognized the right to challenge the California Public Utilities Commission in federal court when the Commission has exceeded its State authority and regulated in a manner that imposes an unconstitutional burden on interstate commerce. *Federal Exp. V California Public Utilities Comm'n*, 936 F.2d 1075 (9th Cir. 1991)

41. California Public Utilities Code "CPUC" sections 5430 through 5450 violate the Dormant Commerce Clause because they create State consent to do what federal transportation laws (49 U.S.C. §13506(b)(2)) and regulations (49 CFR 372.101) prohibit.

42. The CPUC Codes §5431(c) allow for a "TNC" permit to (broker) to arrange and sell prearranged passenger transportation to private vehicles for compensation. Federal regulations 49 CFR §372.101 and statutes 49 U.S.C. 13506(b)(2) specifically prohibit the arranging or selling of passenger transportation to private vehicles for compensation as an occupation or business.

43. Federal regulation 49 CFR 350.201 and federal law over Intrastate transportation requires the States to enforce, 49 U.S.C. 14501(d)(1)(B) requiring State passenger vehicle registration and passenger authority. The

COMPLAINT- 31

California "TNC" Codes allow private vehicles without State passenger authority to do what federal laws specifically prohibit; the very federal laws the State of California agreed to uphold.

44. The result is Plaintiff (and other drivers) are subject, as the motor carriers found on the street, without State and/or federal passenger authority to be subject to punitive fines of $25,000.00 per violation, under 49 U.S.C. §14901, or for each trip.

45. The CPUC Code section 5434 also limits the insurance liability of the private passenger vehicles, acting as motor carriers of passenger transportation, contrary to 49 U.S.C. §31138. The Code 5440.5(b) continues with recent amendments to apply taxes to passenger transportation indiscriminately (over both interstate and intrastate) arguably or in part engaged in interstate commerce, a taxing territory in the exclusive domain of Congress, and prohibited under 49 U.S.C. §14505.

46. The California Public Utilities Commissioners' and CPUC Does 1-20, State officials violated Plaintiff's Fourth and Fifth Amendment rights as applied to the States under the Fourteenth Amendment.

47. Plaintiff alleges Defendant Commissioners' have violated the Commerce clause as well as, federal laws and regulations and Plaintiff has a Fourteenth Amendment right, under U.S. Supreme Court authority to bring an action for

COMPLAINT- 32

his claims under 42 U.S.C. §1983, which is not limited to racial issues, and includes violations of federal laws.

48. Without a warrant, or other legal process, the Defendant Maritza Perez and CPUC Does 1-20, used unlawful coercion, - the continued validity (active status) of his California TCP Permit, - to unlawfully demand Plaintiff's (and thousands of other drivers) private papers and money.

49. They deprived Plaintiff of his property, denied Plaintiff due process, in their multiple unlawful TCP Permit suspensions and revocations, unlawfully forcing him out of a legal properly State and federal complaint passenger transportation business.

50. Plaintiff (and other drivers) is however allowed by the Commissioners' and CPUC Does 1-20, to continue to provide interstate passenger transportation under Uber and Lyft's illegal TNC broker transportation business, which subject Plaintiff to federal fines of $25,000.00 dollars for each violation.

51. Plaintiff has a right to challenge the California "TNC" Codes permitting State approved conduct prohibited by federal law, without first having been fined by the federal government to establish Article III standing under well-established U.S. Supreme Court authority of *Ex Parte Young*, 209 U.S. 123 (1908) .

COMPLAINT- 33

## D. THE UBER – LYFT <u>ILLEGAL</u> <u>ARBITRATION</u> CONTRACTS

<u>Uber and Lyft Drivers are by Law Exempt from Arbitration</u>

EXEMPTION INCLUDES **PASSENGER** AND FREIGHT WORKERS

52.    It should be beyond question that *"any other class of workers"* as stated in the Federal Arbitration Act's section 1, must at least include Uber and Lyft drivers, including Plaintiff, who transport passengers in interstate commerce that Congress has taken to regulate; (49 U.S.C. §14501(d) (Prearranged ground transportation) and "…has jurisdiction of, as specified in this part, over transportation by motor carrier and the procurement of that transportation, <u>to the extent that **passengers**, property, or both, are transported</u> by motor carrier." (49 U.S.C. §13501).

53.    Congress, therefore, obviously regulates the <u>movement of passengers</u> (49 U.S.C. §14501(d)) *and freight* moving in interstate commerce.

54.    Plaintiff drove (like all drivers) with a *contract of employment* with Uber and Lyft.

55.    Uber and Lyft arrange (broker) passenger transportation across all 48 States.

56.    Plaintiff, like the other Uber and Lyft drivers, has provided Uber and Lyft's *passengers' transportation across state lines*, which is the definition of interstate commerce.

COMPLAINT- 34

57. Plaintiff has transported Uber and Lyft passengers 160 plus miles across California, from California point of origin into Nevada point of destination.

58. Uber and Lyft arrange passenger transportation all across the United States and the drivers cross State lines on a daily basis, again the federal definition of interstate commerce. (49 U.S.C. §13501(1) and 49 CFR §390.5 Interstate commerce)

59. So when Congress says (9 U.S.C.§1) "but *nothing herein contained shall apply* to *contracts of employment* of seamen, railroad employees, or <u>any other class of workers engaged in foreign or interstate commerce</u>, ..... this must include Plaintiff and every other Uber and Lyft driver crossing State lines by the thousands, every day, across the United States of America.

60. Passenger transportation providers, *passenger and freight brokers and passenger and freight motor carriers*, are federally regulated and are, transportation providers required to register as motor carriers. (49 U.S.C. §13904(d) and 49 U.S.C. §14501(d)(1)(A)and (B) and 49 U.S.C. §§13901-13902)

61. Additionally, a passenger broker may not broker (arrange) passenger transportation services to registered motor carrier until it complies with 49 U.S.C. §13904(f) requiring federal Surety Bonds and Insurance compliance under 49 U.S.C. §31138 and 49 U.S.C. §387.307.

COMPLAINT- 35

62. Finally, a broker can only broker to registered motor carriers, 49 U.S.C. §13506(b)(2).

63. Plaintiff has provided, just as other Uber and Lyft drivers have - passenger transportation as directed by Uber and Lyft across state lines, including federally regulated non-exempt and exempt *intrastate* passenger transportation as part of a prearranged *interstate* trip, entirely within California.

64. A quote from Federal Motor Carrier Safety Administration, official, Mr. Peter Chandler, Team Leader, Commercial Passenger Carrier Safety Division: (transportation entirely within California can be interstate)

> *"If a passenger plans a trip involving more than one mode of transportation that begins and ends in different States or a place outside the United States, and has prearranged the commercial motor vehicle portion of the trip, secured by an advance guarantee demonstrating an obligation by the passenger to take the service and the motor carrier to provide the service, all transportation during the trip is in interstate commerce because the passenger prearranged the transportation with persistent intent of continuous interstate movement throughout the trip."*

COMPLAINT- 36

65.  The Uber and Lyft drivers are therefore workers engaged in interstate commerce transportation and are federally regulated.  "Prearranged Ground Transportation," under 49 U.S.C. §14501(d), "The Ride Act."

66.  Plaintiff and other Uber and Lyft drivers are, since at least 2013, effectively the beginning of Uber and Lyft's operations, just like interstate truckers, - transportation workers, regulated by Congress, and exempt from arbitration.

67.  The U.S. Supreme Court has said that (even Uber and Lyft) "independent contractors" like Plaintiff have contracts of employment, just like employees, because "a contract of employment" means a contract to do work." _New Prime v. Oliveira_, 585U.S. __ (January 2019).

68.  The Uber and Lyft drivers are: "any other class of workers, engaged in interstate commerce, and exempt from arbitration under Section 1 of the Federal Arbitration Act. No federal court has jurisdiction to compel Uber and Lyft drivers to arbitration, because private parties cannot grant by contract jurisdiction to the federal courts that Congress choose to withhold.

69.  Passenger transportation providers, including **_Internationally_** operating Uber and Lyft, as TNC Permitted transportation providers, (regardless of vehicle size) who provide interstate transportation are required (under 49 U.S.C. §14501(d)) to register as federal motor carriers (49 U.S.C. §13901).

COMPLAINT- 37

70. In Uber and Lyft's case they are required to register as both motor carriers and brokers. (49 U.S.C. §13904(f) passenger broker) Uber and Lyft have not registered as either.

### E. EMPLOYING TECHNOLOGY –

#### How to Strategically Monopolize Passenger Transportation and Evade Government Interference

P.T. Barnum, Ponzi and J. P Morgan evolved…
Meet Travis Kalanick and Company

71. Travis Kalanick has a dubious business history. His company *Scour* earned its money by selling copyrighted property it did not own or license. The entertainment companies didn't like this and sued Scour for 250 billion, bankrupting the company. Mr. Kalanick also had publically admitted his problems withholding and paying employee income taxes, though it appears the IRS never took any formal action against him. This mindset, improperly profiting from the property of others, continues with his Uber creation.

72. Mr. Kalanick, a computer programmer himself, has designed and led several creative computer programs at Uber, like "Greyball," "God View," and others with improper purposes. Reportedly, Greyball allowed Uber to interfere with enforcement efforts to catch Uber drivers providing

unlicensed passenger transportation, and "God View," allowed Uber employees to track passenger movements, without rider consent.

## MR. KANANICK KNEW HIS BUSINESS WAS ILLEGAL

73.   Mr. Travis Kalanick's *published* "Policy White Paper," essentially admits he knew that brokering passenger transportation to unlicensed private vehicles was as he said: "the technology" known as "ridesharing," was illegal, while ignoring his own unlawful brokering to licensed livery drivers at the time, all across the United States without federal authority. Mr. Kalanick's reported foot-dragging to take his company Uber public were well justified concerns, as shown below.

74.   Mr. Kalanick knew that his Uber transportation business operates unlawfully, because he copied his competitors (LYFT) conduct, which he described as...ridesharing...he knew was subject to fines or criminal misdemeanors and despite Uber's new CEO Dara Khosrowshahi, continues to operate illegally.

75.   Uber and Lyft have evolved into an effective scheme designed to create a monopoly (hidden by the appearance of a duopoly) without government restraint or enforcement.

COMPLAINT- 39

*Follow the Money*

76.     The design of the scheme powers changes through phases and adapts its actions to dominate a market and extract supercompetitive (stock sale) profits, for the insiders, at each phase. The culmination of their business model ends with a dominant market position, a monopoly, successfully extracting supercompetitive pricing accomplished by inadequate well intended government reaction. (i.e., SEE: New York City's recent regulation of rates and vehicle limits, but not contracts, below)

77.     Uber and Lyft are then free to claim blamelessness for their illegal monopoly and their hopeful supercompetitive profits. Uber, in particular, has used vague disguises comparing itself to Facebook and Amazon as having the same network and market dominant abilities – in other words, they can dominate a market they claim is in the tens of trillions of dollars.

78.     The media have reported that the entire taxi and livery market in the United States, pre Uber and Lyft was 23 billion dollars.

79.     Uber and Lyft have increased passenger participation dramatically, at least 5 fold, mainly because they price the transportation below the consumers own cost and that of the drivers under their contracts.

80.     Using the pre-Uber and Lyft, taxi average low cost (based on actual costs of operation) regulated taxi rates (set by regulators not taxi companies) of

COMPLAINT- 40

approximately 2.75 per mile and 50 cents a minute, they should have increased their total gross revenue in the United States alone, to something well north of 120 billion dollars, if they were actually increasing competitive value transportation benefiting the social compact.

81.  Unfortunately, they report considerably less in their respective SEC Form S-1 official filings, combined it's about 52 billion dollars gross worldwide.

## F. GAME THEORY, FINANCIAL MODELING AND ARTIFICIAL INTELLIGENCE

**Computer Programs - IBM Proved they win at Chess and Poker...**

### 1. UBER and LYFT Use Computer Programs Too...

**The Difference – Uber and Lyft's Purpose is Illegal!**

82.  Uber started out selling and arranging "brokering" passenger transportation only to State licensed ("TCP") commercially insured passenger transportation providers, 49 U.S.C. §13506(b)(2), with legally questionable broker conduct.

83.  Lyft began as "Zimride," essentially a web based billboard mostly set up on or for University's (for monthly or annual fees) where riders and drivers without cost could connect with each other. The University's paid for the matching service.

COMPLAINT- 41

84. Lyft however evolved into selling and arranging "brokering" passenger transportation for donations to private vehicles, unquestionably prohibited (illegal) (49 CFR §372.101), as rideshare ("ZimRide") for compensation.

### 2. UBER and LYFT, Separate Entities - One Monopoly

85. Both companies have *evolved jointly* from their origins, and like IBM's Chess program, they have created computer programs, artificial intelligence, that avoid regulatory enforcement, (Uber's "Greyball") control economic flow, prices, driver behavior, passenger choices, erecting barriers to competition, while displacing and destroying legitimate established competitors, including Plaintiff to secure their (duopoly to mask monopoly) monopoly.

86. The difference is, Uber and Lyft's computer programs, its "use of artificial intelligence" and business purposes, unlike IBM's Chess programs, violates federal and California laws for an illegal purpose, and with deception and improper influence, they accomplished their monopoly with unlawful State and improper Federal *pay no attention* Official assistance.

87. The Defendants Uber and Lyft bring their joint resources to bear to lobby regulatory and legislative bodies and execute *highly questionable* legal actions for their near identical unlawful purposes.

COMPLAINT- 42

88. The Plaintiff has lived through, witnessed and experienced their separately appearing yet near identical joint efforts and actions to secure their monopoly.

[ "Pay no attention to that man behind the curtain!" Wizard of Oz ]

89. Plaintiff began driving for Lyft only because Lyft offered a $1000.00 dollar bonus to any driver that signed up and drove 1 trip in a 1 week window.

90. Lyft was so deluged with drivers, there was no way all who signed up could be "properly on boarded" because Lyft's resources could not handle the volume of applicants, not because the drivers failed to do their part. Lyft immediately changed the offer. The bad press caused Lyft to back pedal and complete the advertised offer to those who timely signed up.

91. Uber meanwhile also learned from this incident, and both companies in near identical lock step protect their "offers" and "payouts" to drivers and riders by their respective computer programs, orchestrating behind the curtain of their smartphone application displays.

92. Passengers are provided a display of available vehicles, not based on actual available vehicles, but based on the vehicles Uber and Lyft want available for their income needs. Likewise they have displayed Surge and prime time to drivers (as well as higher base compensation) to encourage driver location.

COMPLAINT- 43

93. Both Uber and Lyft promote their "number of drivers" as needed to provide quick response to passengers. That may be truth in part. The *real* effective truth is it promotes their ability to manipulate passenger behavior and driver services while controlling each driver's ability to accumulate compensation.

94. They know which drivers are (need to be) fulltime and part time, which passengers tolerate higher prices and which only want cheap prices and they take advantage of all their "data" to discriminate against both, in real time.

95. Some examples witnessed by Plaintiff:

   a) Plaintiff had earned a weekly bonus of $100 dollars for completing 60 trips and was close (3 trips away) to earning a weekly bonus of $215 for 100 trips completed. However, this bonus had a string attached; the acceptance rate had to be 90%. Plaintiff went to Levi's stadium as promoted by Uber and Lyft. The Uber and Lyft programs began offering Plaintiff trips outside the "designated holding lot" where he was supposed to be, and offered non-surge or prime time trips 15 to 20 minutes away wiping out Plaintiffs acceptance rate and eliminating all weekly trip completed and potential bonuses. Both could have limited trips offered to the drivers located in the holding lot by location data, but that would mean paying earned bonuses.

   b) Plaintiff with six other Uber Black car drivers set up an experiment to discover why or how Uber appeared to be diverting and cannibalizing Uber Black business in morning rush hours.

COMPLAINT- 44

c) We positioned ourselves at varying distances (half a block to ¾
   mile away in suburban neighborhood) from a regular Uber Black,
   Tuesday 8:00am, *airport destination* passenger. In regular text
   communications between the drivers, at 8:10am no one had
   received a ping from the passenger.  We all had the same Uber
   passenger app open of provided view of available vehicles (Uber
   Black, Select, and UberX).  At 8:14am, Plaintiff received the
   passengers ping for service, but not as Uber Black, as Uber Select.
   (Plaintiff was logged in as both on two different phones and
   accounts)

d) Upon arrival, Plaintiff inquired why the regular Uber Black
   passenger had ordered Uber Select. The Passenger said he was late
   in ordering a car, and the app told him the nearest Black car was 12
   minutes away, and the Select car was 2 minutes away. (Plaintiff
   was around the corner from passengers short pipe stem street in a
   church parking lot as both Uber Black and Select)

e) The deception here was twofold. It misrepresented to the passenger
   the cheaper (Uber Black was a lower flat rate to the airport, Select
   was more expensive by the mile and minute trip. Uber's fee
   commission was 25% for Black and 30% for Select.

f) Needless to say the passenger and driver[s] were not pleased by the
   deception played on them. The passenger paid more; the driver
   received less net compensation; for the same vehicle and driver to
   the same destination. The driver, not remotely located Uber
   received the passenger's discontent.

COMPLAINT- 45

96. Defendants' Uber and Lyft are in the business of selling transportation through Plaintiff who they misclassify as an independent contractor rather than an employee under the California Supreme Court decision in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018) because Plaintiff provides work that is the Defendants Uber and Lyft's usual business. Without Plaintiff's (and other drivers) providing the vehicle and labor as TCP or TNC service, neither would exist.

97. Uber and Lyft's business is sales and arranging, "brokering," of *interstate* passenger transportation, mixed with federally regulated *intra-state* trips making all of Uber and Lyft's transportation business without federal authorization, regardless of the various vehicle sizes, styles, or 7 or less passenger capacity, unlawful.

**3. DRIVERS ARE CONTROLLED LIKE ROBOTS**

98. Uber and Lyft control every critical economic and performance factor of the drivers and the drivers *forced* choice of hours worked:

    a) The TNC drivers have no independent license to operate

    b) TNC drivers are totally reliant on Uber or Lyft for passengers; (Taxis can accept and search for street hails, TCP drivers can have independent business with passengers)

    c) The numbers of passengers available;

    d) the drivers' compensation for fares;

COMPLAINT- 46

e)  the types of rides the passengers see available;

f)  the quantities and types of trips they offer to the drivers.

g)  Bonuses and incentives structured not for driver profit but driver performance in line with their algorithms and their profit. (A low acceptance rate or not enough trips you lose bonus)

h)  They combine their control of the flow of business with control over driver behavior by a rating system using passenger sensors with their algorithms, monitoring fast accelerations, harsh braking, to control and discipline the drivers in many ways more comprehensive than human supervisors and employers ever could;

i)  Uber and Lyft even control and monitor the driver route taken using price to stimulate participation and compensation to control driver long hauling while extending a drivers work hours by economic force to achieve a profit above raw costs.

j)  Uber and Lyft use economic force to control total driver hours worked.

99.  <u>The only thing Uber and Lyft do not control is the drivers physical control of the vehicles used.</u>

100.  Uber and Lyft's near absolute control, except for the driver's actual driving the vehicle as described above is nearly the pure equal to Artificial Intelligence "AI" Cars they claim will make them profitable, it hasn't and, it won't.

COMPLAINT- 47

101. Uber and Lyft's false argument that drivers can start and stop whenever they want defies their manipulated economic force and reality.

102. A tank of gas starts at $35 dollars, the wear and tear on the drivers' vehicle has a cost, and a driver must work to pay for these costs, before earning a nickel's worth of labor. Even a "part time" driver must cover costs to justify their expenses and labor effort.

### Real World Example - Algorithm Driver Earnings

103. Some basic math at current Uber and Lyft unilateral driver compensation - Renting a car from Uber or Lyft – (but they are not supposed to operate fleets of vehicles under TNC permits, which have never been enforced by the CPUC) - has a low daily cost between $75 and $85 dollars a day, for vehicle and gas, with an average generous assumption of gross trip fare of $11 dollars each, less the unlawful broker commission, requires at least 9 trips and 4.5 hours of time to break even on expenses, the driver must continue to drive for another 4.5 hours to earn another $85 dollars for a 9 hour gross of $170 dollars and a net of $9.44 dollars per hour.

104. The assumptions were, "perfect world" generous and assumed a constant flow of "non-manipulated" trip offers and the driver's ability to run uninterrupted for 9 hours. Still it required 9 hours below minimum wage and no overtime pay. The reality of operations is worse.

COMPLAINT- 48

105. The Reality: It requires 300 (30 percent of miles are deadhead) to 500 miles a day and 14 to 16 hours a day to keep net profitable.  There are virtually no real profitable part time "gig" drivers for Uber and Lyft.

106. Drivers, like Plaintiff, who own their commercially registered vehicles (and TNC private vehicles), are worse off; they have commercial insurance and maintenance costs, too.

107. Drivers do not *freely* choose their hours, the algorithms control of the daily ebb and flow of riders and driver economics related to expenses, distribution of passengers, how many, which (rush hours) hours, and how long a driver must work. The Uber and Lyft misrepresentations of these factors claim the drivers are making independent decisions and control their own profit or loss destiny.

108. The reality is Uber and Lyft algorithms control driver vehicle choice, work hours, required overtime hours, what services to offer, what prices are paid, so the drivers' destiny for profit occurs with compliance or suffers a loss for non-compliance with the Uber and Lyft's algorithm control.

109. Uber and Lyft's algorithms act like nearly most employers, only they have improved the "suffer or permit" standard at constantly monitored and executed levels of control not achievable by human employer supervision.

COMPLAINT- 49

110. The truth about Uber and Lyft is that the full time drivers handle 80% of the transportation Uber and Lyft arrange so drivers in fact do not control anything; failing to work long enough leads to certain losses, and only full time overtime hours, below minimum wages, yields a gross profit.

111. Further, Uber and Lyft do not pay anything for the necessary waiting time for a "ping" and deadhead miles every driver must spend to get just one trip. A significant 30 percent of time spent and deadhead miles spent as driver expenses are current and real, yet the Uber and Lyft "AI" car promotional argument avoids.

112. Time is money and AI cars deadheading without out revenue still have wear and tear and exhausts available time not earning money.

113. The drivers have no independence, and do not choose when or how many hours they are available to work, its false Uber and Lyft promotional economic hyperbole; everything is controlled by Uber and Lyft (see list above).

114. They control vehicle choices, amount of fares, compensation, driver conduct, track the route taken to and from destinations, including tracking the off trip miles. They use the fare paying passenger as rating sensors combined with their computer algorithms to control every critical behavior and economic decision of their "so-called" independent contractor drivers.

COMPLAINT- 50

115. The drivers are nothing more than human robotic labor that cost Uber and Lyft only what they unilaterally want and decide to pay, with no basis or consideration for Plaintiff's (or other drivers) costs.

116. The future, of Uber and Lyft's AI car ambitions, including AI computers and sensors to service, refuel and clean these vehicles will only increase their actual costs well above what they now avoid or outright steal.

117. Finally, not one TNC driver, and most TCP drivers like Plaintiff (outside New York City limits of the Taxi and Limousine Commission jurisdiction), in California has any (TNC have no legal license to) real ability to grow a customer base separate from the Uber and Lyft monopoly; Uber and Lyft drivers cannot convert the; "leads generated" into regular fare paying customers, the algorithms fix that by insuring "unique passenger matching."

118. Unfortunately, the drivers taught both Lyft and Uber why and how to limit drivers having regular customers. Drivers would be within 2 or 3 trips from achieving a bonus, after experiencing, like Plaintiff, 12 to 14 hours with no pings for trips and they found a solution. Call a friend, have the friend order and take 2 or 3 short minimum fare trips, total under 20 dollar costs, to secured $100 to $500 dollar bonuses. Uber and Lyft eliminated their expense and the drivers independent (calling a friend and selling your services, collecting the fares, is not unlawful, until Uber and Lyft say it is) operation.

COMPLAINT- 51

119. TNC drivers work for Uber and Lyft's passengers or not at all. The TNC drivers' have no ability to independently acquire, (like taxis) service new or secure regular riders.

120. In fact the Uber and Lyft applications do not match closest or repeat rider-driver trips, the algorithms deliberately avoid repeat riders, and base bonus driver payments on "unique riders" and ding "repeat riders" which the algorithms control.

121. Drivers like Plaintiff, who work under a California TCP Permit, are while independently licensed, in essentially in the same position as TNC drivers; because, again outside New York City, throughout the United States, they *must compete with TNC private vehicle passenger rates* lower than TNC drivers' costs AND at less than one third the legally licensed and insured Plaintiff's TCP licensed rates.

122. Thanks to Uber and Lyft's unilaterally established TNC predatory rates at less than one third the legally licensed TCP and government regulated Taxi rates, no legal operator can compete. The barrier to competition Uber and Lyft have created unlawfully restrains competition even as it cannibalized Uber's Black and Lyft's Lux passenger services. This predatory price action did increase participation of riders and drivers to improve the one metric they use to sell and attract stock investors, "growth" of participants.

COMPLAINT- 52

## 4. THE THREE PHASES OF MONOPOLIZATION

123.   The Uber and Lyft's scheme has three main phases.

124.   The <u>first phase</u> takes advantage of venture capital money to resist regulation and institute below cost predatory pricing, keeping drivers indentured, while attracting consumers and driving out the competition, leaving a barrier to any new competitive entrants.

### Misrepresenting the Cost Benefit of AI Cars

125.   One tactic Uber and Lyft use to attract new and keep existing investors is to misrepresent as cheaper the costs to use "AI Cars" instead of drivers.

126.   As Uber has already proven with 40,000 Uber Xchange leasing cars, with drivers as caretakers and paying usurious rates for the privilege. When used commercially, the vehicles rapidly lose value and require three to six times more service, much more maintenance, (ie. not twice yearly oil changes, but twice monthly oil changes) inflicting a reported 531 million dollar loss for Uber's vehicle leasing effort.

127.   The idea that it makes any rational economic sense for anyone, including Uber and Lyft, to buy the millions of vehicles that Uber and Lyft currently have at their disposal in which they have no acquisition cost, unilaterally set below cost rates for, and do not pay for the operational expenses of, without

COMPLAINT- 53

the added cost of artificial intelligence equipment is beyond all rational business or common sense.

128. The <u>second phase</u> takes advantage of the public stock investor money, to continue the predatory pricing, severely crimping driver income to painful insolvency levels, while varying discounts and surge (prime time) pricing to passengers to increase market share and insure survival to reach the third phase.

129. The <u>third phase</u>, where Uber and Lyft are now, completes the scheme; having created a dominant market position, a duopoly, with supracompetitive pricing created not by them, but by government order, (SEE Section: *New York City Difference* below) enforcing minimum labor and expense payments and limiting the number of vehicles allowed to operate.

130. At each stage the Uber and Lyft insiders profit from private stock sales, like Ponzi, adding new investors and capital, insuring the business can continue to appear to reach its ultimate goal of monopolization and supracompetitive profits. Or as J. P. Morgan once said, "I like a *little* competition."

131. The brilliance of this scheme is the deception used to cover the combined illegal methods and means used to orchestrate it, including the improper assistance of the government, including Uber and Lyft volunteering to pay

"new regulatory fees," which come out of the consumers' pocket, not Uber

and Lyft's, yet, adding to the governments' coffers, in what is today called,

"*regulatory capture*."

132. Uber and Lyft also orchestrated other adaptations to their revenue stream at

key points. Prior to fund raising and Court action settlements, both

companies cut passenger prices and drivers compensation.

133. The purpose of cutting passenger prices was to increase growth in

passengers and passenger participation the *metric* they use to excite and

entice investors, not a path to or actual profits from operations. In fact, Uber

CEO Mr. Kalanick claimed that Uber would reach profitability in 2016,

they didn't, and claim they haven't.

134. As for cutting driver compensation, Uber, in front of a potential 100 million

dollar settlement and Lyft, in front of a 27 million dollar settlement, either

cut compensation directly or began "guaranteed pricing to riders" both

designed to increase the spread between driver compensation and passenger

fares, taking the proposed settlement money they would have to pay months

down the road, directly from the drivers pockets.

COMPLAINT- 55

### Game Theory and Artificial Intelligence

135.   However, this Uber and Lyft scheme is no different than previous illegal Ponzi and Antitrust schemes.  The brilliance of the scheme was its implementation on many levels, courtesy of the evolution of computer technology, artificial intelligence, and game theory.

136.   Think of the computer chess inputs; piece movements, rules, strategies, player ability, in the same way IBM taught its computer to play chess and win.  Only here the Uber and Lyft computer program requires transportation inputs; drivers, vehicles, and government rules, antitrust, transportation and labor regulations, Court rules, all with an end game - beat the established regulatory system.

137.   One of Uber's early forays was its reported "Greyball" program designed to obstruct local (ie. Portland, Oregon) law enforcement in stopping Uber drivers from operating without a license.

138.   Uber and Lyft's business model does the following:

   a)   Following *Ponzi*; it robbed Peter to pay Paul; i.e. Uber and Lyft paid drivers less than their costs and supplemented the cost savings with venture capital funding (make it look legit), to subsidize their version of allowable predatory below cost passenger fares pushing out competitors; Simultaneously using surge or prime time pricing to

COMPLAINT- 56

increase passenger fares, increasing the price spread to reduce their losses.

b)   Uber and Lyft used self-manipulated private stock appreciation to lure and keep investors. Said another way Uber and Lyft sold private stock through multiple series, on a *metric* proving increasing passenger count and participation, at higher and higher stock valuations.

c)   They used *per se* illegal horizontal maximum price contracts with the "independent contractor" drivers.

d)   ...all while creating barriers to defeat established competitors and prohibit new market competitors –

 i.  Uber at 65 percent and Lyft at 35 percent control 90 percent of the "rideshare" market, in the United States, with nearly identical pricing in each market, and submarket. (A Standard Oil antitrust redux)

 ii.  They publicly established their ruthless predator reputation; i.e. in their return to the Austin, Texas market where they drove out new and established for profit competitors, previous independent competitor drivers, livery and taxi, have had no choice but to join Uber and Lyft;

iii.  …taxi companies, most of whom have government controlled higher real rates to cover actual expenses with regulated profits; have prices nearly 3 times (by market) or more than Uber and Lyft's predatory passenger fares;

iv.  Resulting in the taxi and livery companies dramatic collapse in size, merging their remnants, dissolved or declared bankruptcy.

139.  The result of this scheme is in full completion mode.  In New York City, (with more to follow, i.e. Connecticut) they recently established an hourly labor and expense rate applicable to Uber, Lyft and other Transportation Network Companies, or "TNC" or rideshare companies[2].

## G. THE NEW YORK CITY DIFFERENCE
### Proper Vehicle and Driver Regulation Saves Lives

140.  The difference in New York City is significant.  Because the Taxi and Limousine Commission, "TLC" requires compliance with federal law, *in part*, under 49 U.S.C. §14501(d). The TNC vehicles are required to have a

---

[2] TNC, Transportation Network Companies, Rideshare are both interchangeable and refer to the same conduct, arranging passenger transportation to private vehicles for compensation.

COMPLAINT- 58

commercial TNC vehicle registration and the drivers a commercial license for passenger transportation which severely limits driver opportunity misconduct.

**Regulated as "Prearranged Ground Transportation" for a Reason**

141.   The TNC's Uber and Lyft however do not comply with 49 U.S.C. §14501(d)(1)(C), in New York City.  Federal law requires a contract between the transportation provider and the passenger, without the contract between real identified entities, and Uber and Lyft's lack of legitimate contract (including their waybills) fertilizes an environment for "unidentified passengers" to take advantage of the drivers.

142.   Like the Plexiglas screen barrier in taxi's the federal contract requirement, doesn't just show locations, services and pricing, it acts as a virtual barrier because both parties are by operation *identified* and future whereabouts can be determined.

143.   Media reports, not surprisingly report a recent video went viral on the internet of a New York City driver being violently beaten by the passenger.

144.   While the media reports a profuse amount criminal driver abuse across the nation, it doesn't happen, but rarely in New York City who's had more than 50,000 TNC rideshare drivers on the streets among 8.5 million potential

COMPLAINT- 59

passengers daily, because of the regulatory "process," the TLC has created in compliance with federal law 49 U.S.C. §14501(d(1)(B).

145.  Passengers however, who know their identity is obscured, can and have taken advantage of the situation, where the driver is vulnerable, and without a taxi shield between them, the assaults continue.

146.  New York City's Taxi and Limousine Commission, because of Uber and Lyft's (and copycats) predatory pricing which pushed career drivers so hard into financial insolvency, at least 8 driver committed suicides, one 30 year veteran driver blew his brains out, on the steps of New York's City Hall.

147.  The Taxi and Limousine Commission, "TLC" has now mandated minimum hourly labor and an expense rate, on the TNC's, including Uber and Lyft.

148.  This TLC action has raised the rates of passenger fares, to supracompetitive levels, not by Lyft or Uber, but by the government. (quieting passenger complaints)

149.  Uber and Lyft already dominate the New York City market, with a reported 50,000 TNC cars a day operating, against legally licensed medallion taxis of less than 14,000, they have therefore established themselves, created a monopoly, and still avoiding federal broker, motor carrier and insurance law.

150.  The difference is Taxis are inherently local, exempt from federal law and operating legally. Uber and Lyft operate nationally interstate passenger

COMPLAINT- 60

transportation enterprises, in New York City, and the nation, in violation of federal law.

151. By operation of New York's TLC imposition of labor and expense law, Uber and Lyft will now have supracompetitive pricing, (which is what they want) for their monopoly (duopoly) and bigger profits, as they extract their federally unlawful fees by greater percentages, above the costs of drivers.

152. Uber and Lyft's vehicles number more than three (3) times the number of New York Taxi cabs on the streets.

153. Uber and Lyft's illegal TNC vehicles out number legal taxi's and livery vehicles much worse in Plaintiff's San Francisco Bay area market[3].

154. The beginning of this entire illegal scheme should probably be laid at the feet of the California Public Utilities Commission[4], the Defendant Commissioners'.

It's well past time to reestablish the rule of law and ordered liberty.

_____

[3] The San Francisco Bay Area Market is defined and includes all nine (9) counties that are adjacent, adjoin or extend from the boundaries of the City and County of San Francisco, in all directions.

[4] The California Public Utilities Commission or California PUC, or "CPUC" are interchangeable throughout this document in reference to the Commission.

COMPLAINT- 61

## H. GOVERNMENT OFFICIAL'S BETRAYAL OF OFFICE

### The Public Safety Requires Active Actual Federal Supervision

155. Uber and Lyft's illegal business enterprises' could never have reached, on a national scale, the dramatic increase in criminal and civil misconduct that did occur and continues. This is the same misconduct, and unsafe conditions, that led to the prohibition of brokering transportation to private motor vehicles, by the Interstate Commerce Commission, back in 1942!

156. But for the Federal and State Officials' failure to execute their essential duties, we have a repeat result: dozens of murders, hundreds of sexual assaults, and unaccountable physical assaults, and growing, to innocent passengers and drivers. The damage includes the theft of the labor (California IWC Wage Order No. 9) and property of hundreds of thousands of California's deceived drivers, by Uber and Lyft's unscrupulous conduct, one of which is the Plaintiff here.

157. The U.S. Supreme Court explained the overarching federal (I.C.C.) regulatory purpose, SAFETY, in *California v. Zook*, 336 U.S. 725, in (1949).

158. The Federal Defendant Officials have debased their oaths of office by refusing to perform their primary duty to insure the safety of the American people and Plaintiff.

COMPLAINT- 62

**Federal Official Indifference Contributed to Death and Injury**

159. The Defendant federal officials, knew or should have known (they slept at the wheel) that they were allowing the several States' to violate their agreements, with the federal government, which is regulated, 350.201, to comply with federal registration requirements, 49 CFR 390.9a.

160. The States are required (49 CFR§350.201) to enforce the operative federal prohibition of Uber and Lyft's selling or arranging passenger transportation to private vehicles as an occupation or business, 372.101.

161. There has been dozens of murders, hundreds of rapes, and daily assaults, of innocent passengers and drivers, and it continues on a daily basis, most of it would be preventable if the federal regulatory scheme were actually administered and enforced by Defendant Federal officials.

162. The federal Department of Justice had no trouble challenging the State of Arizona in a suit in federal court for its **Arizona Senate Bill 1070**, (seeking to limit harm, unlike the California TNC laws which promote harm) **in** which Department of Justice lawyers argued should be declared invalid because it improperly preempted federal law, and in fact Uber's own current General Counsel, Tony West, former Assistant Attorney General, of the United States, who therefore obviously understands federal preemption of State laws, was on that case.

COMPLAINT- 63

163. It begs credibility that Uber's General Counsel, Tony West, with hundreds of lawsuits against his employer Uber, knows or should know that his employer has been alleged to operate in violation of federal laws and that the State authority TNC and TCP permitting, particularly California's where his office is, is not federally preempted by federal transportation laws.

164. Likewise, Lyft, whose national brokering of interstate transportation is no different in substance than Uber's, hired the former U.S. Secretary of Transportation, Anthony Foxx. According to Bloomberg News, Lyft hired the former Secretary to "help the ride-hailing company navigate new regulatory roadblocks across the United States." Lyft named him the "Chief Policy Officer and Advisor." To date Lyft still has not registered as a broker or a motor carrier, or complied with federal insurance requirements.

165. AGAIN, it begs credibility that the former U.S. Secretary of Transportation has no idea that operating across the United State and Canada, as Lyft does would not be subject to federal regulation by his former agencies.

166. To date no federal official, even with Plaintiff's written complaints to the U.S. Secretary of Transportation and teleconferences with the officials informing the federal FMCSA government official Loretta Bitner, Chief of Enforcement, of the problem has resulted in only one active response, silence.

COMPLAINT- 64

167. The Defendant federal officials knew or should have known that failing to actually perform their primary duties and hold States, including California, accountable to their agreements with the federal government, to act compatibly, to comply with, and to enforce federal transportation laws would lead, as it has in the past, to serious injury and death of innocent drivers and passengers. They have the history, records of Interstate Commerce Commission, "I.C.C." decisions and the laws of Congress. Again, asleep at the wheel.

168. The Plaintiff has, because of the federal officials inaction, suffered deprivation of rights by California, passenger assault, illegal competition taking business away from his legal business, loss of liberty and property by allowing California's State Public Utilities Officials to abuse their authority invading federal jurisdiction, (and other States), and California's unlawful legislative federally prohibited TNC enactments to occur and continue all because of their continued improper, idle and constitutionally disloyal tolerant conduct.

169. Plaintiff seeks declaratory and prospective injunctive relief to secure their compliance with and official duty to, actually supervise, administer and enforce the federal transportation regulatory scheme to insure the safety and

COMPLAINT- 65

transportation regulatory infrastructure in conformance with the Nation's

policies (49 U.S.C. §13101).

## I.   THE STATE OFFICIALS UNLAWFUL CONDUCT

170.  Uber and Lyft's illegal business enterprises' would never have been

possible, but for, the Defendant State Officials abuse of authority in creating

a TNC permit that violates their federal obligations (49 CFR §350.201) and

federal regulations (49 CFR 372.101) and federal law (49 U.S.C. §13506(2).

### The Beginning – CPUC Creates *Frankenstein* TNC Permits

### *Violates Federal Preemption of State Interference*

171.  The Defendant California Public Utilities "CPUC" Commissioners', (now

with other States) violated California's (and other States) agreement to

comply and enforce federal transportation laws.

172.  They created an illegal intrastate broker authority, a TNC Permit, to arrange

transportation with private vehicles (49 CFR §372.101), for the Uber and

Lyft's they claim to regulate.

173.  Aside from the illegal broker authority purpose, the CPUC is specifically

prohibited from enacting any provision having the force and effect of law

*related to* ANY intrastate broker; intrastate rates, intrastate routes or

intrastate services (49 U.S.C. §14501(b)).

COMPLAINT- 66

174. They abused their authority (49 CFR §350.201) and unlawfully invaded federal jurisdiction granting State permission (TNC Permit) to Uber and Lyft, to do what federal regulation (49 CFR §372.101) prohibits, violating federal law, (49 U.S.C. §13506(b)(2)) and the Commerce clause routing the Supremacy clause of the U.S. Constitution.

175. Their DECISION of 2013, creating the TNC Permit, unleashed federal regulatory controls, designed in great part for safe national transportation and which prevented murders, rape and assaults of innocent people, as had occurred in the past.

176. Uber and Lyft's regulatory defiant operations have created an ***easy entrance*** environment - inviting criminal activity while also taking advantage of the large U.S. alien population's (70 percent of the drivers, English is not their first language) labor force for less than fair value; many unauthorized to be in or work in the United States.

177. Uber and Lyft's induction methods and lack of sufficient driver vetting of unauthorized aliens, who already display their lack of respect for law and order by their presence have committed atrociously violent murders and rape all across the United States, including the San Francisco Bay area market.

178. Uber and Lyft reduce the ***Coyotes*** south of the Mexican-American border into rank amateurs. Illegals don't (can't strike) complain and Uber and Lyft

COMPLAINT- 67

claim they are not responsible for the conduct of these, "independent contractors."

179. The Commissioners' "TNC" creation, and their *unequal application of, or failure to equally enforce,* California's labor laws, especially IWC Wage Order No. 9, which was enforced against Plaintiff, BUT apparently not against Uber and Lyft, because Uber and Lyft continue to loot drivers of their labor, property and ability to support themselves and their families, while failing to provide mandatory Workmen's compensation for this inherently dangerous work.

180. The California Commissioners' besides creating their illegal TNC permit has not done anything to actively regulate, enforce, reconsider or prevent the harms to California citizens and Plaintiff that their illegal permit has invited.

181. Meanwhile, the Commissioners', motivated by increased revenues of tens of millions in unlawful Public Utilities Commission Transportation Reimbursement Account "PUCTRA" fees (PUC §421), mostly from Uber and Lyft, for the California purse, apparently secures their official Commission careers, while unlawfully putting irritants like Plaintiff who refused to pay their repeated unlawful fees and late payment fines, out of business.

182.  The fact is, if Uber and Lyft operated legally, employing federal registration, insurance, and labor (including eVerify) laws, rather than disrupting (violating) the laws regulatory purpose, safety; the violence and criminal conduct they inflamed would be, as the Interstate Commerce Commission has previously proven, be dramatically reduced and drivers would not be robbed of their labor and property and markets would be openly competitive.

183.  Congress permanently removed the exemption for "rideshare" for-hire under 49 U.S.C. §13506, to further insure it would not be revived by its Federal Motor Carrier Safety Administration (49 CFR 372.101) or the States.

184.  The trouble for Uber and Lyft is that the truth of the size of the "legal passenger transportation market," contrary to their Securities and Exchange Commission Form S-1, disclosures bragging of the size of *"the available market" in the tens of trillions* would drop to reality; from trillions way down to billions; it's not a ten trillion dollar market, as the Uber Securities and Exchange Commission, Form S-1 states.

185.  No other company has had the nerve to claim an *available market* of tens of trillions of dollars. Investors are already pushing back, and suits are being filed around the country.

186.  The California Public Utilities Commission and its Commissioners' are required, under 49 CFR §350.201, to enforce federal motor carrier and

COMPLAINT- 69

broker registration requirements and to only adopt laws, regulations and rules that are compatible with the federal laws and regulations.

187. They didn't comply; they defied both the obligations of the State of California which had agreed to comply, by accepting MCSAP funds, with federal transportation laws and their own oath of office duties.

188. They abused their official State authority in creating and TNC permitting Uber and Lyft's illegal passenger transportation business.

189. Uber and Lyft used -- (now officially condemned) improper lobbying influence over the Defendant State Officials. Lyft for its part paid former CPUC Commissioner (fined $32,500.00 dollars) Susan Kennedy, who had no lobby license, $15,000.00 a month to lobby the Commissioners.

190. The Commissioners' with reckless abandon, acted beyond their lawful State authority (49 CFR §350.201, PUC Code §421), in direct defiance of State Laws, and in conflict with superior federal transportation authority (49 CFR §372.101, 49 U.S.C. §14501(1)(b), to unlawfully grant Uber and Lyft TNC and TCP permits, to permit conduct which is federally prohibited.

191. The Commissioners' seemed more concerned with collecting unlawful PUCTRA permit fees, in the tens of millions of dollars, for allowing Uber and Lyft to operate and continue to operate, a federally prohibited, illegal

transportation business enterprise, under law, 49 U.S.C. §13506(b) and 49 §372.101which states:

    a) - selling, arranging for, transportation to private vehicles as a regular occupation or business is prohibited –(and illegally competing against Plaintiff's lawful TCP Permitted business) – all while the Commission extracted illegal State license fees (CPUC§421) from Plaintiff and other TCP permitted drivers.

192. The Defendant Commissioners' and their staff, CPUC Does 1-20, not only didn't stop Uber and Lyft's State unlicensed activity, they aided them by, entering a "Settlement Agreement" allowing them to continue operate unlawfully; again violating their oaths of office, including California's agreements to comply and enforce federal transportation laws, and violating federal 49 CFR§350.201, regulations.

193. The Commissioners' created an illegal TNC Permit to allow the permittee to sell or arrange passenger transportation to private vehicles; which allows Uber and Lyft to operate a transportation business that is federally prohibited 49 U.S.C.§372.101, improperly invoking the shield of their State plenary and legislative authority to regulate transportation in the State of California.

194. The Defendant Commissioners' administered their illegal creation directing their staff, employees and agents, Does 1-20 here, to issue their illegal TNC

COMPLAINT- 71

and TCP Permits to Uber and Lyft, allowing them to compete illegally with

Plaintiff, and other legal transportation (Taxi and Livery) providers.

195.   Uber resisted the Commissions' DECISION of 2014, which directed CPUC

Does 1-20 to audit and assess Public Utilities Transportation Utilities

Account, or "PUCTRA" TCP Permittee fees for the past three (3) years,

(reported to be as much as 77 million dollars) because Uber Technologies

Inc., had been continuously operating as a "primary" TCP passenger

transportation provider (a CPUC defined "primary provider") without

authority.

**Violating Plaintiff's Fourteenth Amendment Rights**

196.   CPUC Does 1-20 went to work, as directed, even before the effective date of

the DECISION of May 4, 2018 by suspending Plaintiff's, (and thousands of

others) TCP Permit without prior notice, in April 2018.

197.   On information and belief, Plaintiff claims the CPUC Does 1-20 decided the

best way to verify the amount of PUCTRA fees Uber would owe, would be

to suspend all TCP drivers they knew who had claimed Uber was their

primary carrier, like Plaintiff, to which they had sub-contracted, and would

have Uber issued IRS Form 1099's revealing the sub-carriers gross

passenger fares Uber had charged the riders, and establishing the total gross

COMPLAINT- 72

fares of Uber's TCP conduct without a permit to compute the past due Uber PUCTRA fees.

198. CPUC Does 1-20 after they suspended Plaintiff by their computers notified Plaintiff by letter, approximately April 2018, that he had been suspended for not paying PUCTRA fees in excess of $456.00 dollars because Uber is not a primary carrier responsible for the PUCTRA Fees. Under CPUC rules the primary carrier, (the carrier who sold the transportation is the primary carrier) is responsible for paying PUCTRA fees based on a percentage of the gross fares of the primary carrier.

199. The trouble is the California Public Utilities Code §421, does not allow an open-ended fee based on taxing the gross fares, it requires the CPUC Commissioners' to establish an annual budget and divide the total budget needs among the TCP Permit holders as a fixed fee by vehicle or company, to provide "exactly" for the CPUC declared budget needs, not a penny more or a penny less.

200. The open-ended percentage (1/4 or 1/3 percent) taxing of gross fares for PUCTRA fees would violate State law, (CPUC §421) and result in either an over or under collection of PUCTRA fees contrary to the statute.

201. Defendant Maritza Perez called Plaintiff saying if Plaintiff emailed to her within the hour his private papers, his Uber issued IRS Form 1099's she

COMPLAINT- 73

would immediately upon receipt activate Plaintiff's TCP permit. Ms. Perez said if Plaintiff could not do this within the hour, she would address the suspension at some later time, after receipt of the IRS Forms, but could not say when she would be able to "release the suspension."

202. Plaintiff reasonably believed that his TCP permit, without which he could not earn a living or keep his customers, was being used to coerce Plaintiff into providing the IRS Forms. Plaintiff sent the IRS Forms as demanded, and Ms. Perez immediately restored Plaintiff's TCP permit to active from suspended.

203. Defendant Maritza Perez knew or should have known, that she was abusing her authority, without a warrant or other legal process, violating Plaintiff's Fourth (secure in his papers) and Fifth Amendment (due process) rights as applicable to California by the Fourteenth Amendment by unlawfully demanding Plaintiff's private papers.

204. CPUC Does 1-20 suspension of Plaintiff's TCP permit was for an unlawful purpose, and Plaintiff who refused to pay fees he did not owe, (under either calculation of fees) was unlawfully repeatedly quarterly suspended thereafter, until his TCP permit was finally revoked by the Defendants CPUC Does 1-20.

205. The unlawful suspensions and revocation of Plaintiff's permit violated Plaintiffs due process rights, deprived him of his liberty, seized his private property, and destroyed his lawful business, injuring Plaintiff.

206. The conduct of the Defendant Commissioners' and their staff, employees and agents have violated 49 CFR 350.201 and federal laws 49 U.S.C. §13506(b)(2) and 49 CFR §372.101, including the Commerce clause, causing a deprivation of Plaintiff's rights, liberty and property injuring Plaintiff.

207. The Defendant Commissioners' conduct colluded with Uber and Lyft's improper lobbying efforts to produce an illegal business enterprise unlawfully competing with Plaintiff and causing him competitive injury and loss of business.

208. Defendant Commissioners' have admitted by RESOLUTION, M-4838, issued February 5, 2019 that they had overcharged transportation providers in millions of dollars, under PUC §421 and have reduced the PUCTRA fees for 2019, with no refunds of the overcharges.

209. Additionally, the Commission has no authority under State law to "tax" the gross fares, to charge an annual fee yes, but not based on gross fares, based upon the exact amount of their declared budget needs, yet continue to assert

COMPLAINT- 75

such unlawful authority, demanding reports of gross fares, by their Resolution.

210. The Resolution violates federal law prohibitions taxing interstate passenger transportation 49 U.S.C.§14505(4) the gross receipts derived from such transportation 49 U.S.C. §14501(b) prohibiting regulations related to intrastate rates, routes or services, and is preempted.

211. Plaintiff does not complain to pay fees, as legislatively enacted to the amount of the CPUC budget needs, to allow the CPUC to do its job, but the CPUC Commissioners' abuse of their authority and the intent and purpose of the State and federal laws, violates Fourteenth Amendment rights to due process, causing injury to which Plaintiff seeks equitable remedies, as set forth below.

212. Plaintiff claims he has a right, under U.S. Supreme Court authority under "Ex Parte Young" and "Dennis v. Higgins" decisions to have the State officials stripped of their official Eleventh immunity to answer for their individual misconduct.

213. Plaintiff seeks declaratory and prospective injunctive relief to cure their violation of Plaintiff's rights, federal laws and disgorgement of the unlawful PUCTRA fees paid, as provided for under U.S. Supreme Court authority

COMPLAINT- 76

Dennis v. Higgins, 498 U.S. 439 (1991) by appropriate legal process under 42 U.S.C §1983 and §1988.

## J. ANTITRUST VIOLATIONS – INCLUDE Title 49 U.S.C. §14303

[  "I like a *little* competition." – J. P. Morgan   ]

214. The Uber and Lyft contracts violate section 1 of the Sherman Act of 1890 which prohibits every agreement, "in restraint of trade."

215. Uber and Lyft's written contract, with unilateral price control over tens of thousands of independent driver tradesmen established maximum price fixing which destroys free price competition as a market force in violation of the Sherman Antitrust Act.

216. Uniform price fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman law.

217. The Uber and Lyft unilateral maximum passenger fare pricing contract or agreement with the drivers, including Plaintiff is per se illegal; it is a horizontal contract agreement to eliminate competition between independent contractor drivers of Uber and Lyft, Plaintiff cannot compete with other Uber and Lyft drivers, we all must sell at the same price under the contracts. The U.S. Supreme Court says that is illegal pricing fixing by contract.

COMPLAINT- 77

218. The Uber and Lyft agreements fix maximum prices for Plaintiffs services and other competing drivers restraining Plaintiffs ability to sell his services, offer other services not offered under the Uber and Lyft contracts, in accordance with his own business judgment and consumer requests.

219. The drivers, including Plaintiff, providing transportation for Uber and Lyft enter into express agreements with Uber and Lyft and are by the contract's terms separate "independent contractor" individuals, some as separate legal business entities, all described by written contract as "independent contractor, entities."

220. The contracts under attack are agreements among hundreds of thousands of competing California "independent contractor" drivers concerning the price at which each will offer his own services to a substantial number of consumers.

221. The Uber and Lyft drivers, like Plaintiff here provide rides to separate riders. There is no joint production of the underlying transportation service.

222. This maximum pricing (rates) for passenger transportation among competitors, also prohibits adding services or increasing prices to cover costs or yield to profits among the competitors.

223. While the driver competitors are supposedly allowed to sell at lower pricing or rates, the reality is the Uber and Lyft pricing by operation severely hinder

the ability for drivers to actually accomplish lower prices. (i.e. pricing is already below drivers costs, or driver support is either not responsive or overly burdensome).

224. Uber and Lyft's Maximum prices are fixed too low for the Plaintiff and other drivers to furnish some essential services, (i.e. Meet and greet) of value to the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay.

225. Uber and Lyft's maximum pricing is below the Plaintiff's and other drivers actual costs to the extent their pricing scheme has acquired all the attributes of an arrangement fixing minimum prices.

226. These Uber and Lyft horizontal maximum pricing contracts are said to be illegal per se by the U.S. Supreme Court authority, *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 356-57 (1982).

227. Uber and Lyft could have chosen to operate legally, as Uber already does with its Uber Freight "brokering" smartphone application by using a "bid board" where drivers, including Plaintiff could bid and compete with other drivers based on the offered "trips" origin and destination location, distance of trip, traffic and passenger loads. It is after all supposed to be "prearranged ground transportation, by California and federal law definitions.

COMPLAINT- 79

228. Uber and Lyft continue to enforce their unlawful maximum pricing method using their "uniform price" to the consumer argument, in spite of the fact that there is no valid legal or performance justification for violating an antitrust per se rule, prohibiting maximum pricing fixing because of performance arguments.

229. There are drivers, including Plaintiff, who at times would forgo some profits for passenger revenue, (not forced by Uber and Lyft) that while unprofitable, would recover the cost to return to a driver's home base, but such driver actions are not realistically achievable under the Uber and Lyft operational pricing scheme.

230. The Uber and Lyft contracts which on their face and by operation unlawfully interfere and restrict competition because of their maximum pricing and limiting services, in interstate commerce which should be declared illegal and void.

231. Plaintiff has been harmed by the Uber and Lyft price fixing contracts in violation of Section 1 of the Sherman Antitrust Act, because the Defendants price fixing erected barriers to competition; suffering loss of new customers, loss of existing customers, and operational losses below his costs and profits forcing plaintiff to provide below cost UberX and Lyft trips, instead of Uber Black and Lyft Lux trips.

232. Plaintiff's injuries are the result of Defendants prohibited misconduct the antitrust laws were designed to prevent and he seeks equitable and other legal relief including treble damages for his injuries, as set forth below.

## 1. RELEVANT MARKETS - Service Products

233. The Uber and Lyft defendants participate in the "prearranged ground transportation market, providing passenger transportation in the United States, California and San Francisco bay area markets and submarkets relevant to this complaint.

234. The defendants Uber and Lyft sell arrange and provide service to business and consumer travelers in the federally regulated interstate and intrastate passenger transportation as an occupation and business.

235. Defendants Uber and Lyft by their respective contract terms, contract with two types of providers: (1) independent California commercially registered Transportation Charter Party, "TCP" motor carriers and (2) provide under Uber and Lyft's Transportation Network Company, "TNC" permit services arranging and selling of passenger transportation to independent private motor vehicles in the relevant California and San Francisco market.

## 2. MARKET POWER

236. According to defendant Uber's own admission it claims by its Securities and Exchange Commission Form S-1 filing, a market power of 65 percent of the rideshare market across the United States. Defendant Lyft claims in its Form S-1 a market power of at least 35 percent of the US rideshare market.

237. Defendants Uber and Lyft deliberately by written contract and practice price passenger services and subdivide the relevant markets in substantially the same divides and with near identical pricing to achieve dual horizontal maximum pricing between their tens of thousands or more drivers in a per se illegal price fixing agreement destroying competition between drivers for the relevant market.

## 3. HARM TO COMPETITION

238. Each defendant Uber and Lyft's contracts with the drivers' restraints are aimed at restraining horizontal independent driver competition. Each Defendants' restraint harm competition by:
   a) harming the competitive process and disrupting the proper functioning of the price-setting mechanism of a free markets
   b) restraining drivers from encouraging or pressing each Defendant to compete over driver compensation and passenger rates for service;
   c) insulating each Defendant from aggressive competition from rival drivers with predatory maximum pricing that would otherwise encourage drivers to favor use of those other service providers;
   d) restraining drivers from promoting payment methods other than each Defendant's mandatory payment methods;

e) causing increased prices in the form of higher surge or prime time pricing during high demand events;

f) causing increased prices for services and reducing available services paid generally by customers;

g) reducing output of lower-cost payment methods;

h) stifling innovation in services that would emerge if driver competitors were forced to compete for passenger business at the point of sale; and

i) denying consumers information about the relative costs of each Defendant's General services usage compared to other service usage that would cause more consumers to choose lower-cost or additional services and payment methods.

**Violations of Federal Law 49 U.S.C. §14303**

239. Defendants' Uber and Lyft's core business enterprise sells and arranges transportation via private motor vehicles in all 48 states, it unlawfully "contracts to operate the property of another," the drivers private and commercial vehicles, 49 U.S.C. §14303. This "core business model" is not only specifically federally prohibited by 49 CFR §372.101, regulation, it violates 49 U.S.C. §14506(2) and Federal and State antitrust and transportation laws.

240. Federal transportation law (49 U.S.C. §14303) specifically requires, Uber and Lyft, to secure APPROVAL from the Surface Transportation Board,

"STB", in order to, "contract to operate the property of another carrier, like Plaintiff.

241. Uber and Lyft have never "registered for any federal *motor carrier* or *broker* authority.   Uber and Lyft have never applied for or secured Board approval to contract to operate Plaintiff's, (or any other individuals or companies) vehicle property.  Both have contracted and are *operating other carriers* property for their passenger transportation business.

242. The Uber and Lyft business model violates antitrust laws because it exerts prohibited price fixing from their predatory *maximum* pricing on both of its consumers – the drivers and passengers.

243. Uber and Lyft's unilaterally constructed contracts with Plaintiff and other "independent contractor" driver tradesmen competitors sets maximum prices on all competing drivers for the passenger fares and sets the maximum compensation to the drivers, which are *per se* illegal horizontal price fixing contracts under U.S. antitrust law and U. S. Supreme Court authority under *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982).

244. Uber and Lyft, national brokers, price and divide the Plaintiff's competitive marketplace in essentially identical price rate schedules and their geographic subdivisions the San Francisco market into nearly identical submarket areas, which are all part of Plaintiff's inherently local marketplace.

COMPLAINT- 84

245. In the San Francisco Bay Area market, Uber and Lyft in equal lock step price identically including dividing the market geographically.

246. They divide and price their *submarket* of the East Bay Counties into lower rates versus the higher priced *submarket* of the northern half of the San Francisco Bay Area peninsula.  To the South is the Silicon Valley submarket is priced in between the East Bay and San Francisco submarkets even though it is in the overall Plaintiff's San Francisco Bay Area Market. (SEE: Lyft's November 2018 Driver addendum, for example)

247. The costs to provide the transportation is the same in each submarket, both companies discriminate by gouging the submarket San Francisco peninsula consumers and discounting to the submarket East Bay consumers.  Plaintiff must comply with the discrimination under his respective contracts with each company.

248. The Sacramento district market is priced below all the San Francisco Bay Area markets by Uber and Lyft, but <u>again the costs are the same to provide the service</u>. The discrimination against the consumers and the reduction of competition unfairly destroys a competitive marketplace.

249. The unlawful passenger transportation operations of Uber and Lyft, with their combined marketplace discriminations does explain why their drivers

COMPLAINT- 85

run from their hometown Sacramento marketplace into Plaintiff's San Francisco Bay Area Marketplace.

250. The Uber and Lyft's price discrimination has far reaching affects. Drivers who live in Los Angeles commute to the Plaintiff's San Francisco Bay Area Marketplace to take advantage of the price discrimination.

251. It is beyond belief, but these Los Angeles and Sacramento drivers live out of their cars, sharing rental storage lockers for their belongings to keep trunk space free, use cheap "24 hours fitness" memberships to shower once a day, to work 7 to 10 days before returning home for a few days' rest.

252. Uber and Lyft's economic price discrimination reduces available consumers by thousands to Plaintiff's legally operated passenger transportation business.

253. Plaintiff is injured, as a competitor against Uber, Lyft and other "independent contractor" driver providers contracting with Uber and Lyft, in that he cannot charge reasonable or higher prices or offer other services outside Uber and Lyft's limited offerings. Services and prices he seeks to supply, and passengers' request. (i.e., meets and greet service, baggage assistance from baggage claim)

254. Plaintiff cannot compete legally against the other Uber and Lyft TNC drivers or expand his "independent" business because of the barriers to anyone's competition which Uber and Lyft have erected. Their deadly and illegal

COMPLAINT- 86

TNC business model combined with its predatory maximum pricing driver contracts unlawfully fixes pricing destroying the competitive marketplace.

255. By way of example Ford and Toyota cannot have a contract where they discriminate and sell their vehicles to different "independent" retail dealers across the United States at different prices. (Shipping charges are not vehicle prices).

256. Uber and Lyft use arbitrary rates and capricious price discrimination all across the San Francisco Bay Area Marketplace where Plaintiff provides passenger transportation.

257. For all appearances the Uber and Lyft, rates and pricing appear designed to take advantage of the income levels of the consumers living in the San Francisco submarkets Uber and Lyft have created. There is no material cost variance for Plaintiff to provide passenger transportation anywhere in the State of California.

258. Uber and Lyft do not by their contracts have to consider Plaintiff's costs to provide transportation and they arbitrarily and unilaterally set Plaintiff's compensation as their cost, which could be but are not the same across the Plaintiff's marketplace, the San Francisco Bay Area.

259. Uber and Lyft, like the Maricopa Medical Society doctors, cannot unilaterally set the maximum prices of Plaintiff's and other Drivers

passenger transportation services to the consuming public without violating the Sherman Act section 1 and U.S. Supreme Court authority under Arizona v. Maricopa Medical Society, 457 U.S. 332 (1982)

260.  The only way for Plaintiff or others to compete is to operate illegally. Violate federal transportation and antitrust laws and stiff the driver employees of wages and expenses under California Labor laws. The price fixing restraint combined with civil penalties, to Plaintiff and other independent driver tradesmen are severe (in excess of $25,000.00) are worse than the anti-competitive financial losses and not worth the risk.

261.  Plaintiff cannot rely on Defendant State government officials' appearance of fear of the loss of the Uber and Lyft unlawful TNC permit revenue to look the other way so Plaintiff must compete with Uber and Lyft's illegal business model.

262.  Operating illegally "as a motor carrier," under federal transportation laws subjects the Plaintiff driver, not Uber and Lyft, to huge federal civil fines of more than 25,000.00 dollars per violation, 49 U.S.C.§14901(c), and imprisonment if Plaintiff doesn't pay which defeats the entire purpose of engaging in business. Unless of course you have access to billions in private Venture Capital, that can be replenished by Public stock investors.

COMPLAINT- 88

## K.  UBER AND LYFT "FEE COMMISSIONS" ARE UNLAWFUL

## UNJUST ENRICHMENT

263. Uber and Lyft have always sold their unilaterally controlled cost of driver provided transportation to passengers with a markup, for a gross profit.

264. The Uber and Lyft contracts take a "fee commission" (separate from Uber booking and Lyft service fees) based on the Plaintiff's passenger fares at amounts they set, for passenger transportation they had and have no legal authority to provide.

265. Under California law, unlicensed contractors, doctors without State licensing are not entitled to compensation for their unauthorized services lest they be rewarded for their unregulated conduct.

266. Uber and Lyft have no legal authority under State or federal transportation authorization to arrange or sell any transportation of Plaintiff. The fares Uber and Lyft passengers paid belong to the Plaintiff, as the provider of the service and the terms of the Uber and Lyft contracts.

267. Uber and Lyft deducted "fee commissions" they had no legal right to take from his fares, and Plaintiff seeks disgorgement of the unlawful fee commissions.

COMPLAINT- 89

268. Plaintiff claims Uber and Lyft are not entitled to the "service fee commissions" because it would *unjustly enrich* them them for unlawfully selling and arranging transportation.

**The Uber and Lyft Contracts are Unconscionable**

269. The Uber and Lyft contracts provide zero provision to insure the drivers can cover their actual costs or a return on Plaintiff and other drivers' capital.

270. The Uber and Lyft contracts are one-sided in that Uber and Lyft never lose on a sale.  The always take a fee commission from transportation services performed in which they have no obligation to cover the cost to provide it.

271. The following example describes Uber and Lyft's contract misrepresentation conduct:

    a)  It would be the same as if every Ford Dealer (Uber and Lyft) decided to join together and by their joint contract, tell Ford (the drivers) from now on we are only going to pay you 10K per vehicle even though we know your production cost is 30K.  Yeah, we know you built your inventory (bought your car) last month to insure supply, but if you sell them to me today for 10K, from now on, the payment is going to be lower, but don't worry, you'll sell lots more cars and make it up on volume, we promise!

COMPLAINT- 90

272. The fact is Uber and Lyft by written contract claim the right to unilaterally set the driver compensation, and do set the Plaintiff's compensation without any consideration for the Plaintiff's actual costs of the Plaintiff to provide his legal passenger transportation.

273. Uber and Lyft knew or should have known that Plaintiff's costs to provide passenger transportation are inelastic, like Uber's booking fee and Lyft's service fee.

274. However, Uber and Lyft's unlawful "fee commissions" are elastic as they have both proved by their constant unilateral changes, of their gross profit fee commissions over the time Plaintiff has provided the passenger transportation under both their respective contracts.

275. The fact Uber and Lyft make discount offers to passengers below their commission rate up to and including the entire passenger fare - does not change the unconscionable effect of the financial loss the Uber and Lyft contracts impose on Plaintiff, paying less than Plaintiff's actual cost (and other drivers') for passenger transportation services rendered.

**Inefficient Overhead and Physics Explain the Massive Losses**

276. For all the Uber and Lyft technology efficiency claims, they have higher overhead costs than most any established passenger transportation provider.

277. For anyone paying attention, Uber closed its Uber Xchange Leasing business because even at its usurious rates, (according to Federal Trade Commission findings,) charged to the Uber leasing drivers, Uber lost over $9000.00 a car on a reported 40,000 cars for a 531 million dollar loss, in about 14 months of operation.

278. These cars had a human Uber driver caretaker, AI cars will not have this benefit, and the Uber Xchange vehicles collapsed in value in great part because it's not the vehicle care as much, as the abusive commercial use, at 300 to more than 500 miles a day and severely increased repair and maintenance for the vehicles which render the severe losses Uber incurred. Uber and Lyft's claim that Artificial Intelligence cars will be cheaper to operate than with human drivers will not solve this major physics problem.

**Artificial Intelligence Cannot Restore Commercial Wear on Machines**

279. It is Uber and Lyft's own lack of discipline and inefficient overhead which has caused their massive losses. Their constant pursuit and ultimate goal of _growing riders and drivers_ _at an "any cost" metric, attracts investor capital_, setting up an apparent self-inflicted irreversible **_Ponzi scheme_** trap, for Uber, Lyft and their investors.

COMPLAINT- 92

## L. UBER / LYFT UNCONCIONABLE DRIVER CONTRACTS –

280. Uber and Lyft do not own the labor (employ) or the vehicles they sell for their transportation business.

281. Plaintiff provides transportation services that are Uber and Lyft's usual course of business, without Plaintiff's labor and vehicle, Uber and Lyft would not be able to provide the transportation they arrange and sell.

282. Uber and Lyft control every aspect of Plaintiff's conduct, the economic factors; compensation rates, passenger fares, quantity of and availability of passengers; they actively supervise Plaintiff's conduct and behavior using algorithms and passenger ratings, leaving Plaintiff in false control of one thing, the number of hours he works.

283. Plaintiff's number and choice of hours is controlled by Uber and Lyft's unilateral price controls and the actual flow of business. (ie. The flow of business at 3:30am Wednesday morning is dead slow compared to 2:00am Friday night getting riders home from the bar.)

284. Uber and Lyft's unilateral prices and compensation rates force a minimum number of work hours upon Plaintiff (and other drivers). The breakdown of the annual, monthly and weekly costs to produce a vehicle and labor, are further broken down to a daily cost.

285. As an example, Plaintiff's daily costs to provide a Mercedes Benz, R-Class luxury SUV are approximately $93.00 dollars a day 7 days a week, and $130.00 dollars for a 5 day week. Plaintiff must recover the daily costs before he can earn labor wages or overtime.

286. The Plaintiff (and other misclassified "independent contractor" drivers) owns the labor and the vehicles used to provide Uber and Lyft's transportation services. The Plaintiff (and other drivers) is, by contract, improperly labeled as an independent contractor, deprived of Workmen's Compensation, (IWC Wage Order No.9) and minimum wages, overtime, meal and rest break pay which Uber and Lyft have looted from Plaintiff for the actual value of his labor.

287. Uber and Lyft have violated California Labor Code §2802 in failing to reimburse Plaintiff's vehicle costs and operating expenses.

288. Uber and Lyft have unfairly taken Plaintiffs vehicle, operating expenses and labor without compensation under California Labor Code §2802.

289. Plaintiff has suffered a loss of property and labor because of Uber and Lyft's violation of the California Labor Code §2802.

290. Uber and Lyft are apparently allowed, unlike TCP Permittee's like Plaintiff, by Defendant Commissioners' to avoid California's well-established Industrial Welfare Commission Wage Order No. 9 which requires drivers

COMPLAINT- 94

working, providing transportation to be granted, "employee status,"

including minimum wage, overtime, and Workmen's Compensation, as the

labor law requires.

291. Plaintiff, as a TCP Permittee providing the same passenger transportation, as

Defendants Uber and Lyft was required by the Defendant Commissioners'

and Does 1-20, to execute a declaration under oath that he would comply

with Wage Order No. 9, providing employee status and Workmen's

Compensation to anyone he engaged as a driver for Plaintiff's passenger

transportation service.

292. Defendant Commissioners' and CPUC Does 1-20, are either unequally

applying their mandate to sign a declaration under oath for Plaintiff to

comply with California's Industrial Commission "IWC" Wage Order No. 9,

or deliberately failing to enforce the same requirement upon Uber and Lyft,

contrary to legislative intent.

293. For the Commission to do both is an unequal application of using

"Declarations" to insure Plaintiff's compliance with California's Labor Code

§§3351 and 3352, under Assembly Bill No. 2883 (revised exemptions) while

failing to subject Uber and Lyft to the same compliance.

294. Plaintiff's is injured in his right to equal application of the laws and seek

declaratory and injunctive relief for his injury, as set forth below.

COMPLAINT- 95

295. If Plaintiff must comply under oath, with IWC Wage Order No. 9, before the California Public Utilities Commission will permit Plaintiff to operate, then Uber and Lyft should be also required to comply under oath with California's Labor laws, BEFORE they can continue to operate.

296. Defendants Uber and Uber Does 1-50, Lyft and Lyft Does 1-50 do not pay for and provide Plaintiff with Workmen's Compensation insurance as required by California law and are doing at least one of the following:

   a) Committing perjury before the California Public Utilities Commission
   b) Flagrantly violating California's Labor Codes §§3351 and 3352 requiring Uber and Lyft to maintain worker's compensation for their employee drivers, including Plaintiff
   c) Operating a transportation business in violation of California's Labor codes.

297. Plaintiff is a transportation worker for Uber and Lyft, in a significantly high risk occupation providing passenger transportation, and has been deprived of the Worker's Compensation Insurance that Defendants Uber and Lyft are required by law to provide.

298. Under Uber and Lyft's unilateral predatory maximum pricing scheme they have continued since at least 2015 to unilaterally lower the maximum rate paid to the drivers' below the actual labor and vehicle costs, while increasing

passenger fares to the riders, this expansion between driver compensation and passenger fare pricing, the spread, becomes Uber and Lyft's profit.

299. Uber and Lyft have continued extracting, larger and larger price expansions to increase their total percentages of take in their service fee commissions, reducing Plaintiff and other drivers' compensation into indentured servitude levels of financial advantage.

300. Upon information and belief Uber initiated a cut to Plaintiff's (and other TNC drivers) compensation and passenger fares, in 2015, to predatory levels in front of one of its financing rounds. The purpose was to show rapid growth in passengers serviced and frequency of use, as well as a growth in drivers with a 500 million dollar loss of drivers earning and Uber savings in their costs, increasing their "metric" to entice private venture capital.

301. Upon information and belief, Uber AGAIN, in 2016, cut driver compensation more severely, to ultra-predatory levels, reducing driver earnings by at least 1 billion dollars, and reducing passenger fares, increasing riders and participation faster than non-predatory pricing, BUT improving their "metric" of riders and drivers and total market size, in front of a financing round to attract billions in venture capital.

302. All drivers like Plaintiff have made vehicle expenditure choices and financial commitments (financing vehicles, etc.) based upon Uber and Lyft's

representations, which are unilaterally changed with no concern for the Plaintiff driver's costs, investment or necessary financial expense obligations.

303. Uber and Lyft make no adjustments temporary or permanent for the radical rise in gas prices experienced in Plaintiff's San Francisco Bay Area Market, between the California increasing gasoline taxes by 20 to 40 cents a gallon and the market price exponentially increasing Plaintiff has suffered unnecessary financial harm due to Uber and Lyft's unfair contract terms.

304. Since at least 2013, Uber and Lyft have had no legal authority, and continue to have no legal authority, under State and Federal transportation law, to operate or charge commissions *or broker fees* for their illegal transportation business.

305. Uber and Lyft continue to sell what they do not own, not below just their total cost, but below the owners of the labor and vehicles, of the Plaintiff and other drivers actual cost.

306. This creates a predatory pricing barrier to new market participants and forces out established legal operators, like Plaintiff.  This predatory pricing fixing is why the antitrust laws were put into place; to stop the price gouging of driver or passenger consumers either up or down the economic scales, and prevent the killing of legal competition.

COMPLAINT- 98

307. California's Unfair Practices Act specifically prohibits "loss leader" pricing, that Uber and Lyft practice.

308. Plaintiff is injured by this scheme, was physically abused by unknown passengers, pushed to insolvency, and unlawfully forced out of his TCP Permit passenger transportation business, by the combined treachery between the Defendant State Officials and Uber and Lyft's unlawful conduct.

309. Some drivers have been driven to bankruptcy and some suffer the worst finality - total surrender - suicide!

**M. THE ATTORNEYS** – Government – and Private

310. There are Government Official attorneys, Plaintiff attorneys, Defense Attorneys, all kinds of attorneys involved around the United States in *legal battles* on all sides of Uber and Lyft's conduct.

311. The media, Courthouse News, reports over 430 suits around the country.

312. All of the attorneys have a professional obligation to, at a minimum, (1) investigate the facts and the law, BEFORE formulating strategies and (2) to always before a Court of Law, act with complete honesty and candor in their actions.

COMPLAINT- 99

313. If not for the questionable utilization of their professional talents, to avoid the truth, omit evidence and law, to correct their representations or assist client misconduct, there would have been fewer people dead, raped or harmed and a safer passenger transportation flow throughout the United States.

314. Mr. Theodore Boutrous, and the Gibson Dunn Law Firm, representing Uber in the O'Connor case, especially, given his arguments in a related arbitration of case before the U.S. Supreme Court, attempting to claim that a "contract of employment" does not include "independent contractors" which argument, even this layman Plaintiff thinks is ridiculous. BUT, so did the U.S. Supreme Court in its 8-0 decision. *New Prime v. Oliveira*, 585 U.S. ___(January 2019) (Employees and independent contractors are exempt from the FAA under section 1.)

315. Mr. Boutrous and his firm Gibson Dunn, in spite of an 8-0 defeat continued to keep their Motion to Compel Arbitration of the Uber drivers, pending, as of May 20, 2019, before the District Court, of Northern District of California.

316. Mr. Boutrous and his firm know or should know that their Motion to Compel Arbitration, in the O'Connor v. Uber case is without merit and should have withdrawn it upon the U.S. Supreme Court decision defeat.

COMPLAINT- 100

317.   Certainly they need to earn a living, BUT some need to be held to account when their conduct results in wrongful intended and unintended costs to the life, liberty and property of their fellow citizens, including Plaintiff.

### 1.  Malpractice by Deliberate Omission and Lack of Candor

318.   The Defendant attorneys, representing the Plaintiff, as an unnamed Plaintiff have failed to use the ordinary skill and care in representing Plaintiff (and other class members).

319.   Attorneys have a duty to "investigate the facts and the law" before and after the filing of the complaints and other pleadings. They breached that duty, to Plaintiff and were negligent in not raising several substantial issues, not least of which is Plaintiff's (and other class action driver members) federal statutory right, as workers engaged in interstate commerce to exemption from arbitration under the Federal Arbitration Act ("FAA"), section 1.

320.   The indisputable, well-known fact is that both Uber and Lyft have and are operating in all 48 contiguous States and have no limits to the distance a passenger may travel on their respective smart phone applications.

321.   BY FEDERAL LAW, there can be no limit on the routes (distance) where the drivers can travel to or from, and California's transportation permits

have no set any limit either. This requires no legal discovery process. It begs

credibility that the Defendant Attorneys had no clue the Uber and Lyft

drivers are driving passengers across state lines and are engaged in interstate

transportation, the media reports of driver activity wipeout such excuses.

322.   The plain language of the federal law includes the regulation of ;

"**passengers**, property, or both, are transported by motor carrier," under 49

U.S.C.§13501, General jurisdiction.

323.   The named attorneys knew or should have known that their failure, their

negligence, to raise the "driver exemption" from arbitration in their

pleadings before the courts could or would harm Plaintiff, and the other

drivers, they represent subjecting them to a legitimate malpractice claim by

Plaintiff.

324.   That such a failure or negligence would and did result in adverse decisions,

including significant court system delays fighting meritless Motions to

Compel Arbitration. Thus depriving Plaintiff (and other drivers) of his

substantial statutory rights and result in further financial hardships and

physical and emotional harm. Plaintiff suffered injury because of the

attorneys' failure to exercise ordinary care.

325.   The named attorneys raised "exemption" under section 1 of the FAA, in no

less than 4 other (Caviar, Doordash; Grubhub; Postmates, Jan-Pro) current

and former cases they are prosecuting in State, federal district and appellate courts.

326.   Amazingly none of those other businesses fall within federal transportation jurisdiction nor are they federally regulated. This failure occurred in spite of email and telephone communications between Plaintiff Mendel and lead Attorney Shannon Liss-Riordan, urging her to raise the issue, she refused.

327.   Given Attorney Liss-Riordan's and her fellow Defendant attorneys actions and conduct in their other cases; this refusal was irrational and below the applicable standard of care.  It might be that a win for the drivers means that Uber or Lyft pays the attorney's fees, but does that mean they need to do the minimum required for their clients – regardless of their self-interest – in the millions of dollars.

328.   There are apparently only two conceivable reasons the defendant attorneys irrational failure to assert the readily available evidence or raise and defend the statutory rights of their client Plaintiff (and other drivers): (1) the illegal purpose of the contracts of Uber and Lyft would be discovered by the courts and declared void requiring some form of dismissal (their quantum meruit count was dismissed at least once in the O'Connor case because of the omission) or (2) their main concern, "their earnings - their fees" were improperly placed above the needs of their clients.

COMPLAINT- 103

329.  The Defendant attorneys misplaced priorities are not conjecture by the
      Plaintiff, because it is a fact these attorneys secured a 27 million dollar
      settlement with LYFT previously which regardless of the money
      compensation for the drivers, allows LYFT to continue its federally
      prohibited and illegal business activity with the essentially the STAMP of a
      federal court approval of the LYFT continued illegal business enterprise.

330.  The only thing worse is they are about to do it again. Their pending
      approved settlement seeks to secure the same improper relief for the Plaintiff
      and other drivers in the O'Connor case, while extracting the full or nearly
      full value of their labor, costs and fees, while leaving the drivers, including
      Plaintiff not only woefully short of financial compensation for their losses
      and exemption rights, but will have a federal court STAMP of approval over
      the illegal Uber business model continuing their abuse of the drivers and
      Plaintiff.

331.  Even IF Plaintiff seeks to work as a driver and have a passenger
      transportation business some other way, the antitrust violations of UBER
      and LYFT and their dominant market control through their illegal horizontal
      price fixing contracts have created such formidable barriers to free market
      price discovery and illegal their competition, Plaintiff would have to operate
      illegally and risk severe fines over $25,000.00 for each violation and

                                                        COMPLAINT- 104

imprisonment on top of the financial business and labor losses he would

sustain in even trying to compete.

332.  This failure, by the Defendant Attorneys, to exercise ordinary care, for their

client first, resulted in several major adverse outcomes injuring Plaintiff and

other drivers.

333.  One decision was in the Ninth Circuit, _Mohamed v. Uber_, 848 F.3d 1201,

(9th 2016) (claiming the drivers are subject to arbitration). Another

egregious result was a settlement with Lyft, for well less than fair value that

also secured *tacit* federal district court approval of Lyft's continued illegal

sales and arranging passenger transportation, and its continued forcing of

arbitration on their contracted drivers, who are by conduct and law exempt.

334.  This occurred, in significant part, because the "Courts" lacked the

undisputed factual evidence of drivers crossing state lines, and "engaged in

commerce," which these attorneys had a duty to present. (Uber's attorneys

also mislead the Courts)

335.  The result is no federal district or the Ninth Circuit Appellate Panel, has

complied with Ninth Circuit, and now U.S. Supreme Court authority to

verify their jurisdiction, under 9 U. S. C. §1., first before compelling

arbitration. Federal courts are of limited jurisdiction and have limited power

to compel arbitration.

COMPLAINT- 105

336.   The *Mohamed* appellate court panel improperly implied that the Uber

drivers are subject to arbitration in the related <u>*O'Connor v. Uber*</u> class action,

under the Ninth Circuit, *Mohamed v Uber* decision cited above.  This

miscarriage of justice has injured Plaintiff.  The *Mohamed* panel decision is

in excess the Ninth Circuit's jurisdiction, is voidable as a matter of law as an

act beyond the jurisdiction of the courts. Plaintiff will seek to have the

arbitration contract declared unlawful and void.

## N. THE CONSEQUENCES...

337.  As a result of the Defendant Government Officials, failure to exercise their

lawfully mandated duties, their abuse of power, unlawfully taking millions

of dollars in permit fees and complicity with Uber and Lyft's illegal

enterprise, the consumers, the drivers, including Plaintiff, have paid a

*terribly steep price for this illegal transportation; some with their very lives!*

338.  As of the filing of this complaint, Uber and Lyft have swindled the investing

public, failing to disclose the illegality of their business model in their S-1

filing, by issuing stock in the billions of dollars for a business model, they

claim has trillions of dollars of potential, that has never achieved a profit, is

easily and arguably less efficient than the competition they displaced and

since 1942, is illegal as hell!

COMPLAINT- 106

**THE HEART OF THE COMPLAINT**

### Driver Contracts – DECISIONS – FED-STATE Agreements

339. The Plaintiff has attached the following documents: Defendants Uber and Lyft's, UBER Technologies, Inc., UBER USA, LLC, RASIER-CA,LLC, LYFT, INC., *Driver Contracts*[5] and CPUC Defendants *DECISION[S]* and the Defendant Federal Officials "Federal Register" re: California's agreement to comply with federal transportation laws for receipt of MCSAP grant funding, as included herein as though full set forth.

## II.   THE PARTIES

### THE PLAINTIFF

340. Plaintiff, S. Patrick Mendel is an adult resident of San Leandro, California.

### PLAINTIFF'S STANDING

341. Plaintiff claims Article III standing, to (1) enforce his Constitutional Rights, to (2) enforce his federal statutory rights and to (3) enforce his California Constitutional rights, (4) to enforce and remedy defendants anticompetitive price fixing conduct under the Sherman Act §1, for defendants violations of his respective rights, as alleged and to secure appropriate remedies for

---

[5] The term "contracts" includes the respective Defendants contract terminology regardless of the terms used such as "agreements" or "terms of service" or "addendums" or "amendments" as inclusive of their descriptions.

COMPLAINT- 107

the/his injuries, as set forth throughout his complaint. *Davis v. Passman*, 442 U.S. 228 (1979).

342. Plaintiff, himself complies with 49 U.S.C. §14501(d)(1)(B) having commercial passenger vehicle registration and California TCP passenger authority, and is exempt under 49 U.S.C. §§13506(a)(2) and 13506(b)(1)(B) from federal registration under 49 U.S.C.§14501(d)(1)(A) because his independent business and private clientele remained inherently local, and are not related to Uber and Lyft's misrepresented unlawful and unauthorized federally non-exempt  passenger operations.

343. Plaintiff's standing is similarly situated to the New York licensed livery drivers, having no federal authorities, who had standing to challenge New Jersey's interference with interstate transportation. 49 U.S.C.§ *Black Car Assistance Corporation v. New Jersey*, 351 F.Supp.2d 284 (2004).

344. Plaintiff Mendel has worked as an Uber Driver, since November 2014 and with Lyft as a driver since 2015.

345. Plaintiff Mendel has provided locally exempt passenger transportation for his private TCP permit clients.

346. Plaintiff Mendel, under contract to Uber and Lyft, has provided passenger transportation to Uber and Lyft passengers, as assigned by Uber and Lyft.

347. Plaintiff provided federally exempt and non-exempt interstate passenger transportation throughout California and across State lines into Nevada, all as assigned and directed by Uber and Lyft.

348. Plaintiff has complied with Uber and Lyft passenger requests to provide and complete Uber and Lyft assigned, federally regulated and non-regulated interstate passenger transportation throughout California and across State lines.

349. Plaintiff Mendel has worked as a Lyft driver since approximately March 2015, with a 4.9 plus rating completing over 2600 trips.

350. Plaintiff Mendel has worked as an UberX driver since at least 2014, for 4.5 years with over 2200 trips, and as an Uber Black driver since 2015 for 4 years, with a 4.9 plus average rating and completed over 4500 trips, both as peer-to-peer UberX and Uber Black and Uber SUV accounts

351. Plaintiff Mendel last drove as an Uber Black driver, March 26, 2018, where he spent 18.56 hours online and had 2 trips for gross earnings of $73.94 dollars.

352. Plaintiff Mendel has been injured by the denial of minimum wages, overtime, meal and rest breaks, reimbursement of expenses, charged unlawful

COMPLAINT- 109

commissions, and other misconduct as a direct and foreseeable result of the defendants Uber and Lyft's conduct, as set forth below.

353. Plaintiff Mendel seeks equitable, compensatory and punitive relief for his injuries and damages as more fully set forth below.

## THE DEFENDANTS

## U.S DEPARTMENT OF TRANSPORTATION - Federal Officials

354. Defendant ELAINE CHAO, U. S. Secretary of Transportation, has her primary office at 1200 New Jersey Ave. SE, Washington, DC 20590. is sued in her official capacity, for failing to acknowledge and address Plaintiff's valid complaints of violations of federal transportation laws by the State of California and the California Public Utilities Commission, Uber and Lyft.

355. Under federal law the U.S. Secretary of Transportation has jurisdiction over the transportation conduct of Uber and Lyft under 49 U.S.C. §§13101, the transportation policy of the United States and 13506(b)(2) as well as, 49 U.S.C. §14501, Federal Authority Over Intrastate Transportation. The Secretary has jurisdiction over the violations by the State of California and the California Public Utilities Commission, Uber and Lyft, for violating federal transportation laws and operating regulations, in violation of the Supremacy and Commerce clause of the United States Constitution.

COMPLAINT- 110

356. Her failure to properly administer and train her subordinates to insure the safety of Plaintiff and the American public in carrying out the policies, function and purpose of the Department of Transportation, Federal Motor Carrier Safety Administration division, resulting in Plaintiff sustaining injury.

   a) As a direct and foreseeable result of the failure of defendant ELAINE CHAO, U. S. Secretary of Transportation to carry out her official administrative duties insuring her lower department staff carry out the administration and enforcement of federal transportation laws, Plaintiff has been injured and seeks declaratory and prospective relief as to this defendant;

357. Defendant RAYMOND MARTINEZ, Administrator, Federal Motor Carrier Safety Administration, is sued in his official capacity for failing to comply with federal regulations 49 CFR §1.87, his delegated authority requiring him to carry out his duties under law.  Mr. Martinez failed to act or acknowledge and address Plaintiff's valid complaints made to his subordinate, Loretta Bitner, Chief of Enforcement of the Federal Motor Carrier Safety Administration violations by the State of California and the California Public Utilities Commission, Uber and Lyft, for violating federal

COMPLAINT- 111

transportation laws and operating regulations, in violation of the Supremacy

and Commerce clause of the United States Constitution. and to properly

administer and train his subordinate, Loretta Bitner, who failed to perform

her official duty, to insure the safety of Plaintiff and the American public,

and investigate and enforce the violations of federal transportation laws

reported to her by Plaintiff of Uber and Lyft, resulting in Plaintiff sustaining

injury and Plaintiff seeks declaratory and prospective relief as to this

defendant, as set forth below.

358. Defendant LORETTA BITNER, Chief, Office of Enforcement and

Compliance, Federal Motor Carrier Safety Administration, is sued in her

official capacity for failing to comply with federal regulations 49 CFR §1.87,

her delegated authority requiring her to carry out her duties under law. For

failing to investigate Plaintiffs complaint of Uber and Lyft violations of

federal transportation laws, which she acknowledged and knew or should

have known such violations would lead to serious safety and transportation

law violations, physical and illegal competitive harm to Plaintiff and the

American consumers and Plaintiff seeks declaratory and prospective relief as

to this defendant, as set forth below.

COMPLAINT- 112

359. Plaintiff seeks equitable declaratory and prospective relief against the all Defendant federal officials for their conduct as set forth below.

## CALIFORNIA EXECUTIVE BRANCH - State Officials

360. Defendant GAVIN NEWSOM, the Governor is the chief executive officer of the State of California. It is his responsibility to ensure that the laws of the State are properly administered and enforced. He is sued in his official capacity. because California Public Utilities Codes §§5430-5450 provides for arranging and selling passenger transportation to private vehicles as an occupation or business, conduct which is prohibited under federal law, and usurps the Supremacy clause of the U.S. Constitution, and Plaintiff seeks to have the codes be declared unconstitutional as preempted

361. Defendant XAVIER BECERRA is the Attorney General of California. He is the chief law enforcement officer of California. Defendant Becerra is charged by Article V, Section 13 of the California Constitution with the duty to see that the laws of California are uniformly and adequately enforced. He is sued because California Public Utilities Codes §§5430-5450 provides for arranging and selling passenger transportation to private vehicles as an occupation or business, conduct which is prohibited under federal law, and usurps the Supremacy clause of the U.S. Constitution, and Plaintiff seeks to

COMPLAINT- 113

have the codes be declared unconstitutional as preempted. He is sued in his

official capacity.

## CALIFORNIA PUBLIC UTILITIES COMMISSION -

362. The Defendant Commissioners' as listed below are all members of the

California Public Utilities Commission, "CPUC" and upon information and

belief work in the city of San Francisco, located at 5050 Van Ness Street,

San Francisco, CA.

363. The Defendant Michael Picker, President, Commissioner, California Public

Utilities Commission, and sued in his individual and Official Capacity.

364. The Defendant Carla J. Peterman, Commissioner, California Public Utilities

Commission, is sued in her individual and Official Capacity.

365. The Defendant Liane M. Randolph, Commissioner, California Public

Utilities Commission, is sued in her individual and Official Capacity

366. The Defendant Clifford Rechtschaffen, Commissioner, California Public

Utilities Commission, is sued in his individual and Official Capacity.

367. The Defendant Martha Guzman Aceves, Commissioner, California Public

Utilities Commission is sued in her individual and Official Capacity.

368. The Defendant Maritza Perez is a California Public Utilities Commission, a staff member, self-described as, Section Supervisor Badge #11, Transportation License Section.

369. Plaintiff has attached to this complaint three (3) correct and true copies of CPUC documents: DECISION 13-09-045, September 2013; DECISION 18-04-005, May 2018; and RESOLUTION M-4838, issued February 5, 2019, which are all incorporated herein as though fully set forth

370. Plaintiff sues the CPUC State Officials Commissioners' and staff, including CPUC Does 1-20, individually and jointly for their violations of federal laws and regulations and injuring Plaintiff's substantial constitutional rights and seeks declaratory, prospective relief, and other disgorgement relief as allowed or provided by law.

371. Plaintiff is informed and believes, and on such information and belief allege, that each CPUC State Official Defendant acted in all respects pertinent to this action as the agent of the other State Official Defendant, carried out a joint scheme, plan or policy in all respects pertinent hereto, and the acts of each State Official Defendant is legally attributable to the other State Official Defendant.

COMPLAINT- 115

372. Plaintiff seeks equitable declaratory and prospective and disgorgement relief against the State Official Defendants for their conduct, injuring Plaintiff as described and as set forth below.

## UBER DEFENDANTS

373. Defendant UBER TECHNOLOGIES, INC., is a Delaware corporation headquartered in San Francisco. Uber Technologies, Inc. sells and arranges passenger transportation itself and through its various subsidiaries across the United States and internationally in Canada and Mexico, and other countries around the world.  Uber reports 2018 revenue in excess of 49 billion dollars;

374. Defendant RAISER-CA, LLC is upon information and belief a wholly owned subsidiary of Uber Technologies, Inc., with no known employees or location in California

375. Defendant UBER USA, LLC; and is upon information and belief a wholly owned subsidiary of Uber Technologies, Inc. and has no known employees or location in California.

376. None of the Defendant Uber companies hold federal registration, Surety Bonds or insurance, as required by law, for their passenger operations and Plaintiff has attached, and incorporated herein as though fully set forth of the undisputed proof by true and correct copies from the Official SAFER WEB

COMPLAINT- 116

site of the Federal Motor Carrier Safety Administration, used to verify

authorized operations and they show Uber and its companies have never

held or complied with the federal passenger transportation scheme.

377. Defendant TRAVIS KALANICK, is a Board Member, major shareholder,

and former CEO of Uber and is responsible for the conduct of the Uber

Technologies, Inc., company and its subsidiary companies conduct;

378. Defendant GARRETT CAMP is a Board Member, major stockholder, and

former CEO of Uber and is responsible for the conduct of the Uber

Technologies, Inc. company and its subsidiary companies conduct; ;

379. Defendant RYAN GRAVES is a Board Member, major stockholder and is

responsible for the conduct of the Uber Technologies, Inc., company and its

subsidiary companies conduct;

380. The true names and capacities, whether individual, corporate, associate, or

otherwise, of Defendant Uber's Officers, Directors and Employees sued

herein as UBER DOES 1 through 50, inclusive, are currently unknown to

Plaintiff, who therefore sue Defendant by such fictitious names. Plaintiff is

informed and believe, and based thereon allege, that each of the Defendants

designated herein as a DOE is legally responsible in some manner for the

unlawful acts referred to herein. Plaintiff will seek leave of court to amend

COMPLAINT- 117

this Complaint to reflect the true names and capacities of the Defendants

designated hereinafter as DOES when such identities become known.

381. Hereinafter Uber Defendants and the DOE Defendants shall be referred to

collectively as "Defendants or Uber Defendants."

382. Plaintiffs are informed and believe, and on such information and belief

allege, that each Uber Defendant acted in all respects pertinent to this action

as the agent of the other Uber Defendant, carried out a joint scheme,

business plan or policy in all respects pertinent hereto, and the acts of each

Uber Defendant is legally attributable to the other Defendant.

## ADDITIONAL FACTUAL BACKGROUND OF UBER

383. The Defendants set up its dispatch smartphone application as a means to

assign work to Plaintiff and to send instant messages throughout the work

day, including details about how the work is to be performed. Plaintiff was

required to use the same dispatch application to document, among other

things, the acceptance of the work, arrival and departure times from point of

origin to point of destination, begin movement times, rate passengers and

COMPLAINT- 118

status updates.  Plaintiffs were also required to use the telephone application

to comply with regulatory related documents, including waybills and

recovery of passengers lost items. The application also recorded completed

assignments and related information for purposes of processing payments for

Plaintiff.

384. While the Agreement states that Plaintiff had discretion to refuse

assignments, Plaintiff who has tried to exercise that right did not receive

alternate assignments or was temporarily suspended for minutes or hours or

deactivated for that day and often, after rejecting an assignment, was not

offered new assignments for up to two or more work days, and only restored

after visiting a driver hub for supervisor approval and reactivation. Rejecting

an assignment also resulted in the involuntary permanent termination of

other driver's employment with Uber and Lyft.

385. The Agreements required Plaintiff to abide by Uber and Lyft's "safety rules"

and any policies' or requests of Defendants' customers.

386. Defendants also controlled and limited the compensation paid to Plaintiff.

Plaintiff's remuneration depended on his ability to drive his or rental or lease

vehicle providing the passenger transportation Defendants arranged and sold.

387. The compensation levels were set forth in various "zones" by geo located

boundaries, a rate sheet, which was standardized and not subject to

negotiation. Defendants paid Plaintiff based upon primarily the mileage from the point of origin to the point of destination. Payments were issued weekly, or on demand for a fee deducted from the Plaintiff driver's fare.

388. The Agreements provided that payments to Plaintiff were subject to charge backs, by Defendants and for any trip overcharges, detours due to traffic enlarging passenger fares and loss or damages for which Defendants had sole discretion to hold Plaintiff liable.

389. The Agreements provided that the relationship between Plaintiffs and Defendants was terminable at will by written notice. However, in fact Defendants retained the right to terminate at will without any notice, as they had the power to immediately "deactivate" and cease assigning work to Plaintiff and they exercised that power.

390. At all relevant times, Defendants controlled all aspects of customer relations, including setting the price for the services, agreeing to and processing customer transportation orders, scheduling the transportation, requiring the exclusive method of payment directly to Defendants, prohibited passenger cash or credit card payments directly to Plaintiff and handling customer complaints.

391. The Agreements also required Plaintiffs to carry certain types of insurance and specifies the levels of coverage and who is to be covered and while

required by government regulation were required of Defendants and benefited Defendants business enterprise.

392. Defendants' classification and treatment of Plaintiff as "independent contractors" rather than as "employees" was unlawful.

393. As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants willfully and knowingly failed to reimburse Plaintiff for employment-related expenses, including mileage incurred driving his own vehicles or his rented or leased vehicles in service to Defendants and their customers; the costs of purchasing and/or leasing vehicles and all operation costs associated with the vehicles, including fuel, maintenance, and repair; the costs of various forms and amounts of insurance required by Defendants; purchase of a dedicated smart-phone and related service; and loss and damages determined by Defendants.

394. As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants made unlawful deductions from the wages of Plaintiff for items such as insurance deductibles, fees commissions in addition to Defendants' service fees and Workmen's Compensation insurance.

395. As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants regularly failed to provide a 30-minute off-duty

COMPLAINT- 121

meal period to Plaintiff when he worked more than five hours in a day.

Defendants also regularly failed to provide a second 30-minute meal period

to Plaintiff when he worked more than 10 hours in a day.

396. As a result of Defendants misclassifying Plaintiff as an "independent

contractor," Defendants regularly failed to authorize and permit 10-minute

off-duty, paid, rest periods to Plaintiff every four hours worked or major

fraction thereof.

397. As a result of Defendants misclassifying Plaintiff as an "independent

contractor," Defendants failed to pay minimum wage compensation to

Plaintiff for all hours worked.

**LYFT DEFENDANTS**

398. Defendant LYFT, Inc. is a Delaware corporation headquartered in San

Francisco, California. Lyft sells and arranges passenger transportation across

the United States and into Canada. Lyft reports revenue in excess of 2 billion

dollars;

399. Defendant Lyft, Inc., does not hold federal registration, Surety Bonds or

insurance, for its passenger operations as required by law and Plaintiff has

attached, and incorporated herein as though fully set forth  the undisputed

proof by true and correct copies from the Official SAFER WEB site of the

COMPLAINT- 122

Federal Motor Carrier Safety Administration, used to verify authorized operations and they show Lyft, Inc. has never held or complied with the federal passenger transportation scheme.

400. Defendant LOGAN GREEN, is CEO of Lyft and is responsible for the conduct of the Lyft, Inc., company's conduct;

401. Defendant JOHN ZIMMER, is President of Lyft and is responsible for the conduct of the Lyft Inc. company's conduct;

402. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendant Lyft's Officers, Directors and Employees sued herein as LYFT DOES 1 through 50, inclusive, are currently unknown to Plaintiff, who therefore sue Defendant by such fictitious names. Plaintiff is informed and believe, and based thereon allege, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOES when such identities become known.

403. Hereinafter Defendants and the LYFT DOE Defendants shall be referred to collectively as "Defendants or Lyft Defendants."

404. Plaintiffs are informed and believe, and on such information and belief allege, that each Lyft Defendant acted in all respects pertinent to this action

COMPLAINT- 123

as the agent of the other Lyft Defendant, carried out a joint scheme, business

plan or policy in all respects pertinent hereto, and the acts of each Lyft

Defendant is legally attributable to the other Defendant.

## ADDITIONAL FACTUAL BACKGROUND OF LYFT

405. The Defendants set up its dispatch smartphone application as a means to

assign work to Plaintiff and to send instant messages throughout the work

day, including details about how the work is to be performed. Plaintiff was

required to use the same dispatch application to document, among other

things, the acceptance of the work, arrival and departure times from point of

origin to point of destination, begin movement times, rate passengers and

status updates. Plaintiffs were also required to use the telephone application

to comply with regulatory related documents, including waybills and

recovery of passengers lost items. The application also recorded completed

assignments and related information for purposes of processing payments for

Plaintiff.

406. While the Agreement states that Plaintiff had discretion to refuse

assignments, Plaintiff who has tried to exercise that right did not receive

alternate assignments or was temporarily suspended for minutes or hours or

deactivated for that day and often, after rejecting an assignment, was not

COMPLAINT- 124

offered new assignments for up to two or more work days, and only restored

after visiting a driver hub for supervisor approval and reactivation. Rejecting

an assignment also resulted in the involuntary permanent termination of

other driver's employment with Uber and Lyft.

407. The Agreements required Plaintiff to abide by Uber and Lyft's "safety rules"

and any policies' or requests of Defendants' customers.

408. Defendants also controlled and limited the compensation paid to Plaintiff.

Plaintiff's remuneration depended on his ability to drive his or rental or lease

vehicle providing the passenger transportation Defendants arranged and sold.

409. The compensation levels were set forth in various "zones" by geo located

boundaries, a rate sheet, which was standardized and not subject to

negotiation. Defendants paid Plaintiff based upon primarily the mileage

from the point of origin to the point of destination. Payments were issued

weekly, or on demand for a fee deducted from the Plaintiff driver's fare.

410. The Agreements provided that payments to Plaintiff were subject to charge

backs, by Defendants and for any trip overcharges, detours due to traffic

enlarging passenger fares and loss or damages for which Defendants had

sole discretion to hold Plaintiff liable.

411. The Agreements provided that the relationship between Plaintiffs and

Defendants was terminable at will by written notice. However, in fact

Defendants retained the right to terminate at will without any notice, as they had the power to immediately "deactivate" and cease assigning work to Plaintiff and they exercised that power.

412. At all relevant times, Defendants controlled all aspects of customer relations, including setting the price for the services, agreeing to and processing customer transportation orders, scheduling the transportation, requiring the exclusive method of payment directly to Defendants, prohibited passenger cash or credit card payments directly to Plaintiff and handling customer complaints.

413. The Agreements also required Plaintiffs to carry certain types of insurance and specifies the levels of coverage and who is to be covered and while required by government regulation were required of Defendants and benefited Defendants business enterprise.

414. Defendants' classification and treatment of Plaintiff as "independent contractors" rather than as "employees" was unlawful.

415. As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants willfully and knowingly failed to reimburse Plaintiff for employment-related expenses, including mileage incurred driving his own vehicles or his rented or leased vehicles in service to Defendants and their customers; the costs of purchasing and/or leasing vehicles and all

COMPLAINT- 126

operation costs associated with the vehicles, including fuel, maintenance, and repair; the costs of various forms and amounts of insurance required by Defendants; purchase of a dedicated smart-phone and related service; and loss and damages determined by Defendants.

416. The As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants made unlawful deductions from the wages of Plaintiff for items such as insurance deductibles, fees commissions in addition to Defendants' service fees and Workmen's Compensation insurance.

417. As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants regularly failed to provide a 30-minute off-duty meal period to Plaintiff when he worked more than five hours in a day. Defendants also regularly failed to provide a second 30-minute meal period to Plaintiff when he worked more than 10 hours in a day.

418. As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants regularly failed to authorize and permit 10-minute off-duty, paid, rest periods to Plaintiff every four hours worked or major fraction thereof.

COMPLAINT- 127

419. As a result of Defendants misclassifying Plaintiff as an "independent contractor," Defendants failed to pay minimum wage compensation to Plaintiff for all hours worked.

## THE PLAINTIFF'S ATTORNEY DEFENDANTS

420. Defendants Lichten & Liss-Riordan P. C. is a law firm of the attorneys representing Plaintiff Mendel as an unnamed member in the O'Connor v. Uber class action.

421. At all times herein mentioned, Defendants Lichten & Liss-Riordan P. C, Shannon Liss-Riordan, Adelaide Pagano, Anne Kramer, and each of them, were, and now are, attorneys at law, duly admitted and licensed to practice law in the State of California, and doing business in San Francisco County, California.

422. Plaintiff refers to each attorney individually or as Defendant Attorneys.

423. Defendant Shannon Liss-Riordan, Attorney of the law firm Lichten & Liss-Riordan, P.C. whose role was lead counsel for unnamed Plaintiff Mendel, an unnamed member in the O'Connor v. Uber class action;

424. Defendant Adelaide Pagano, Attorney of the law firm Lichten & Liss-Riordan, P.C whose role was counsel for unnamed Plaintiff Mendel in the O'Connor v. Uber class action;

COMPLAINT- 128

425. Defendant Anne Kramer, Attorney, of the law firm Lichten & Liss-Riordan, P.C., whose role was counsel for unnamed Plaintiff Mendel in the O'Connor v. Uber class action.

426. Defendant Attorneys: Shannon Liss-Riordan, Adelaide Pagano, Anne Kramer, are on information and belief attorneys with the law firm Lichten & Liss-Riordan P. C. and are representing Plaintiff Mendel as an unnamed member in the *O'Connor v. Uber* case number 13-cv-03826-EMC, in the Northern District of California, San Francisco, CA.

427. Plaintiffs are informed and believe, and on such information and belief allege, that each Defendant Attorney acted in all respects pertinent to this action as the agent of the other Defendant Attorneys or their firm Lichten & Liss-Riordan, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each Defendant Attorney is legally attributable to the other Attorney Defendants together or together for their firm Lichten & Liss Riordan, P.C.

428. Defendant Attorneys conduct fell below the applicable standard of care as set forth herein injuring Plaintiff and Plaintiff seeks relief as set forth below.

## III.   DAMAGES

429. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff is owed un-reimbursed business expenses plus interest, repayment

COMPLAINT- 129

of unlawfully deducted wages, including deductions for fee commissions

plus interest, minimum wage plus interest and liquidated damages, premium

pay for missed meal periods plus interest, and premium pay for missed and

unpaid rest periods plus interest, the precise amount of which will be proven

at trial. Plaintiff is also entitled to recover the reasonable attorneys' fees and

costs.

## IV.   **JURISDICTION**

430. This Court has original jurisdiction over the federal law claims, including 15

U.S.C. §§4 and 15, 49 U.S.C. §§13901, 13902, 14303, 14102, 14704, 14707,

1ne 42 U.S.C. §§1983, 1988, under 28 U.S.C. §1331, Federal Question, and

28 U.S.C. §1343 Civil rights, 28 U.S.C. §1332, Amount in controversy, 28

U.S.C. §1336 Surface Transportation Board's orders, 28 U.S.C. §1337,

Commerce and Antitrust Regulations, This Court has authority to review

federal agency action pursuant to the APA, 5 U.S.C. §§ 701-706 and under

28 U.S.C. §1346 United States as defendant.

431. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367

over the claims alleged herein arising under the California Laws and Labor

Code, including but not limited to claims for the following:

    a) reimbursement of business expenses under Labor Code § 2802;

COMPLAINT- 130

b) unlawful deduction from wages under Labor Code §§ 221, 223, 400-410;

c) failure to provide off-duty meal periods and failure to provide off-duty paid rest periods under Labor Code §§ 226.7, 512, IWC Wage Order No. 9;

d) minimum wage and liquidated damages under Labor Code §§ 1194, 1194.2, 1197; and,

e) unfair competition under Bus. & Prof. Code § 17200, et seq.; including restitution arising from Defendants' unlawful business practices, under California's Unfair Competition Law ("UCL"), Business & Professions Code §§ 17203 and 17204.

432. This Court has personal jurisdiction over Defendants because they reside in and have their principal place of business in the State of California, or practice before the federal district court, and/or substantial parts of the unlawful conduct at issue took place in and caused harm in the State of California.

**VENUE**

433. Venue is proper in this District, UNDER 28 U.S.C. §1391, because the Defendants have their principal places of business AND Official State Offices in this District and are subject to personal jurisdiction in this District.

COMPLAINT- 131

and the unlawful conduct at issue was agreed upon and occurred in this District.

## V.   **STATUTORY AND REGULATORY FRAMEWORK**

434. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

**Industry Regulation and Business Reform**

435. Progressive Era reformers pushed for the regulation of business and industry and laws protecting workers and consumers. The Sherman Antitrust Act of (1890) was the earliest attempt to regulate business conduct. The Department of Commerce and Labor was created to enforce federal regulations, particularly those involving interstate commerce. The Mann-Elkin Act (1910) authorized the Interstate Commerce Commission to regulate telegraph and telephone companies. And by 1913, a separate Department of Labor was created to protect the welfare of workers and to improve working conditions.

436. The most important antitrust legislation passed during Woodrow Wilson's administration, which began in 1913, was the Clayton Antitrust Act (1914). The Clayton Antitrust Act attempted to strengthen the Sherman Antitrust Act (1890) by identifying specific illegal practices and business

COMPLAINT- 132

combinations that were against the law if they tended to lessen competition or create a monopoly.

**The Motor Carrier Act**

437. The Motor Carrier Act, (originally enacted in 1935) of deep concern here, also contains antitrust provisions in addition to safety, regulatory and educational requirement for the transportation business (i.e. 49 U.C.S. §14303) as well as compliance and preemption of State authority, as Congress has the plenary "Commerce clause" authority to do over interstate commerce. Some of primary priorities to be regulated, of concern here, included:

- The **<u>Safety of the public</u>**, the drivers and the passengers
- Preventing the Forming of unsupervised monopolies
- Prohibiting Maximum price fixing by contract among competitors without supervision
- Price discrimination, which is charging different consumers different prices for the same service
- Enforcement of labor expense rights from corporate abuse
- Regulating the divergent competitors contracting ability between them to insure each participant, corporate, labor, broker, motor carrier, drivers, and others, an honest and level playing field – the leasing statutes – regulating driver hours - for example.
- Insuring willful State compliance and preventing State Interference of the federal transportation scheme – Preemption

443. Since the removal of the exemption, which has never been restored and in fact has been by federal regulation, 49 CFR §372.101, "rideshare for compensation as an occupation or business IS prohibited, with enforcement upon the States to comply with this prohibition by federal regulation (49 CFR §350.201) as all States had agreed to do by accepting federal MCSAP (highway) funding.

444. Today, as in the years of 1935 to 1941, the preventable criminal mayhem has resurrected and continues because the defendant federal officials have failed to enforce State compliance or enforce Uber and Lyft's illegal brokering of passenger transportation.

445. The States, including California's Defendant CPUC Commissioners' have not only failed to comply with the federal rideshare prohibition, but have defied it by creating a TNC Permit allowing the prohibited conduct, Plaintiff has been assaulted and suffered injury, and the media headlines, on a daily basis report dozens of murders, hundreds of rapes, uncountable assaults, all preventable, if the law is complied with.

446. Plaintiff has operated as a taxi and livery driver for over 30 years and because of the Uber and Lyft unlawful business practices and shame they brought to the industry, he has had his once proud, respected, and trusted

professional status reduced to the equal status of untrustworthy criminals and thieves.

447. Plaintiff is also injured in his business because of Uber and Lyft's unlawful conduct, which has led many consumers to shame and deride him and shun his business, leading to a loss of incalculable valuable customers. This to the point that media reported former U.S. Secretary of Labor Tom Perez, in answering a reporter's query of his use of Uber, said he did not use Uber because of their questionable labor practices.

## VII.   THE FEDERAL REGULATORY PASSENGER SCHEME

### Preliminary Introduction

448. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows:

449. The Plaintiff finds it necessary to explain the federal transportation regulatory scheme by regulation and statutes. The following is in numerical order from lowest to highest and proceeds like a flow chart, only in words rather than graphic pictures.

450. It is important to realize that statutes which may be permissive, (ie. The Secretary may register...becomes mandatory when the regulation says "shall

register" which represents the Secretary's exercise of discretion) can be made mandatory by the underlying regulations; regulations support the laws of Congress in order to effectively execute the transportation scheme.

451. There are some "ambiguities" which appear to occur because the Motor Carrier Act has never been repealed BUT has been amended over 84 years. For example the regulation says "property" not "freight" or "passengers" the confusion or ambiguity can usually be cleared with a macro view of the purpose, rather than a micro literal reading of the words.

**The Federal Transportation Regulations**

452. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

453. Beginning **in 2013**, California's CPUC created the Transportation Network Company Permit, or "TNC."  Next in 2014, Colorado enacted their state-level legislation to authorize and regulate TNC operations. As of June 2017, 48 states and the District of Columbia have passed some sort of TNC legislation, all violative of federal regulations.

454. Every one of these "State TNC Acts," including California's, violates each States' agreements with the federal government, through the Department of Transportation, to comply with, and enforce the federal transportation laws.

COMPLAINT- 137

455. The main thrust of all of these State TNC laws, is to unlawfully permit the arranging of transportation to private vehicles as an occupation or business, in direct defiance of federal laws and regulations, 49 CFR §372.101, which prohibits the arranging of passenger transportation to private vehicles for compensation.

456. Every State had agreed under federal regulation 49 CFR §350.201, (Conditions a State must meet to qualify for MCSAP Grant (highway) Funds), and by implication, to comply with and to not violate federal transportation law.

457. The federal government provides financial assistance to the States to carry out its national policies and commitments for a cohesive joint effort for the benefit of all the American people.

458. Here, we are concerned with transportation and federal "MCSAP" or Motor Carrier Safety Assistance Program funds.  Like most federal grant programs, the federal government attaches strings to the grant money. Strings California agreed to accept.

459. States must agree to perform, to act compatible with the federal transportation scheme and purpose to receive the grant money.

460. All States during the time of this action, from at least 2013 to the present have agreed to act compatible with, Comply with and Enforce Federal

Transportation laws. 49 CFR §350.201 The States Agreed to be Compatible, Comply and Enforce Federal Laws.

461. All of the States, including California have agreed to enforce the federal prohibition against arranging or selling transportation to private vehicles for compensation as an occupation or business, 49 CFR §372.101 Arranging, selling passenger transportation to private vehicles for compensation prohibited.

462. All motor carriers, those entities that sell transportation, who do not own the vehicles used for the transportation must [own] lease or rent the vehicle[s] from the owner to transport *property* by motor carriers registered and regulated under 49 U.S.C. subtitle IV, Part B. (49 U.S.C. §14102 and 49 CFR Part 376 Lease of Vehicles – Requirements)

463. The regulation appears ambiguous, because it refers to property generally, but it is not when read in conjunction to the laws and implementing regulatory relationships, it means passenger and freight motor carriers.

464. However, as the regulation says it applies to all motor carriers regulated under subtitle IV, Part B, which covers both passenger and freight motor carriers. Part B covers motor carriers [freight and passenger], water carriers, brokers, and freight forwarders under 49 U.S.C. §§13101 through 14916, statutes, in other words not just "property" as in freight, but passengers too.

465. Motor carriers of passengers must comply with the federal insurance requirements of 49 CFR Subpart B, [§§387.25-387.43], which in the case of Uber and Lyft means 1.5 million dollars of coverage because the vehicles used have less than 15 passenger capacity.

466. The California (and the other States) is required to enforce 49CFR 392.9a regulation requiring federal registration of brokers and motor carriers for operating authority.

467. The Federal Arbitration Act, section 1, provides that workers, who have an employment contract, and are engaged in interstate commerce, are exempt from arbitration.

468. From at least 2013, Uber and Lyft have been "brokering" arranging and selling transportation across state lines, and drivers have been crossing state lines.

469. Uber and Lyft drivers have been providing prearranged transportation, entirely within California that is part of a planned total interstate journey.

470. The United States Supreme Court said: "the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. United States v. Yellow Cab, 332 U.S. 218 (1947)

COMPLAINT- 140

471. No matter how you slice it, from the interstate brokering by Uber and Lyft, to the drivers crossing State lines, to the Uber and Lyft drivers providing the important "prearranged ground transportation to get to the subsequent flight at the airport, ship port or train station, the drivers are engaged in interstate commerce as much as Uber and Lyft are engaged in interstate transportation.

472. **Example**: Plaintiff accepted an Uber Black ping, and it had been scheduled the week previous by the corporate travel department of his New York City [Manhattan] office, to pick him up from his home in San Francisco home on Russian Hill and transport him to a waiting private jet at the Signature Fixed Base Operator at the Mineta San Jose International Airport.  Plaintiff drove through the security ramp gate and on to the ramp and to the waiting running Corporate Gulfstream jet, where the Uber passenger boarded the aircraft and left to New York. That is interstate transportation entirely within California, by Plaintiff driver and Uber.

473. Certainly not all Uber and Lyft transportation and all the drivers' trips are interstate, but once you cross the line and enter the jurisdiction of Congress and its regulatory agencies, everything you do must conform to the federal regulatory scheme.

474. The line begins, after a motor carrier exceeds 70 miles from the center of his "inherently" local jurisdiction and even one trip, according to I.C.C or

COMPLAINT- 141

FMCSA agency opinions and Federal Appellate Court decisions requires compliance. *I.C.C. v. Mr. B's Services, Ltd*. 934 F.2d 117, (7th Cir. 1991).

475. There is no *de minimis* or trivial amount that is exempt, one trip and you're in federal jurisdiction and must comply, and where Uber and Lyft are concerned, since every driver is subject to being offered, accepting and providing an interstate trip on the next ping, all drivers must be considered as performing interstate transportation. One Trip: *California v. Thompson*, 313 U.S. 109 (1941); *California v. Zook*, 336 U.S. 725 (1949); All drivers who can be expected to drive interstate trips are considered as engaged in interstate commerce: *Morris v. McComb*, 332 U.S. 422 (1947)

476. Uber and Lyft unilaterally set the maximum rates by their contract with the drivers which defined them as "independent contractor" drivers, having independent businesses, such written horizontal (between those controlling a trade or business) contracts that maximum price fix are per se illegal according the U.S. Supreme Court.

477. Uber and Lyft claim with their recent Securities and Exchange Commission, "SEC" Form S-1 official filings that Uber controls 65 % and Lyft more than 35% of the "rideshare" market in the United States. Between Uber and Lyft, who are based in San Francisco, they dominate that market as well.

COMPLAINT- 142

478. No performance or need for "uniform pricing" or rule of reason arguments are to be heard by the court or jury. It is to be condemned.

479. There are exemptions from the federal motor carrier regulations, some apply to Plaintiff Mendel, and none apply to Uber and Lyft.

480. First there are no exemptions for passenger brokers like Uber and Lyft who are required to secure Surety Bonds and financial responsibility under 49 U.S.C. §13904(f) and because they sell passenger transportation for compensation, they take fee commissions from the drivers fares, (both Uber and Lyft also have Booking and Service fees) they are required to register as a motor carrier as well. 49 U.S.C. §13904(d).

481. There are many federal exemptions under 49 U.S.C. §13506, and the two that apply to Uber and Lyft are not exemptions but mandates:

   a) 49 U.S.C. 13506(a)(14) brokers for motor carriers of passengers are not required to have broker authority, BUT cannot broker to unregistered passenger motor carriers and they must comply with 49 U.S.C. §13904(f) securing Surety Bonds and Insurance under 49 U.S.C. §31138.

   b) 49 U.S.C. §13904(b)(2):transportation by motor vehicle provided casually, occasionally, or reciprocally *but not as a regular occupation or business,* except when a broker or other person sells or offers for sale passenger transportation provided by a person

COMPLAINT- 143

authorized to transport passengers by motor vehicle under an
application pending, or registration issued, under this part.

482. By the plain language Uber and Lyft cannot broker to TNC private vehicles.

483. By the plain language of the stature Uber and Lyft must for the protection of
the fare paying passengers and the [driver] motor carriers [Like Plaintiff,
California TCP permitted] secure Surety Bonds, in the event of Uber or
Lyft's insolvency the bonds pay claims; and the insurance in the event of
accidents or other liability.

484. A motor carrier is federally defined as "a person providing motor vehicle
transportation for compensation. (49 U.S.C. §13102(14).

485. Both Uber and Lyft fit the description as well as the Plaintiff.

486. Uber and Lyft must register as motor carriers under 49 U.S.C. §§13901 and
13904(d).

487. Plaintiff need not register as a motor carrier as long as he keeps his
passenger transportation limited to inherently local "personal clientele,"
which he has done.

488. Uber and Lyft are also required to register as a motor carrier under 49 U.S.C.
14501(d)(1)(A) because they are the ones who are national operators selling
interstate transportation and servicing national business and private

passenger travelers from around the world, unlike Plaintiffs few inherently local clients.

489. Uber and Lyft besides unlawfully brokering and contracting with TNC private vehicle drivers also contract with Plaintiff and other Transportation Charter Party Permittees, or TCP Permits.

490. Plaintiff and other TCP Permit holders, who have federally compliant commercial passenger vehicle registration and State passenger operating authority are legal, and perform "inherently local" livery services.

491. Uber and Lyft, national brokers of passenger transportation, however are not allowed to do as they have done which is to contract to operate the property of another motor [the TCP drivers]  carrier; nearly every independent TCP Permitted [motor carriers] entity in the State of California without the approval of the federal Surface Transportation Board, under 49 U.S.C. §14303.

492. The California Public Utilities Commission does not have the authority to grant to Uber or Lyft the TNC authority they have created; to operate from any point of origin to any point of destination throughout California. Such a blanket authority without also requiring federal motor carrier authority is incompatible with previous I.C.C. decisions and federal Appellate authority limiting taxis and livery vehicles to at most a 70 mile limit from the center of

COMPLAINT- 145

their home base. Beyond these limits federal jurisdiction begins and requires

motor carrier authority. Federal district courts are to apply Chevron

deference to the I.C.C. decisions regarding their definitions of the taxi cab or

"inherently" local exemptions. *I.C.C. v. Mr. B's Services, Ltd*, 934 F.2d 117,

(7th Cir, 1991).

493. The California Public Utilities Commission has no authority to regulate the

rates of motor carriers of passengers. 49 U.S.C. §14501(a)(1)(B) except for

requiring a notice of a change in rates 30 days before such changes.

494. The California Public Utilities Commission must comply with 350.201 and

knew or should have known they have no authority to enact ANY provision

having the force and effect of law RELATED to intrastate rates, intrastate

routes, or intrastate services of ANY intrastate broker passenger or freight.

49 U.S.C.§14501(b). SEE: *Federal Exp. V California Public Utilities*

*Commission* 936 F.2d 1075 (1991)

495. The California Public Utilities Commission must comply with 49 CFR

350.201, and has no authority to act incompatibly with federal law requiring

that all State motor carriers, like Plaintiff, must have commercial passenger

vehicle [commercial plates] registration and State passenger [TCP Permit]

authority. 49 U.S.C. §14501(d)(1)(B).

COMPLAINT- 146

496. The California Public Utilities Commission must comply with 350.201, and cannot create a TNC permit, used by Uber and Lyft to broker or arrange passenger transportation to private vehicles which is prohibited by federal law and regulations. 49 U.S.C. §13506(b)(2) and 49 CFR §372.101.

497. Plaintiff has a federal statutory right to remedy the violations of Uber and Lyft that have injured Plaintiff, 49 U.S.C. §14704.

498. Uber and Lyft have taken unlawful fee commissions without having federal authority; have placed incompetent, illegal TNC drivers into Plaintiff's market, causing irreparable harm in taking incalculable business from Plaintiff's legal motor carrier operations.

499. Uber and Lyft continue to operate in defiance of numerous federal requirements destroying Plaintiff's competitive marketplace.

500. Uber and Lyft are liable for damages to Plaintiff as a result of acts or omissions of Uber and Lyft's unregistered motor carrier and broker conduct in violation of Title 49, Subtitle IV, Part B.

501. Defendants Uber and Lyft have injured Plaintiff by failing to comply with federal registration requirements for motor vehicles, 49 U.S.C. 14501(d)(1)(A), and as passenger brokers also acting as motor carriers under 49 U.S.C. 13904(d) which requires Uber and Lyft to register as motor carriers as mandated by 49 U.S.C. §13901, and to comply with 49

COMPLAINT- 147

U.S.C.§13902, to take responsibility for the vehicles they use, by owning or leasing or renting Plaintiffs vehicle property under 49 U.S.C. §14102 and the underlying regulations (49 CFR §387).

502. Plaintiff has been injured because Uber and Lyft have failed to comply with the federal registration scheme by placing completely illegal TNC competitors into Plaintiff's market, causing irreparable incalculable financial harm in the loss of business to their unlawful TNC passenger transportation operations and suffered the loss of vehicle value and operating expenses to which Uber and Lyft have benefitted from but have not paid for.

503. Federal law provides for civil penalties of $25,000.00 dollars for each violation [each interstate trip run] without having registered as a passenger motor carrier, 49 U.S.C §14901, and Plaintiff seeks equitable relief that Uber and Lyft should hold Plaintiff harmless from any civil fines that may be levied against plaintiff by the FMCSA for his provision of interstate transportation to Uber and Lyft passengers because Uber and Lyft were required to have federal authority for their non-exempt interstate passenger transportation, and their failure to comply placed Plaintiff in harm's way for their benefit.

504. This flow chart by words explains how the federal regulatory passenger transportation scheme is supposed to work and be complied with an or was

violated, which the defendants have by their acts as described failed to

comply or by omission caused harm to Plaintiff's to which he seeks

remedies and attorney's fees and costs as allowed by 49 U.S.C. §§14704,

14707.

## VIII.  **CLAIMS FOR RELIEF**

**COUNT ONE** –Violations of APA –

**Failure to Administer and Enforce Transportation laws.**

Elaine Chao, U.S. Secretary of Transportation, Raymond Martinez,
Administrator, Loretta Bitner, Chief Enforcement, FMCSA

505.  The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference, and Plaintiff alleges as follows.

506.  An actual and justiciable controversy exists between the Plaintiffs and

Defendants because Plaintiffs contend, that Defendants' actions and

inactions as described above have violated the constitutional and federal

transportation law provisions cited herein.

507.  Plaintiff brings COUNT ONE against the U. S. Secretary of Transportation

and the Department of Transportation's Federal Motor Carrier Safety

Administration division defendants Raymond Martinez, Administrator of the

FMCSA, and Loretta Bitner, Chief Enforcement Officer, of the FMCSA. Hereafter the "DOT" defendants.

508. Plaintiff seeks a declaration, under 5 U.S.C.§702, that the U.S. Secretary of Transportation, ELAINE CHAO and the Department of Transportation have failed to exercise any positive discretion or take any effective remedial action to repair or restore the violations by California and its Agencies of **Agreements** California agreed to with the federal government for receipt of MCSAP Funding, including conditions to comply and enforce and make only compatible intrastate passenger transportation laws.

509. Plaintiff seeks a declaration, including relief under 5 U.S.C. §705, that the U.S. Secretary of Transportation, ELAINE CHAO and the Department of Transportation have failed to take any effective remedial action, as provided for under 5 U.S.C. §558 to repair or restore the improper making, of California's Transportation Network Company permit, by California, under Public Utilities Codes §§5430-5450 and its California Public Utilities Commission DECISION 13-09-045, Adopting TNC Rules, September 2013, to allow entities to secure TNC permits to sell and/or arrange passenger transportation to private vehicles for compensation as an occupation or business, in direct conflict with the federal regulations 49 CFR §372.101 and

COMPLAINT- 150

federal laws 49 U.S.C. §13506(b)(2), 49 U.S.C. §14501(d)(1)(B), 49 U.S.C.§13901-13902.

510. The Plaintiff seeks a declaration, including relief under 5 U.S.C. §705, that the U.S. Secretary of Transportation, ELAINE CHAO and the Department of Transportation have failed to take any effective remedial action, or active supervision, as provided for under 5 U.S.C. §558 to repair or restore or prevent the illegal operations of Uber Technologies Inc., and Lyft, Inc. using Transportation Network Company "TNC permits secured from the California Public Utilities Commission to sell and/or arrange or broker passenger transportation to private vehicles for compensation as an occupation or business, in direct violation of federal regulations 49 CFR §372.101 and federal laws 49 U.S.C. §13506(b)(2), 49 U.S.C. §14501(d)(1)(B), 49 U.S.C.§13901-13902, 49 U.S.C. §13904(d), and 49 U.S.C.§13904(f).

511. The U.S. Secretary of Transportation and Department of Transportation's delays and inaction to enforce and restore the conflicts, violations and failures to comply with the nations passenger transportation regulations, statutes and Constitutional provisions as cited herein, was without observance of required procedures required by law and in violation of the APA, 5 U.S.C. §706.

COMPLAINT- 151

## **COUNT TWO** - Violation of APA – (Arbitrary and Capricious)

Elaine Chao, U.S. Secretary of Transportation, Raymond Martinez, Administrator, Loretta Bitner, Chief Enforcement

512. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

513. Plaintiff brings COUNT TWO against the U. S. Secretary of Transportation and the Department of Transportation's division, the Federal Motor Carrier Safety Administration defendants Raymond Martinez, Administrator of the FMCSA, and Loretta Bitner, Chief Enforcement Officer, of the FMCSA. Hereafter the "DOT" defendants.

514. There are no grounds to justify, complete inaction or action devoid of any deterrent, remedial, compatible or corrective effect, to assure actual supervision or insure compatible California conduct with the agreements the two sovereigns' made for MCSAP Grant funding , by the U.S. Secretary of Transportation and Department of Transportation, and FMCSA defendants when they knew of should have known serious violations and illegal activity were taking place and required action, failure to so would or could lead to unsafe conditions for drivers and passengers, unregistered rogue operations, because they received complaints and media reported the violative activity,

COMPLAINT- 152

3. Plaintiff be awarded relief under the Administrative Procedures Act, his costs of this action, and such other and further relief as may be appropriate and as the Court may deem just and proper.

**COUNT THREE** – **Violation of Commerce Clause**

(U.S. Const, Art I §8)

Against Defendant Xavier Becerra, Attorney General

515. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

516. An actual and justiciable controversy exists between the Plaintiffs and Defendant California Attorney General XAVIER BECERRA because Plaintiffs contend, that Defendant's actions and inactions as described above have violated the Supremacy and Commerce clauses and Plaintiff's U.S. Constitutional Rights including violations of federal laws and regulation provisions cited herein.

517. Plaintiff brings COUNT THREE against the California Attorney General, XAVIER BECERRA, in his official capacity, as the executive officer responsible for defending and executing the laws of the State of California.

518. Plaintiff alleges California Public Utilities Code §5430 through §5450 are preempted because Congress has occupied the field or preempted the

COMPLAINT- 154

transportation the State has created, or conflicts with federal laws and

regulations as explained herein and violate the Dormant Commerce Clause.

519. The California legislature enacted California's Transportation Network

Company scheme, effective beginning January 2015, or a "TNC" permit

scheme., under Public Utilities Codes §§5430-5450 and delegated regulation

to the California Public Utilities Commission "CPUC."

520. The California Codes §5430-5450, cited herein and throughout violates

federal transportation laws and the Supremacy and Commerce clauses of the

United States Constitution. The Codes allow California's CPUC to exceed

its authority, invade federal jurisdiction and grant to private parties the

ability to evade and avoid federal laws and regulations interfering with and

burdening interstate commerce; the Codes violate California agreement in

accepting MCSAP grants funds to only make provisions have the force and

effect of law compatible with, to comply with and enforce the transportation

laws not avoid, evade and conflict with them, as explained herein.

521. Plaintiff seeks to have the California Codes found in conflict with or

improperly invading a field occupied by Congressional legislation, therefore

violative of the Commerce clause, unconstitutional and declared preempted

522. There are no grounds for California, through its Attorney General to claim it

has any authority to create, or enact the Codes having the force and effect of

law interfering and burdening interstate and intrastate commerce, which they

agreed to be compatible with, comply with and enforce as legislated by

Congress.

**WHEREFORE**, plaintiff prays for COUNT THREE that final judgment be

entered against Defendant and successors declaring, ordering, and adjudging that:

1.      Plaintiff seeks a declaration that the California Codes §5430-

5450, challenged here are unconstitutional and violate the Dormant

Commerce clause and are preempted.

2.      Plaintiff seeks injunctive relief prohibiting the California

Attorney General XAVIER BECERRA and his successors from

implementing or enforcing the challenged Codes,

3.      and requiring an official consult and review with and between

the federal Department of Transportation and its Federal Motor

Carrier Safety Administration, with the California Attorney General's

Office for a period of 2 years, for current and future California

legislative bill or agency or Commission action related to activity

federally defined as passenger brokers, motor carriers or passenger

transportation in vehicles having a capacity of up to 15 or less

passengers that operate in intrastate or interstate transportation and

COMPLAINT- 156

proving such consultation occurred and documenting the conformance

of California with the federal MCSAP funding grant agreements with

federal law and transportation agencies before any California

transportation provisions having the force and effect of law, rule or

regulation can be implemented or administered or enacted by

California or its State Commissions, Departments or Agencies or

Regulatory body.

4.  Plaintiff be awarded his costs of this action, under 42 U.S.C. §1988

and such other and further relief as may be appropriate and as the

Court may deem just and proper.

### COUNT FOUR – Violation of Dormant Commerce Clause
(U.S. Constitution, Art I §8)
Defendant CPUC Commissioners' Maritza Perez and CPUC Does 1-20

523.  The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference, and Plaintiff alleges as follows.

524.  Plaintiff has attached the CPUC official DECISION"S 13-09-045 and 18-04-

005 of the Commissioners' to this complaint and are incorporated here as if

set forth in their entirety.

COMPLAINT- 157

525. An actual and justiciable controversy exists between the Plaintiffs and Defendants California Public Utilities Commission, Commissioners' named herein, Maritza Perez and Does 1-10, hereafter "CPUC Defendants" because Plaintiffs contend, that CPUC Defendant's actions and inactions as more fully described herein have violated federal laws causing violations of the Supremacy and Commerce clauses and Plaintiff's U.S. Constitutional Rights including violations of federal transportation laws and regulation provisions cited herein.

526. Plaintiff brings COUNT FOUR against the California State officials "CPUC Defendants", in their official capacity, as Commissioners' and staff of the California Public Utilities Commission responsible for regulating passenger and freight ground transportation of the State of California.

527. Plaintiff alleges the official DECISIONS, numbered 13-09-045, effective September 19, 2013 and 18-04-005, effective May 4, 2018 and attached to this complaint and included herein as though fully set forth are violative of federal laws and regulations, and conflict with and interfere with a transportation field Congress has occupied and the State of California in accepting MCSAP Grant Funds, has agreed to comply, enforce and be compatible with, as explained herein and the DECISIONS violate those

State agreements and the Supremacy and Dormant Commerce Clauses of the United States Constitution, and Plaintiff's constitutional rights.

528. The CPUC Agency, has created by DECISION 13-09-045, Adopting TNC Rules, September 2013, the TNC permit scheme allows entities to secure TNC permits to sell and/or arrange passenger transportation to private vehicles for compensation as an occupation or business, contrary to and in direct conflict with, and occupy the field Congress has legislated in the federal regulations over interstate and intrastate commerce under, at least 49 CFR §372.101 and federal laws 49 U.S.C. §13506(b)(2), 49 U.S.C. §14501(d)(1)(B), 49 U.S.C.§13901-13902, and as set forth herein.

529. The Defendant CPUC Commissioners' as State officials have exceeded their authority and granted to private parties the ability to evade and avoid federal laws and regulations and financial responsibility causing interfering with, and burdening interstate commerce and improperly occupied Congress' legislative field and violated the federal transportation laws in violation of the Supremacy and Commerce clauses of the U.S. Constitution.

530. Plaintiff contends the Commissioners' directed their staff, by their DECISION 18-04-005, to conduct an audit of Transportation Charter Party Permit "TCP" holders (commercial vehicle and passenger authority) including Plaintiff.

COMPLAINT- 159

531. Plaintiff contends the CPUC Defendants' suspended his TCP Permit without notice or due process before the CPUC DECISION, 18-04-005, effective May 4 2018, had even become effective, and did so without any legal or just reason.

532. Their staff member, Section Supervisor, Maritza Perez, used coercion, the active or inactive status of Plaintiff's TCP Permit, to force Plaintiff to surrender his private papers, while demanding money, unlawfully under California Public Utilities Code §421, in violation of his Fourth and Fifth Amendment rights as applied to the States through the Fourteenth Amendment.

533. Plaintiff contends that he was fully compliant with his TCP Permit and its reporting obligations and fees, yet suffered several suspensions and revocations without due process and by unjustified unlawful means injuring him in his substantial rights and liberty interests.

534. Plaintiff contends the actions of the CPUC defendants all was a significant factor in unlawfully stopping him from earning an honest living in the profession of his choice and destroying his lawful business.

535. Plaintiff contends that the Commissioners' have never suspended or revoked the Defendants Uber or Lyft for their unlawful operations, even after issuing a letter to cease and desist, and granted a "Settlement Agreement" to allow

COMPLAINT- 160

Defendants Uber and Lyft to continue to operate without State or federal operating authority to provide regulated passenger transportation.

536. Plaintiff contends that he was treated to unlawful unequal application of the CPUC laws, rules and regulations in violation of his rights as an individual proprietor worker versus the CPUC Defendants favoring Corporations who the CPUC Defendants favor and appease because of improper lobbying, as set forth herein.

537. Plaintiff contends that the CPUC Defendants demonstrate their discrimination by allowing Defendants Uber and Lyft to continue to operate for 5 years, without proper State TCP authority and TNC authority, or required federal operating authority while violating Plaintiff's Fourteenth Amendment rights by suspending Plaintiff for operating lawfully in violation of his rights to be secure in his papers and property of the Fourth Amendment and right to due process and equal application of the laws of the Fifth Amendment causing injury to Plaintiff's rights and property.

538. The Plaintiff alleges California Public Utilities Commission DECISIONS, numbered 13-09-045 and 18-04-005 are preempted because Congress has occupied the field or preempted the transportation the Commission has unlawfully created and conflicts with federal laws and regulations and unlawfully burdens federally regulated interstate and intrastate commerce in

COMPLAINT- 161

a field occupied by Congress' legislative Acts, laws and regulations as set forth and explained herein and violate the Supremacy and Dormant Commerce Clauses of the United States Constitution.

539. The CPUC Defendants' DECISIONS enacted California's Transportation Network Company scheme, effective beginning January 2013, or a "TNC" permit scheme, and continue their unlawful interference with their DECISION 18-04-005, effective May 4, 2018 allowing for illegal or unlawful and unregulated competitors to compete with Plaintiff's lawful TCP permit and business.

540. The CPUC Defendants DECISIONS cited herein and throughout violates federal transportation laws and the Supremacy and Commerce clauses of the United States Constitution. The Codes allow California's CPUC to exceed its authority, invade federal jurisdiction and grant to private parties the ability to evade and avoid federal laws and regulations interfering with and burdening interstate commerce; the Codes violate California's agreement in accepting MCSAP grants funds to only make provisions have the force and effect of law compatible with, to comply with and enforce the transportation laws and not to avoid, evade and conflict with them, as explained herein.

541. Plaintiff seeks to have the California Codes found in conflict with or improperly invading a field occupied by Congressional legislation, therefore violative of the Commerce clause, unconstitutional and declared preempted

542. There are no grounds for Defendants Commissioners through its California Constitutional authority to claim it has any authority to create, or enact the Codes having the force and effect of law interfering and burdening interstate and intrastate commerce, which their State of California had agreed to be compatible with, comply with and enforce as legislated by Congress.

**COUNT FIVE** – **Plaintiff's Fourteenth Amendment Rights**
(42 U.S.C. §1983, 1988)
Defendant CPUC Commissioners' Maritza Perez and CPUC Does 1-20

543. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

544. Plaintiff has attached the CPUC official DECISION"S 13-09-045 and 18-04-005 of the Commissioners' to this complaint and are incorporated here as if set forth in their entirety.

545. Plaintiff has also attached the CPUC RESOLUTION issued 2019 and is incorporated herein as it fully set forth, because of its relevance regarding the Plaintiff's PUCTRA fees dispute herein.

COMPLAINT- 163

546. An actual and justiciable controversy exists between the Plaintiff and Defendants California Public Utilities Commission, Commissioners' named herein, Maritza Perez and Does 1-20, hereafter "CPUC Defendants" because Plaintiff contend, that CPUC Defendant's actions and inactions as more fully described herein have violated federal laws causing violations of Plaintiff's Fourth and Fifth Amendment as applicable to the States through the Fourteenth Amendment, of the U.S. Constitution and the Commerce clause cited herein.

547. Plaintiff brings COUNT FIVE against the California State officials "CPUC Defendants", in their official capacity, as Commissioners' and staff of the California Public Utilities Commission Maritza Perez and Does 1-20, responsible for executing, regulating and administering the DECISIONS of the California Public Utilities Commission, Commissioners.'

548. Plaintiff alleges the official DECISION'S, numbered 13-09-045, effective September 19, 2013 and 18-04-005, effective May 4, 2018 and attached to this complaint are violative of federal laws and regulations, and conflict interfere and burden interstate commerce;  a transportation field Congress has occupied and the State of California by accepting MCSAP Grant Funds, has agreed to comply, enforce and be compatible with, as explained herein.

549. The DECISIONS violate those State agreements, the Supremacy and Dormant Commerce Clauses of the United States Constitution, and Plaintiff's constitutional rights, to due process and to be secure in his liberty interests, private papers and property as set forth herein.

550. The CPUC Agency, has created by DECISION 13-09-045, Adopting TNC Rules, September 2013, the TNC permit scheme allows Defendants Uber and Lyft to secure TNC permits to sell and/or arrange passenger transportation to private vehicles for compensation as an occupation or business, contrary to and in direct conflict with, the field of law occupied by Congress which has legislated federal authority over interstate and intrastate commerce under, 49 CFR §372.101 and federal laws 49 U.S.C. §13506(b)(2), 49 U.S.C. §14501(d)(1)(B), 49 U.S.C.§13901-13902, and as set forth herein.

551. The Defendant CPUC Commissioners' as State officials have exceeded their authority, violated California's Agreement with the Department of Transportation, and granted to private parties the ability to evade and avoid federal laws and regulations and financial responsibility causing, interfering with, and burdening interstate commerce and causing unlawful competition harming Plaintiff and causing him loss of customer business and financial injuries.

552. Plaintiff contends the Commissioners' directed their staff, by their DECISION 18-04-005, to conduct an audit of Transportation Charter Party Permit "TCP" holders (commercial vehicle and passenger authority) including Uber and Plaintiff.

553. Plaintiff contends such audit was unlawful and for an improper purpose. The CPUC Defendants have no authority under State or federal law to tax the gross fares (whether intrastate or interstate). Their only the authority, lies in California Public Utilities Code §421, to establish a fixed fee for TCP permits based upon the CPUC predetermined annual budget needs, which has no bearing or relationship to Plaintiff's business earnings.

554. Plaintiff contends the CPUC Defendants' suspended his TCP Permit without notice or due process and demanded approximately $457.00 plus dollars, as an alleged tax on his gross receipts which they had no authority to demand.

555. The CPUC DECISION, 18-04-005, became effective May 4, 2018, , directing the CPUC staff to conduct the unlawful audit of Plaintiff and they did so in April 2018 before the DECISION was effective, and their actions were without any legal or just lawful reason.

556. Their staff member, Section Supervisor, Maritza Perez, used coercion, the active or inactive status of Plaintiff's TCP Permit, to force Plaintiff to surrender his private papers, while demanding money, unlawfully under

COMPLAINT- 166

California Public Utilities Code §421, in violation of his Fourth Amendment

to be secure in his person, papers and property and Fifth Amendment, due

process rights, as applied to the States through the Fourteenth Amendment.

557. Plaintiff contends that he was fully compliant with his TCP Permit, the

required reporting obligations and proper fees, yet suffered several unlawful

suspensions and revocations without due process and by unjustified unlawful

means injuring him in his substantial rights and liberty interests.

558. Plaintiff contends the actions of the CPUC defendants all in depriving him

of his substantial rights, his proper use of his TCP permit, and these

unlawful acts were a significant factor in unlawfully preventing him from

earning an honest living in the profession of his choice and destroying his

lawful business.

559. Plaintiff contends that the CPUC Defendants and particularly Maritza Perez

and CPUC Does 1-20 applied their actions against the Plaintiff, an

individual, in a discriminatory manner, in an unequal application of the law

because CPUC Defendants have never suspended or revoked the Defendants

Uber or Lyft, rich corporate entities, for their actual unlawful operations,

even after having issuing a letter to cease and desist, and further granted

Uber an illegal "Settlement Agreement" to allow Defendants Uber and Lyft

to continue to operate without legitimate State or any federal operating

COMPLAINT- 167

authority to provide regulated passenger transportation harming Plaintiff's right to a competitive market with legal competition.

560. Plaintiff contends that he was treated to unlawful unequal application of the CPUC laws, rules and regulations in violation of his rights as an individual proprietor worker versus the CPUC Defendants favoring Uber and LYFT Corporations who the CPUC Defendants favored by accepting Uber and Lyft's improper lobbying, as set forth herein.

561. Plaintiff contends that the CPUC Defendants demonstrate their discrimination by allowing Defendants Uber and Lyft to continue to operate for 5 years, from 2013 -2018, without proper State TCP authority and TNC authority, or required federal operating authority which they were required to enforce by federal law the State of California had agreed to.

562. Instead they discriminatorily violated Plaintiff's Fourteenth Amendment rights without justification causing injury to Plaintiff's liberty and property interests.

563. The CPUC Defendants' DECISION (2013) enacted California's Transportation Network Company scheme, effective beginning January 2013, or a "TNC" permit scheme, and they continue their unlawful interference with their DECISION 18-04-005, effective May 4, 2018

COMPLAINT- 168

allowing for illegal and unlawful, unregulated competitors UBER and LYFT to compete with Plaintiff's lawful TCP permit and business.

564.   There are no grounds for Defendants Maritza Perez and CPUC Does 1-20 through the CPUC California State Constitution authority to claim it has any authority to grant illegal competition, to audit or tax the gross passenger fares, or any fares of Plaintiff; to subjecting Plaintiff to their abusive process without any lawful reason depriving him of his liberty, property and business in violation of his constitutional rights as set forth herein.

**WHEREFORE,** plaintiff prays for COUNT FOUR and FIVE that final judgment be entered against each Defendant declaring, ordering, and adjudging that:

1.  Plaintiff seeks a declaration that the CPUC DECISIONS challenged here violate federal laws and regulations as set forth and explained herein and are unconstitutional, violate the Dormant Commerce clause and should be preempted.

2.  Plaintiff seeks a declaration that the CPUC Defendants violated Plaintiff's Fourth and Fifth Amendment Rights, by CPUC Defendants, as set forth and explained herein and as applied to the States through the Fourteenth Amendment of the United States Constitution.

COMPLAINT- 169

3.  Plaintiff seeks a declaration that the CPUC Defendants unlawfully deprived Plaintiff of his TCP Permit, charged unlawful fees, which was a factor for the loss of liberty interests his preferred form of living and the destruction of his business.

4.  Plaintiff seeks injunctive relief prohibiting the CPUC Defendants their successors from implementing or enforcing the challenged DECISIONS, and requiring an official consult and review with and between the federal Department of Transportation and its Federal Motor Carrier Safety Administration, with the California Public Utilities Commission or its successor State organization for a period of 2 years, for current and future Commission regulation and action related to activity federally defined as passenger brokers, motor carriers or passenger transportation in vehicles having a capacity of up to 15 or less passengers that operate in intrastate or interstate transportation and documenting such consultation occurred and documenting the compliance with California's agreement for MCSAP Funding grants with the Department of Transportation, by the Commission or its successors and the appropriate federal agencies, the Department of Transportation's Federal Motor Carrier Safety Administration division for current and future California Commission transportation regulation provisions having

COMPLAINT- 170

the force and effect of law, rule or regulation can be implemented or

administered or enforced by California or its State Commissions,

Departments or Agencies or Regulatory body or successors.

5.  Plaintiff seeks the disgorgement of PUCTRA fees unlawfully taken

from and paid to the California Public Utilities Commission, under the

authority of the U.S. Supreme Court, *Dennis v. Higgins*, 498 U.S. 439

(1991) and the restoration of his TCP permit as previously issued.

6.  Plaintiff be awarded his costs of this action, under 42 U.S.C. §1988

and such other and  further relief as may be appropriate and as the Court

may deem just and proper,


**COUNT SIX – ANTITRUST SHERMAN ACT §1**
**Defendants UBER and LYFT**

565. The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference, and Plaintiff alleges as follows.

566. Each Defendants restraint constitute agreements that unreasonably restrain

competition in the San Francisco and California market for passenger

transportation services in violation of Section  1 of the Sherman Act, 15

U.S.C. §1.

COMPLAINT- 171

567. The defendants' driver agreements have had and will continue to have anticompetitive effects by protecting defendants from driver competition, raise barriers to entry, drive out established competition and retard services and innovation of the relevant market place.

568. These agreements are per se illegal agreements and are not necessary to achieve any of the Defendants allegedly procompetitive goals. Any procompetitive benefits are outweighed by the anticompetitive harm and there are less restrictive alternatives by which the defendants would be able to achieve procompetitive goals.

569. Plaintiff's injury flows from the Defendants unlawful written contract price fixing scheme among independent contractor driver tradesmen. Plaintiff and other drivers are in no position to control the market or determine their own *competitive* prices because the defendants directly interfere with the free play of market price forces, the very evil the Sherman Act section 1 was designed to prevent.

570. Courts have no ability to determine the acceptance of any of Defendants justifications, it is enough that the defendants fix prices destroying the free play of market price forces conduct Congress' Sherman Act was designed to prevent.

COMPLAINT- 172

571. Plaintiff with other established and new entry participants suffer from the barriers of free market price flow erected by Defendants written agreement price fixing scheme. The scheme causes a loss of customers, innovation, and forces Plaintiff and competitors to sell valuable luxury passenger transportation well below the cost to provide it, not because he wants to charge more or passengers are unwilling to pay more, but because of the dominant market control by Defendants and their prohibited maximum pricing control of most competitors causing restraint upon the competitive market place.

572. Plaintiff's suffered irreparable harm in the loss of customers, damages between the prohibited price fixing Defendants established and his fair retail prices resulting in lost expenses and profits and the destruction of his business.

      **WHEREFORE**, plaintiff prays, for COUNT SIX that final judgment be entered against each Defendant declaring, ordering, and adjudging that:

573. The Defendants Uber and Lyft are found to have respectively horizontal driver contracts with maximum fixed pricing, causing competitive injury to plaintiff and others: and

COMPLAINT- 173

a) The aforesaid agreements unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

b) The aforesaid written amount to and are horizontal price fixing agreements and are per se illegal;

c) Each Defendant be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the agreements in which it is alleged to have engaged, or any other agreement having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

d) Each Defendant eliminate and cease enforcing all Independent contractor driver Restraints and be prohibited from otherwise acting to restrain trade unreasonably;

e) Each Defendant fund and undertake programs to inform drivers of drivers rights to encourage customers to use any payment method they choose;

f) Award Plaintiff treble damages and be awarded its costs of this action and reasonable attorneys' fees, and such other relief as may be appropriate and as the Court may deem proper.

## **COUNT SEVEN – PRIVATE ENFORCEMENT OF REGISTRATION**

COMPLAINT- 174

(49 U.S.C.§§13901. 13904(d),13904(f), 14501(d),  and 14707(a))

**Defendants UBER and LYFT[6]**

574. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

575. Plaintiff has attached the CPUC official DECISION"S 13-09-045 (Sept. 2013) and 18-04-005 (May 2018) of the Commissioners' to this complaint and are incorporated here as if set forth in their entirety.

576. An actual and justiciable controversy exists between the Plaintiff and Defendants Uber and Lyft because Plaintiff contends the Uber and Lyft Defendants are conducting unauthorized; interstate and intrastate passenger broker and motor carrier operations throughout the United States and California in violation of the following federal statutes: 49 U.S.C.§§13901. 13904(d), 13904(f), 14501(d), 31138, thereby injuring Plaintiff by diverting passengers and revenue.

577. Plaintiff contends that the defendants Uber and Lyft have been holding themselves' out as "authorized" *interstate* prearrange ground transportation providers serving interstate and intrastate passenger transportation from any point of origin to any destination, which means they are holding themselves

---

[6] Defendants Uber and Lyft include the subsidiaries and Officers, Directors, Employees, Agents and Uber Does 1-300, Lyft Does 1-300 of each company inclusive.

COMPLAINT- 175

out as motor carriers as defined under federal law and under well-established

federal agency decisions.

578. There are no limits in their smartphone application to the distance a

passenger can travel. There are no limits under State or federal law to

"authorized" passenger ground transportation providers.

579. Defendants Uber and Lyft advertise via pop up ads on the internet, radio and

TV commercials, and promote their interstate travel via their blogs and

email marketing campaigns. Defendant Uber, in 2016, offered Uber

Passport, a prearranged ground transportation service from San Diego, CA

across the American-Mexican border providing foreign commerce. Uber

secured the endorsement of the then Mayor of San Diego, whose

endorsement was broadcast across the major networks, NBC, CBS and

ABC. Defendant Lyft promotes its interstate transportation by sending out

an email announcement to passengers and drivers alike, applauding there 1

billion rides achievement noting the longest Lyft ride was 639 miles from

Denver, CO to Sioux Falls, IA.

580. Plaintiff contends Defendant Uber and Lyft have no authorization to provide

interstate or intrastate passenger motor carrier transportation. The Federal

Motor Carrier Safety Administration maintains an official U.S. government

web site called SAFER, which allows law enforcement, shippers, motor

COMPLAINT- 176

carriers, and the general public to immediately access their data revealing

who is, who is not authorized, and who never has had federal authorization

to operate as passenger brokers, motor carriers, and freight forwarders.  The

SAFER web site also keeps a complete history and safety record of each

current, not authorized and revoked or other condition for ready

determinations. True and correct copies of the SAFER web site showing

these results for Uber and Lyft are attached to this complaint, and

incorporated as though fully set forth herein.

581.  The Defendants Uber Technologies, Inc. and its subsidiaries have never had

federal authority or qualifying insurance or Surety Bonds to provide the

passenger transportation they sell and arrange for compensation. Uber

Freight, one subsidiary does have freight broker authority. This also means

because of the related requirements for ANY broker authority one must

prove 3 years of experience and pass a written knowledge test to secure

federal broker authority.   Uber the parent cannot claim ignorance of the

requirements to broker passenger transportation.

582.  Defendant Lyft, Inc., has never had any federal authorization to offer for sale

or arrange prearranged ground transportation, and true and correct copies of

the SAFER web history has been attached to this complaint, and are

incorporated as though fully set forth herein.

COMPLAINT- 177

583. Defendants Uber and Lyft misrepresented their authority to Plaintiff and placed him (and all other drivers) in a position to provide unauthorized federal and California passenger transportation on their behalf, subjected him (and all other drivers) to the risk of severe federal fines in excess of $25,000.00, imprisonment for failure to pay the fines and participating in under insured operations subjecting Plaintiff to claims in excess of Plaintiff's commercial insurance some $750,000.00 short of Plaintiff's State qualified coverage and risking certain financial ruin.

584. The Defendants Uber and Lyft "arrange for and sell" passenger transportation to private motor vehicles (not commercially registered) who do not hold State passenger authority (Transportation Charter Party, "TCP" permits) for compensation as an occupation or business thereby injuring Plaintiff by diverting passengers and revenue.

585. Defendants Uber and Lyft's California TNC passenger transportation operations are unauthorized and cannot be federally authorized because TNC operations are federally prohibited under 49 U.S.C§13506(b)(2) and federal regulation 49 CFR§372.101. Defendants TNC operations unlawful diverts passengers and revenue from Plaintiff's lawful operations and toward their unauthorized and federally prohibited operations to improperly vetted,

COMPLAINT- 178

unlicensed, unauthorized, TNC drivers injuring Plaintiff by reducing and

diverting passengers and revenue.

586.   Plaintiff contends Defendants Uber and Lyft's unauthorized and prohibited

passenger operations provide the evil opportunity that would not otherwise

exist BUT FOR their providing unauthorized prohibited TNC passenger

transportation to non-commercially registered private motor vehicles and

unlicensed unscrupulous drivers who have preyed on innocent passengers,

who commit preventable murder, rape and assaults, unnecessarily

endangering unsuspecting members of the public, including Plaintiff as an

Uber or Lyft rider.

587.  Plaintiff contends that if the federal regulatory scheme was followed, by

Defendants Uber and Lyft, and the CPUC Defendants did not make TNC

permits allowing Uber and Lyft to avoid and evade the Federal scheme then

Uber and Lyft would never have existed in the first place to allow an Uber or

Lyft driver to either be accosted or the driver able to accost a passenger. The

numerous media accounts of carnage would never have occurred.

588.  The media reports dozen of murders, hundreds of rapes and uncountable

assaults committed by individuals identified as Defendants Uber and Lyft's

drivers, which criminal events were at the very least preventable if Uber and

Lyft were not providing prohibited passenger transportation in the first

place. The billion dollar losses these companies report pale to the damage

there prohibited and unauthorized operation have made possible.

589. Plaintiff contends Defendants Uber and Lyft have no justification for their

unlawful passenger transportation operations in defiance of federal

prohibitions and their failure to comply with mandatory registration, Surety

Bond, and insurance requirements of the federal regulatory scheme whose

purpose and compliance act as an active restraint creating preventable

barriers to the carnage their misconduct contributed to and described herein.

Defendants Uber and Lyft have rendered the entire purpose of the federal

transportation regulatory scheme and U.S. policy worthless.

590. Plaintiff contends Defendants Uber and Lyft's failure to actually comply

with 49 U.S.C.§14501(d)(1)(C), requiring passenger transportation,

"…service pursuant to a contract for…" rather than their "waybills" which

do not positively identify the Defendants Uber and Lyft's passengers,

likewise invites unscrupulous passengers to rely on their known incomplete

identification to assault Drivers, as occurred to Plaintiff, leaving Plaintiff

with insufficient information to assist police in their investigation of

criminal conduct.

591. Additionally, Defendants Uber and Lyft's unauthorized and prohibited

operations cause Plaintiff, a 30 year career driver to suffer being maligned

by their passengers who insult and malign Plaintiff's trade and reputation based on other drivers' misconduct as reported by the media.

592. Defendants Uber and Lyft have no reasonable justification to create insufficient contracts, or "waybills" between unknown passengers, such as "2" and "PJ" and their well identified drivers to the waybill. This federal law requirement 49 U.S.C §14501(d)(1)(c), has an effective deterrent purpose and Defendants Uber and Lyft have rendered it worthless.

**WHEREFORE,** plaintiff prays, for COUNT SEVEN that final judgment be entered against each Defendant declaring, ordering, and adjudging that:

    a) Declare that defendants Uber and Lyft, operated in federally regulated interstate and intrastate commerce for an illegal purpose by conduct as follows:

        i. operate as a "passenger broker" selling passenger transportation for compensation as a motor carrier to unauthorized private motor vehicles without securing federal authority in violation of 49 U.S.C. §13904(d) and 49 CFR§392.9a;

        ii. operate as a "passenger broker" selling and arranging passenger transportation for compensation to unauthorized private motor vehicles without securing required Surety

COMPLAINT- 181

Bonds and insurance in violation of 49 U.S.C. §13904(f) and 49 U.S.C. §31138.

iii.  operate a federally prohibited business or occupation, beyond the legal scope of their California TNC permit, as a broker or person selling, or offering for sale passenger transportation for compensation to private motor vehicles in violation Federal law 49 U.S.C. §13506(b)(2).

iv.   operate a federally prohibited business or occupation, beyond the legal scope of their California TNC permit, as a broker or person who sold or offered for sale, or provided or procured or furnished or arranged for, passenger transportation for compensation to private motor vehicles in violation Federal regulation 49 C.F.R. §372.101.

v.  Operate as a Transportation Network Company's selling "prearranged ground transportation" in intrastate and interstate commerce for compensation without required valid California State passenger vehicle registration, without valid State passenger authority and without valid federal authority in violation of 49 U.S.C. §14501(d) and federal regulation 49 CFR §392.9a.

COMPLAINT- 182

vi.   Sold and sell passenger transportation for compensation without authority or federal registration as motor carriers as mandated and in violation of 49 U.S.C. §13904(d) and 49 U.S.C.§13901and 49 U.S.C. §14501(d)(1)(A) and federal regulations 49 CFR §392.9a.

vii.   Sold and sell passenger transportation as unauthorized motor carriers to private motor vehicles they did not own, rent or lease in violation of federal laws 49 U.S.C.§14501(d)(1)(B) and 49 U.S.C.§14102 and federal regulations 49 CFR PART 376.

b) Declare that defendants Uber and Lyft's operations selling and arranging federally prohibited passenger transportation to private motor vehicles for compensation as an occupation or business in violation of 49 U.S.C.§13506(b)(2) and federal regulation 49 CFR §372.101  is a per se violation of the law entitling Plaintiff to swift injunctive relief to immediately restrain defendants Uber and Lyft:

i.   From selling or arranging passenger transportation to private motor vehicles for compensation as an occupation or business;

COMPLAINT- 183

ii. Prohibit defendants Uber and Lyft from brokering passenger transportation until and unless they secure from Surety Bonds and Insurance in an amount and limits approved by the U.S. Secretary of Transportation and produce that proof to the Court for verification before commencing the brokering, arranging or selling of passenger transportation to State and federally authorized passenger motor carriers.

iii. Prohibit defendants Uber and Lyft from selling passenger transportation for compensation without first securing federal registration as a motor carrier and related mandatory insurance.

## **DEFENDANTS UBER**

**COUNT EIGHT** REIMBURSEMENT OF BUSINESS EXPENSES

Defendants UBER - (LABOR CODE § 2802)

593. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

594. While acting on the direct instruction of Defendants and discharging their duties for them, Plaintiffs incurred work-related expenses. Such expenses

COMPLAINT- 184

included but were not limited to the purchase and/or lease of vehicles; fuel, maintenance, and other vehicle operating costs; costs of replacing and/or upgrading vehicles various forms of insurance; cellular telephone and applications required for receiving dispatch assignments and tracking progress. Plaintiff incurred these substantial expenses and losses as a direct result of performing their job duties for Defendants.

595. Defendants failed to indemnify or in any manner reimburse Plaintiffs for these expenditures and losses. By requiring Plaintiff to pay expenses and cover losses that they incurred in direct consequence of the discharge of their duties for Defendants and/or in obedience of Defendants' direction, Defendants violated Labor Code § 2802.

596. By unlawfully deducting wages and failing to reimburse Plaintiffs, Defendants are also liable for reasonable attorneys' fees and costs under Labor Code § 2802(c).

597. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered substantial losses according to proof, as well as pre-judgment interest, costs, and attorneys' fees for the prosecution of this action.

598. Plaintiffs request relief as described below

**COUNT NINE  UNLAWFUL DEDUCTIONS FROM WAGES**
COMPLAINT- 185

(LABOR CODE § 221 AND IWC WAGE ORDER NO. 9, § 8)
Defendants Uber

599. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

600. The Labor Code § 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

601. IWC Wage Order No. 9, § 8 provides that the only circumstance under which an employer can make a deduction from an employee's wage due to payment shortage, breakage or business loss is if the employer can show that the shortage, breakage, or business loss was the result of the employee's gross negligence or dishonest or willful act.

602. These and related statutes, along with California's fundamental public policy protecting wages, prohibit employers from subjecting employees to unanticipated or unpredicted reductions in their wages; making employees the insurers of their employer's business losses; otherwise passing the ordinary business losses of the employer onto the employee; or taking deductions from wages for business losses in any form unless the employer

COMPLAINT- 186

can establish that the loss was caused by a dishonest or willful act, or gross negligence of the employee.

603. Defendants violated Labor Code § 221 and IWC Wage Order No.9, § 8 by unlawfully taking deductions from Plaintiff's compensation to cover certain ordinary business expenses of Defendants, including but not limited to, deducting fee commissions for the unauthorized sales and arranging of passenger transportation, charges for Workmen's Compensation Insurance, deductibles for insurance Defendants liability, lease and/or rental fees for vehicles used.

604. Because Defendants made unlawful deductions from Plaintiff's compensation, they are liable to Plaintiff for the compensation that should have been paid but for the unlawful deductions, pursuant to Labor Code § 221 and IWC Wage Order No. 9, § 8. dishonest or willful act.

605. Plaintiff request relief as described below.

**COUNT TEN FAILURE TO PROVIDE OFF-DUTY MEAL PERIODS**

(LABOR CODE §§ 226.7, 512, IWC WAGE ORDER NO. 9)
Defendants UBER

606. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

607. Plaintiff regularly worked in excess of five (5) hours a day without being afforded at least a 30-minute meal period in which he was relieved of all duties, as required by Labor Code §§ 226.7 and 512, and IWC Wage Order No. 9, § 11(A). Plaintiff also frequently worked in excess of 10 hours in a day without being provided a second 30-minute meal period in which he was relieved of all duties.

608. Because Defendants failed to afford proper meal periods, they are liable to Plaintiff for one hour of additional pay at the regular rate of compensation for each workday that the proper meal periods were not provided, pursuant to Labor Code § 226.7(b) and IWC Wage Order No. 9 § 11(B).

609. Plaintiff request relief as described below.


**COUNT ELEVEN**

**FAILURE TO PROVIDE OFF-DUTY PAID REST PERIODS**

(LABOR CODE §§ 226.7, IWC WAGE ORDER NO. 9)
Defendants UBER

COMPLAINT- 188

610. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

611. Plaintiff regularly worked in excess of three and a half hours a day without being afforded at least a paid 10-minute rest period in which he was relieved of all duties, as required by Labor Code §§ 226.7, and IWC Wage Order No. 9, § 12(A).

612. Because Defendants failed to afford proper paid rest periods, they are liable to Plaintiff for one hour of additional pay at the regular rate of compensation for each workday that the proper rest periods were not provided, pursuant to Labor Code § 226.7(b) and IWC Wage Order No. 9, § 12(B).

613. Plaintiffs request relief as described below.

## COUNT ELEVEN - MINIMUM WAGE

(LABOR CODE §§ 1182.11, 1194, ET SEQ., IWC WAGE ORDER NO. 9, MINIMUM WAGE ORDER)
Defendants UBER

614. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

615. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows:

COMPLAINT- 189

616. The At all times relevant to this complaint, Labor Code §§ 1182.11, 1182.12 and 1197, IWC Wage Order No. 9, and the Minimum Wage Order were in full force and effect and required that Defendants' California nonexempt employees receive the minimum wage for all hours worked irrespective of whether nominally paid on an hourly, piece rate, or any other basis, at the San Francisco rate $10.74 per hour commencing January 1, 2014, $11.05 per hour commencing January 1, 2015, and $12.25 per hour commencing May 1, 2015, $13.00 per hour commencing July 1, 2016, $14.00 per hour commencing July 1, 2017.

617. At various times throughout the relevant liability period, Defendants required Plaintiff to perform various tasks and be subject to Defendants' control without compensation. This uncompensated time included, but was not limited, to time reporting for work "online" each day and waiting for assignments, time performing pre-trip, post-trip and other inspections, waiting for job assignments while in the field and/or waiting to be released from a job location, resulting in Defendants failing to pay minimum wages for all hours worked, as required by law.

618. As a direct and proximate result of the acts and/or omissions of Defendants, Plaintiff was deprived of minimum wages due in amounts to be determined

COMPLAINT- 190

at trial, and to additional amounts as liquidated damages, pursuant to Labor Code §§ 1194 and 1194.2.

619. By violating Labor Code §§ 1182.11, 1182.12 and 1197, IWC Wage Order No. 9, § 4, and the Minimum Wage Order, Defendants are also liable for reasonable attorneys' fees and costs under Labor Code § 1194.

620. Plaintiff request relief as described below.

## COUNT TWELVE - FAILURE TO TIMELY PROVIDE CODE-COMPLIANT WAGE STATEMENTS

(LABOR CODE § 226)  Defendants UBER

621. The allegations of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

622. The Defendants, in violation of Labor Code § 226(a), failed to furnish Plaintiff with accurate, itemized wage statements showing all items required pursuant to said code section, including, but not limited to (1) total hours worked, (2) all deductions made, (3) and the name and address of the legal entity that is the employer.

COMPLAINT- 191

623. Plaintiff suffered cognizable legal injuries as a result of said violations, such as (a) confusion over whether Plaintiff received all wages owed them, (b) difficulty and expense involved in reconstructing pay records to compute all pay actually due and owing, and/or (c) the need to make mathematical computations to analyze whether the wages paid in fact compensated Plaintiff properly under the law.

624. Plaintiff requests relief as described below, including damages and/or penalties pursuant to Labor Code §226(e) for each violation by Defendants of Labor Code §226(a) and an award of reasonable attorneys' fees and costs pursuant to Labor Code §226(g).

## COUNT THIRTEEN - VIOLATIONS OF THE UNFAIR COMPETITION LAW (UCL)
### (BUSINESS & PROFESSIONS CODE §§ 17200-09)
### Defendants UBER

625. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

626. The Business & Professions Code § 17200 prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.

COMPLAINT- 192

627. Business & Professions Code § 17204 allows "any person acting for the interests of itself, its members or the general public" to prosecute a civil action for violation of the UCL.

628. Defendants improperly, fraudulently, and unlawfully classified Plaintiffs as "independent contractors" and thereby committed unlawful, unfair, and/or fraudulent business acts and practices as defined by Business & Professions Code § 17200, by engaging in the following:

 a) failing to reimburse Plaintiff for employment-related business expenses and losses;

 b) improperly and unlawfully making deductions from Plaintiff's compensation because of insurance deductions, workmen's compensation insurance, vehicle lease or rental fees, and other work-related expenses and losses not attributable to Plaintiff's dishonest or willful act, or to the gross negligence of Plaintiff;

 c) failing to provide adequate, off-duty meal periods to Plaintiff and failing to pay the premium pay for missed meal periods;

 d) failing to permit and authorize adequate and paid off-duty rest periods to Plaintiff and failing to pay him premium pay for missed/unpaid rest periods;

COMPLAINT- 193

e)   failing to pay minimum wage compensation to Plaintiff for all hours worked; and

f)   improperly and unlawfully making deductions from Plaintiff's compensation for work-related expenses and losses not attributable to Plaintiffs' dishonest or willful act or gross negligence, as described above; and,

629.   The violations of these laws serve as unlawful, unfair, and/or fraudulent predicate acts and practices, for purposes of Business & Professions Code § 17200.

630.   As a direct and proximate result of Defendants' unlawful, unfair, and/or fraudulent acts and practices described herein, Defendants received and continue to hold ill-gotten gains belonging to Plaintiff. As a direct and proximate result of Defendants' unlawful business practices, Plaintiff suffered economic injuries including, but not limited to out-of-pocket business expenses, unlawful deductions from compensation, compensation for missed meal and rest periods, and loss of minimum wages. Defendants have profited from its unlawful, unfair, and/or fraudulent acts and practices in the amount of those business expenses, improper deductions from compensation, unpaid compensation for missed meal and rest periods, unpaid minimum wage, and interest accrued by Plaintiff.

COMPLAINT- 194

631. Plaintiff is entitled to restitution pursuant to Business & Professions Code §§ 17203 and 17208 for all unpaid business expenses, unlawful deductions from compensation, missed meal and rest period compensation, and interest since four years prior to the filing of this action.

632. Plaintiff is entitled to enforce all applicable penalty provisions of the Labor Code pursuant to Business & Professions Code § 17202.

633. Plaintiff's success in this action will enforce important rights affecting the public interest. In this regard, Plaintiff sues on behalf of the public as well as on behalf of himself and others similarly situated. Plaintiff seeks and is entitled to reimbursement of expenses and unlawful deductions, the unpaid compensation, declaratory relief, and any other appropriate remedy.

634. In order to prevent Defendants from profiting and benefiting from their wrongful and illegal acts and continuing those acts, an order requiring Defendants to restore such moneys in which the Plaintiff has an ownership interest, including fee commissions and the unpaid compensation complained of herein.

635. Plaintiff has assumed the responsibility of enforcement of the laws and lawful claims specified herein. There is a financial burden incurred in pursuing this action which is in the public interest. Therefore, reasonable attorneys' fees are appropriate pursuant to Code of Civil Procedure § 1021.5.

636. By all of the foregoing alleged conduct, Defendants committed unlawful, unfair and fraudulent business practices within the meaning of Business & Professions Code §17200, et seq.

637. As a direct and proximate result of the unfair business practices described above, Plaintiff has suffered significant losses and Defendants have been unjustly enriched.

638. Pursuant to Business & Prof. Code §17203, Plaintiff is entitled to: (a) restitution of money acquired by Defendants by means of their unfair business practices, in amounts not yet ascertained but to be ascertained at trial; and (b) a declaration that Defendants' business practices were unfair within the meaning of the statute.

639. Plaintiff requests relief as described below.

## **PRAYER FOR RELIEF – DEFENDANTS UBER**

WHEREFORE, Plaintiffs request relief against UBER as follows:

    A. A declaratory judgment that Defendants knowingly and intentionally violated the following provisions of law:

        1. Labor Code § 2802 by failing to indemnify Plaintiff for all necessary business expenses and losses;

        2. Labor Code § 221 and IWC Wage Order No. 9 by making unlawful deductions from the compensation paid to Plaintiff for

COMPLAINT- 196

ordinary business expenses and losses without a showing that the expenses and/or losses were due to Plaintiff's dishonest or willful act, or to the gross negligence of Plaintiff;

3. Labor Code §§ 226.7 and 512, and IWC Wage Order No. 9 by failing to provide adequate, off-duty meal periods to Plaintiff;

4. Labor Code §§ 226.7 and 512, and IWC Wage Order No. 9 by failing to permit and authorize paid, off-duty rest periods to Plaintiff;

5. Labor Code § 1194, et seq., IWC Wage Order No. 9, and the Minimum Wage Order by failing to pay minimum wage to Plaintiff for all hours worked;

6. Labor Code § 226 by failing to provide code-compliant wage statements to Plaintiff; and

7. Business & Professions Code §§ 17200-17208, by failing to reimburse Plaintiff for necessary business expenses, by making wrongful deductions from wages, by failing to provide off-duty meal periods and/or pay missed meal period compensation to Plaintiff, by failing to permit and authorize paid, off-duty, paid rest periods and/or pay missed rest period compensation to Plaintiff, by failing to pay Plaintiff minimum wage under

COMPLAINT- 197

California law and by failing to provide Plaintiff with itemized wage statements showing all hours worked;

B. A declaratory judgment that Defendants' violations as described above were willful;

C. An equitable accounting to identify, locate, and restore to Plaintiff the wages and unreimbursed expenses that are due;

D. An award to Plaintiff of damages in the amount of unpaid minimum wage, necessary business expenses, missed meal and rest period compensation, and amounts unlawfully deducted from wages, including interest thereon, subject to proof at trial;

E. An award to Plaintiff for liquidated damages because of Defendants' failure to pay Plaintiff minimum wage;

F. An award of damages and/or penalties pursuant to Labor Code §226(e) for each violation by Defendants of Labor Code §226(a);

G. An order requiring Defendants to pay restitution of all amounts owed to Plaintiff for Defendants' failure to pay legally required meal and rest period pay, minimum wage, and interest thereon and Defendants' failure to repay out-of-pocket business expenses incurred and business expenses unlawfully deducted, and interest thereon, in an amount according to proof, pursuant to Business & Professions Code § 17203.

COMPLAINT- 198

H. An award to Plaintiff of reasonable attorneys' fees and costs, pursuant

to Labor Code §§ 218.5, 226(g), 1194, and 2802, and/or other

applicable law; and

I.   An award to Plaintiff such other and further relief as this Court deems

just and proper.

## DEFENDANTS LYFT

### COUNT FOURTEEN – LYFT REIMBURSEMENT OF BUSINESS EXPENSES

Defendants LYFT - (LABOR CODE § 2802)

640. The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference, and Plaintiff alleges as follows.

641. While acting on the direct instruction of Defendants and discharging their

duties for them, Plaintiffs incurred work-related expenses. Such expenses

included but were not limited to the purchase and/or lease of vehicles; fuel,

maintenance, and other vehicle operating costs; costs of replacing and/or

upgrading vehicles various forms of insurance; cellular telephone and

applications required for receiving dispatch assignments and tracking

progress. Plaintiff incurred these substantial expenses and losses as a direct

result of performing their job duties for Defendants.

COMPLAINT- 199

642. Defendants failed to indemnify or in any manner reimburse Plaintiffs for these expenditures and losses. By requiring Plaintiff to pay expenses and cover losses that they incurred in direct consequence of the discharge of their duties for Defendants and/or in obedience of Defendants' direction, Defendants violated Labor Code § 2802.

643. By unlawfully deducting wages and failing to reimburse Plaintiffs, Defendants are also liable for reasonable attorneys' fees and costs under Labor Code § 2802(c).

644. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered substantial losses according to proof, as well as pre-judgment interest, costs, and attorneys' fees for the prosecution of this action.

645. Plaintiffs request relief as described below

**COUNT FIFTEEN - UNLAWFUL DEDUCTIONS FROM WAGES**

(LABOR CODE § 221 AND IWC WAGE ORDER NO. 9, § 8)
Defendants LYFT

646. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

COMPLAINT- 200

647. The Labor Code § 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

648. IWC Wage Order No. 9, § 8 provides that the only circumstance under which an employer can make a deduction from an employee's wage due to payment shortage, breakage or business loss is if the employer can show that the shortage, breakage, or business loss was the result of the employee's gross negligence or dishonest or willful act.

649. These and related statutes, along with California's fundamental public policy protecting wages, prohibit employers from subjecting employees to unanticipated or unpredicted reductions in their wages; making employees the insurers of their employer's business losses; otherwise passing the ordinary business losses of the employer onto the employee; or taking deductions from wages for business losses in any form unless the employer can establish that the loss was caused by a dishonest or willful act, or gross negligence of the employee.

650. Defendants violated Labor Code § 221 and IWC Wage Order No.9, § 8 by unlawfully taking deductions from Plaintiff's compensation to cover certain ordinary business expenses of Defendants, including but not limited to, deducting fee commissions for the unauthorized sales and arranging of

COMPLAINT- 201

passenger transportation, charges for Workmen's Compensation Insurance,

deductibles for insurance Defendants liability, lease and/or rental fees for

vehicles used.

651. Because Defendants made unlawful deductions from Plaintiff's

compensation, they are liable to Plaintiff for the compensation that should

have been paid but for the unlawful deductions, pursuant to Labor Code §

221 and IWC Wage Order No. 9, § 8. dishonest or willful act.

652. Plaintiff request relief as described below.


## COUNT SIXTEEN - FAILURE TO PROVIDE OFF-DUTY MEAL
## PERIODS

(LABOR CODE §§ 226.7, 512, IWC WAGE ORDER NO. 9)
Defendants LYFT


653. The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference, and Plaintiff alleges as follows.

654. Plaintiff regularly worked in excess of five (5) hours a day without being

afforded at least a 30-minute meal period in which he was relieved of all

duties, as required by Labor Code §§ 226.7 and 512, and IWC Wage Order

No. 9, § 11(A). Plaintiff also frequently worked in excess of 10 hours in a

COMPLAINT- 202

day without being provided a second 30-minute meal period in which he was relieved of all duties.

655. Because Defendants failed to afford proper meal periods, they are liable to Plaintiff for one hour of additional pay at the regular rate of compensation for each workday that the proper meal periods were not provided, pursuant to Labor Code § 226.7(b) and IWC Wage Order No. 9 § 11(B).

656. Plaintiff request relief as described below.

## COUNT SEVENTEEN - FAILURE TO PROVIDE OFF-DUTY PAID REST PERIODS

(LABOR CODE §§ 226.7, IWC WAGE ORDER NO. 9)
Defendants LYFT

657. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

658. Plaintiff regularly worked in excess of three and a half hours a day without being afforded at least a paid 10-minute rest period in which he was relieved of all duties, as required by Labor Code §§ 226.7, and IWC Wage Order No. 9, § 12(A).

659. Because Defendants failed to afford proper paid rest periods, they are liable to Plaintiff for one hour of additional pay at the regular rate of compensation

for each workday that the proper rest periods were not provided, pursuant to Labor Code § 226.7(b) and IWC Wage Order No. 9, § 12(B).

660. Plaintiffs request relief as described below.

## **COUNT EIGHTEEN - MINIMUM WAGE**

(LABOR CODE §§ 1182.11, 1194, ET SEQ., IWC WAGE ORDER NO. 9,
MINIMUM WAGE ORDER)
Defendants LYFT

661. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

662. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows:

663. The At all times relevant to this complaint, Labor Code §§ 1182.11, 1182.12 and 1197, IWC Wage Order No. 9, and the Minimum Wage Order were in full force and effect and required that Defendants' California nonexempt employees receive the minimum wage for all hours worked irrespective of whether nominally paid on an hourly, piece rate, or any other basis, at the San Francisco rate $10.74 per hour commencing January 1, 2014, $11.05 per hour commencing January 1, 2015, and $12.25 per hour commencing May 1, 2015, $13.00 per hour commencing July 1, 2016, $14.00 per hour commencing July 1, 2017.

COMPLAINT- 204

664. At various times throughout the relevant liability period, Defendants required Plaintiff to perform various tasks and be subject to Defendants' control without compensation. This uncompensated time included, but was not limited, to time reporting for work "online" each day and waiting for assignments, time performing pre-trip, post-trip and other inspections, waiting for job assignments while in the field and/or waiting to be released from a job location, resulting in Defendants failing to pay minimum wages for all hours worked, as required by law.

665. As a direct and proximate result of the acts and/or omissions of Defendants, Plaintiff was deprived of minimum wages due in amounts to be determined at trial, and to additional amounts as liquidated damages, pursuant to Labor Code §§ 1194 and 1194.2.

666. By violating Labor Code §§ 1182.11, 1182.12 and 1197, IWC Wage Order No. 9, § 4, and the Minimum Wage Order, Defendants are also liable for reasonable attorneys' fees and costs under Labor Code § 1194.

667. Plaintiff request relief as described below.

## <u>COUNT NINTEEN</u> - FAILURE TO TIMELY PROVIDE CODE-COMPLIANT WAGE STATEMENTS

### (LABOR CODE § 226)  Defendants LYFT

668. The allegations of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

669. The Defendants, in violation of Labor Code § 226(a), failed to furnish Plaintiff with accurate, itemized wage statements showing all items required pursuant to said code section, including, but not limited to (1) total hours worked, (2) all deductions made, (3) and the name and address of the legal entity that is the employer.

670. Plaintiff suffered cognizable legal injuries as a result of said violations, such as (a) confusion over whether Plaintiff received all wages owed them, (b) difficulty and expense involved in reconstructing pay records to compute all pay actually due and owing, and/or (c) the need to make mathematical computations to analyze whether the wages paid in fact compensated Plaintiff properly under the law.

671. Plaintiff requests relief as described below, including damages and/or penalties pursuant to Labor Code §226(e) for each violation by Defendants

COMPLAINT- 206

of Labor Code §226(a) and an award of reasonable attorneys' fees and costs

pursuant to Labor Code §226(g).

## COUNT TWENTY - VIOLATIONS OF THE UNFAIR COMPETITION LAW (UCL)

(BUSINESS & PROFESSIONS CODE §§ 17200-09)
Defendants LYFT

672. The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference, and Plaintiff alleges as follows.

673. The Business & Professions Code § 17200 prohibits unfair competition in

the form of any unlawful, unfair, or fraudulent business act or practice.

674. Business & Professions Code § 17204 allows "any person acting for the

interests of itself, its members or the general public" to prosecute a civil

action for violation of the UCL.

675. Defendants improperly, fraudulently, and unlawfully classified Plaintiffs as

"independent contractors" and thereby committed unlawful, unfair, and/or

fraudulent business acts and practices as defined by Business & Professions

Code § 17200, by engaging in the following:

a) failing to reimburse Plaintiff for employment-related business

expenses and losses;

COMPLAINT- 207

b)   improperly and unlawfully making deductions from Plaintiff's compensation because of insurance deductions, workmen's compensation insurance, vehicle lease or rental fees, and other work-related expenses and losses not attributable to Plaintiff's dishonest or willful act, or to the gross negligence of Plaintiff;

c)   failing to provide adequate, off-duty meal periods to Plaintiff and failing to pay the premium pay for missed meal periods;

d)   failing to permit and authorize adequate and paid off-duty rest periods to Plaintiff and failing to pay him premium pay for missed/unpaid rest periods;

e)   failing to pay minimum wage compensation to Plaintiff for all hours worked; and

f)   improperly and unlawfully making deductions from Plaintiff's compensation for work-related expenses and losses not attributable to Plaintiffs' dishonest or willful act or gross negligence, as described above; and,

676.   The violations of these laws serve as unlawful, unfair, and/or fraudulent predicate acts and practices, for purposes of Business & Professions Code § 17200.

COMPLAINT- 208

677. As a direct and proximate result of Defendants' unlawful, unfair, and/or fraudulent acts and practices described herein, Defendants received and continue to hold ill-gotten gains belonging to Plaintiff. As a direct and proximate result of Defendants' unlawful business practices, Plaintiff suffered economic injuries including, but not limited to out-of-pocket business expenses, unlawful deductions from compensation, compensation for missed meal and rest periods, and loss of minimum wages. Defendants have profited from its unlawful, unfair, and/or fraudulent acts and practices in the amount of those business expenses, improper deductions from compensation, unpaid compensation for missed meal and rest periods, unpaid minimum wage, and interest accrued by Plaintiff.

678. Plaintiff is entitled to restitution pursuant to Business & Professions Code §§ 17203 and 17208 for all unpaid business expenses, unlawful deductions from compensation, missed meal and rest period compensation, and interest since four years prior to the filing of this action.

679. Plaintiff is entitled to enforce all applicable penalty provisions of the Labor Code pursuant to Business & Professions Code § 17202.

680. Plaintiff's success in this action will enforce important rights affecting the public interest. In this regard, Plaintiff sues on behalf of the public as well as on behalf of himself and others similarly situated. Plaintiff seeks and is

COMPLAINT- 209

entitled to reimbursement of expenses and unlawful deductions, the unpaid compensation, declaratory relief, and any other appropriate remedy.

681. In order to prevent Defendants from profiting and benefiting from their wrongful and illegal acts and continuing those acts, an order requiring Defendants to restore such moneys in which the Plaintiff has an ownership interest, including fee commissions and the unpaid compensation complained of herein.

682. Plaintiff has assumed the responsibility of enforcement of the laws and lawful claims specified herein. There is a financial burden incurred in pursuing this action which is in the public interest. Therefore, reasonable attorneys' fees are appropriate pursuant to Code of Civil Procedure § 1021.5.

683. By all of the foregoing alleged conduct, Defendants committed unlawful, unfair and fraudulent business practices within the meaning of Business & Professions Code §17200, et seq.

684. As a direct and proximate result of the unfair business practices described above, Plaintiff has suffered significant losses and Defendants have been unjustly enriched.

685. Pursuant to Business & Prof. Code §17203, Plaintiff is entitled to: (a) restitution of money acquired by Defendants by means of their unfair business practices, in amounts not yet ascertained but to be ascertained at

COMPLAINT- 210

trial; and (b) a declaration that Defendants' business practices were unfair within the meaning of the statute.

686. Plaintiff requests relief as described below.

## **PRAYER FOR RELIEF – DEFENDANTS LYFT**

WHEREFORE, Plaintiffs request relief against LYFT as follows:

    A. A declaratory judgment that Defendants knowingly and intentionally violated the following provisions of law:

        1. Labor Code § 2802 by failing to indemnify Plaintiff for all necessary business expenses and losses;

        2. Labor Code § 221 and IWC Wage Order No. 9 by making unlawful deductions from the compensation paid to Plaintiff for ordinary business expenses and losses without a showing that the expenses and/or losses were due to Plaintiff's dishonest or willful act, or to the gross negligence of Plaintiff;

        3. Labor Code §§ 226.7 and 512, and IWC Wage Order No. 9 by failing to provide adequate, off-duty meal periods to Plaintiff;

        4. Labor Code §§ 226.7 and 512, and IWC Wage Order No. 9 by failing to permit and authorize paid, off-duty rest periods to Plaintiff;

COMPLAINT- 211

5. Labor Code § 1194, et seq., IWC Wage Order No. 9, and the Minimum Wage Order by failing to pay minimum wage to Plaintiff for all hours worked;

6. Labor Code § 226 by failing to provide code-compliant wage statements to Plaintiff; and

7. Business & Professions Code §§ 17200-17208, by failing to reimburse Plaintiff for necessary business expenses, by making wrongful deductions from wages, by failing to provide off-duty meal periods and/or pay missed meal period compensation to Plaintiff, by failing to permit and authorize paid, off-duty, paid rest periods and/or pay missed rest period compensation to Plaintiff, by failing to pay Plaintiff minimum wage under California law and by failing to provide Plaintiff with itemized wage statements showing all hours worked;

B. A declaratory judgment that Defendants' violations as described above were willful;

C. An equitable accounting to identify, locate, and restore to Plaintiff the wages and unreimbursed expenses that are due;

D. An award to Plaintiff of damages in the amount of unpaid minimum wage, necessary business expenses, missed meal and rest period

COMPLAINT- 212

compensation, and amounts unlawfully deducted from wages, including interest thereon, subject to proof at trial;

E. An award to Plaintiff for liquidated damages because of Defendants' failure to pay Plaintiff minimum wage;

F. An award of damages and/or penalties pursuant to Labor Code §226(e) for each violation by Defendants of Labor Code §226(a);

G. An order requiring Defendants to pay restitution of all amounts owed to Plaintiff for Defendants' failure to pay legally required meal and rest period pay, minimum wage, and interest thereon and Defendants' failure to repay out-of-pocket business expenses incurred and business expenses unlawfully deducted, and interest thereon, in an amount according to proof, pursuant to Business & Professions Code § 17203.

H. An award to Plaintiff of reasonable attorneys' fees and costs, pursuant to Labor Code §§ 218.5, 226(g), 1194, and 2802, and/or other applicable law; and

I.  An award to Plaintiff such other and further relief as this Court deems just and proper.

**COMMON COUNTS - DEFENDANTS UBER AND LYFT**

**COUNT TWENTY-ONE –**

**CALIFORNIA UNFAIR PRACTICES ACT**
(California Business and Professions Code §§17043, 17044)
(Defendants Uber and Lyft)

687. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

688. Defendants Uber and Lyft sold, and continue to sell and arrange, federally unauthorized and preempted passenger transportation services to private vehicles for compensation as a business or occupation below cost and on a loss leader basis in violation of Cal. Bus. & Prof. Code §§ 17043, 17044.

689. Defendants' Uber and Lyft sell and arrange passenger transportation which activity is defined under federal law as *passenger broker* and *motor carrier* activity or conduct requiring compliance with federal broker and motor carrier laws and regulations. The defendants have no passenger broker or motor carrier compliance with the Federal Motor Carrier Safety Administration.

690. Defendants' rates are not set or regulated by, the California Public Utilities Commission, "CPUC." Federal law does not regulate the Defendants rates.

691. Federal authority over intrastate transportation preempts (prohibits) States and their agencies from regulating the rates of passenger motor carriers under 49 U.S.C. §14501(a) while allowing States to require a notice, not in excess of 30 days of any change in rates.

692. The CPUC has no authority to establish or usurp federal law and is preempted (prohibited) by federal authority over intrastate transportation under 49 U.S.C. §14501(b)(1) from enacting or creating any provision having the force and effect of law related to ANY passenger intrastate broker's, intrastate rates, intrastate routes, or intrastate services.

693. The defendants maintain unlawful Agreements or contracts or "Terms of Service," with their California TNC drivers unilaterally maintaining a horizontal agreement to fix prices with and among their hundreds of thousands of "independent contractor" driver tradesmen creating an unfair loss leader barrier with overwhelming force injuring Plaintiff's ability to legally compete in the San Francisco Bay area and California market.

694. Plaintiff is informed and believes and thereon alleges that the directors and officers of Uber at the time of the above-referenced violations included the following persons: Dara Khosrowshahi, Travis Kalanick, Garrett Camp, John Thain, Ursula Burns, Wan Ling Martello, Yasir Al Rumayyan, Matt Cohler, David Trujillo, Ryan Graves, Arianna Huffington, and Ronald Sugar

COMPLAINT- 215

(chair), Tony West (General Counsel). Additionally, Dara Khosrowshahi is the current CEO of Uber; Travis Kalanick is a co-founder of Uber, and formerly served as Uber's CEO; Garrett Camp is a co-founder of Uber.

695. Plaintiff is informed and believes and thereon alleges that the directors and officers of Lyft at the time of the above-referenced violations included the following persons: Logan Green, CEO, John Zimmer, President, Sean Aggarwal, Chairman, Ben Horowitz, Valerie Jarrett, Hiroshi, Ann Miura-KO, Maggie Wilderotter and Anthony Foxx

696. Defendants performed the above-mentioned acts for the purpose of operating a federally prohibited business or occupation, below cost destroying competition and injuring Plaintiff a lawful TCP licensed operator and other competing drivers.

697. As a direct result of the above-mentioned acts of Defendants, Plaintiff has been deprived of the patronage of a large number of the actual and potential customers. Defendant's conduct has in fact proximately caused damages to Plaintiff in an amount to be proved at trial.

698. Unless restrained, Defendant will continue to contract with riders on a loss leader basis.

COMPLAINT- 216

## PRAYER FOR RELIEF – UBER AND LYFT UPA CLAIM

**WHEREFORE**, Plaintiff request COUNT TWENTY-ONE relief as follows:

a) Plaintiff requests that the Court enter declaratory relief and adjudging that Uber and Lyft violated the law as alleged in the complaint;

b) That Uber and Lyft be enjoined and restrained from in any manner continuing, maintaining, or renewing its unlawful and anticompetitive conduct or adopting or following any practice, plan, program, or device with a similar purpose or effect;

c) That Plaintiff is awarded damages and treble damages under the Unfair Practices Act.

d) That Plaintiff, be awarded reasonable attorney's fees and costs, including expert costs, as allowable under law; and

e) All other relief to which Plaintiff be entitled at law or in equity including injunctive relief as the Court may deem just and proper.

## COUNT TWENTY-TWO – BREACH OF CONTRACT

699. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff re-alleges as follows.

COMPLAINT- 217

700. The Plaintiff alleges that the defendants Uber and Lyft contracts violate federal transportation laws.  The defendants are violating both the regulatory scheme and providing a passenger transportation service specifically prohibited by federal law and are per se unlawful.

701. Plaintiff lawfully provided passenger service to Defendants under his TCP permit, with commercial passenger vehicle registration and State passenger authority and State approved commercial insurance.

702. Contracts for an illegal purpose are illegal agreements, under the common law of contract, and are contracts which courts will not enforce because the purpose of the agreement is to achieve an illegal end.

703. The Defendants Uber and Lyft's illegal end in this case is the sale, selling or arranging of passenger transportation to private vehicles for compensation violating 49 U.S.C. 13506(b)(2) and 49 CFR §372.101.

704. Defendants Uber and Lyft misrepresented their lawful authority to arrange, *broker* or sell passenger transportation which they knew or should have known was false, in that their conduct was violative of current federal prohibitions and could, would and did lead to criminal and civil mayhem as it had in the past.  The very reason Congress and its agencies removed in 1942 the exemption and Congress permanently removed the exemption in its 1995 amendment of the Motor Carrier Act.

COMPLAINT- 218

705. The Defendants improper lobbying influence over State and local political bodies and the results of their efforts as reported by the media, bolstered the misrepresentation of their transportation authority to offer, arrange and sell transportation to the drivers who, like Plaintiff were justifiably misled by the Defendants conduct. The drivers' especially Plaintiff who was properly licensed had every reason to believe the defendants' misrepresentations were true.

706. The truth is the defendant Travis Kalanick knew or should have known his company Uber's representations were false because he published a White Policy paper acknowledging the competition, one of which was defendant Lyft selling, arranging and dispatching passenger transportation to private vehicles, which he called a "new technology called ridesharing."

707. Likewise Defendant Lyft knew or should have known that ridesharing was unlawful because it sold off its "Zimride" legal ride sharing business to the Enterprise Car Rental company. Zimride did not sell passenger transportation to private vehicles; it provided web based "public billboards" which in great part allowed for college students to be able to arrange their own private agreements to share rides. Zimride's revenue came from organizations, including Universities who paid for the bill board service to be provided.

COMPLAINT- 219

708. The Defendants have breached the contract with the Plaintiff because they do not have and have never had, nor could they secure federal authority or legal State authority to arrange, broker or sell passenger transportation to private vehicles for compensation as an occupation or business, 49 U.S.C. §13506(b)(2) and 49 CFR §372.101 . Defendants can never secure federal authority because federal law prohibits the defendants conduct as described throughout Plaintiff's complaint.

709. Defendant Uber USA, LLC., has specifically breached their contract with Plaintiffs because Uber Technology, Inc.'s subsidiary Rasier-CA, LLC., placed unlawful competition directly against Plaintiff's legal TCP operated business and forced Plaintiff to sell his services for below cost passenger fare pricing in his futile effort to avoid insolvency.

710. Defendant Rasier-CA,LLC breached its contract with Plaintiff because it has never had legal State or any federal authority to arrange, broker or sell transportation and could never secure federal or legal State authorization for conduct specifically prohibited under federal law 49 U.S.C. §13506(b)(2) and 49 CFR §372.101.

711. The defendant Lyft, Inc., breached its contract with Plaintiff because it has never had legal State or any federal authority to arrange, broker or sell transportation and could never secure federal or legal State authorization for

COMPLAINT- 220

conduct specifically prohibited under federal law 49 U.S.C. §13506(b)(2) and 49 CFR §372.101.

## COUNT TWENTY-THREE QUANTUM MERUIT

## UNJUST ENRICHMENT

712. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

713. The Defendant Uber Technologies, Inc., is the controlling parent of its subsidiaries, Uber USA, LLC and Rasier-CA, LLC, and on information ad belief took fee commissions, from Plaintiff's passenger fares, on behalf of its subsidiaries for the unauthorized conduct of its subsidiaries and has been unjustly enriched.

714. The Plaintiff contends that Defendants" Uber and Lyft never had a valid written contract because their contracts were for an illegal purpose. Plaintiff claims he is therefore entitled to a claim for quantum meruit for unjust enrichment for Defendants retention of fee commissions, minimum wages and overtime, vehicle costs and vehicle expenses, and insurance deductibles. Plaintiff is entitled to reimbursement, disgorgement and restitution, lest Defendants be rewarded for their unlawful conduct.

COMPLAINT- 221

## COUNT TWENTY-FOUR  CONVERSION

715. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

716. Defendants Uber and Lyft intentionally and unlawfully took Plaintiffs' property, namely fee commissions and money for expenses, without legal authority, for an unlawful purpose or Plaintiffs' permission.

717. The Defendant's conduct, as set forth above, substantially interfered with Plaintiffs' property.

718. As a result, Plaintiff was harmed and is entitled to restitution for his full share of proceeds for his lawful conduct.

719. The Defendants Uber and Lyft's conduct was willful wanton, malicious, and oppressive, and further justifies the awarding of exemplary damages.

## COUNT TWENTY-FIVE - CONSTRUCTIVE FRAUD

720. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

721. Defendants Uber and Lyft made false representations, that they were authorized by law to arrange, broker and sell passenger transportation, which Defendants knew was a false representation at the time, that Plaintiffs would

COMPLAINT- 222

receive passenger fares, provide a vehicle, expenses and labor, which

Defendants intended to defraud of their true value, which Plaintiff justifiably

relied upon, causing Plaintiff to incur damages.

**COUNT TWENTY-SIX - Untrue or Misleading Advertising—**

**Business and Professions Code § 17500**

722. The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference, and Plaintiff alleges as follows.

723. The Defendants intended to perform transportation services.

724. Defendants Uber and Lyft arrange, broker and sell passenger transportation

725. Defendant disseminated advertising before the public in California that:

    a) contained statements that were illegal, untrue or misleading;

    b) Defendant knew, or in the exercise of reasonable care should have

       known, was illegal, untrue or misleading;

    c) concerned the personal property or services or their disposition or

       performance; and

    d) was likely to mislead or deceive a reasonable consumer and

       Plaintiff. The illegal, untrue and/or misleading statements and

       representations made by Defendants include but are not limited to:

COMPLAINT- 223

    i.  Words stating or implying that Defendants were authorized to provide, arrange or sell passenger transportation for compensation,

    ii.  to provide safe transportation, to provide proper or responsible insurance when in fact they were not authorized to provide, arrange, sell offer, hold themselves out as an authorized transportation business, because they did not have federally authorization to arrange offer or sell transportation for compensation, they did not hold sufficient or federally required insurance,

    iii.  that drivers could earn money without explaining the true costs and true net earnings.

## PRAYER FOR RELIEF – UBER AND LYFT COUNTS 22, 23, 24, 25, 26

**WHEREFORE**, Plaintiff request relief equitable and legal relief and damages for Breach of Contract, Quantum Meruit, Conversion, Fraud, and Misleading Advertising, as follows:

1.    Plaintiff requests that the Court enter declaratory and injunctive relief and adjudging:

COMPLAINT- 224

A. that Uber and Lyft violated California law Business and Professions Code §17500 by misleading consumer and driver Plaintiff to his injury;

B. That Defendant made false representations at the time with the intent to defraud Plaintiff of his property for their own purposes which Plaintiff justifiably relied on, causing Plaintiff's damages.

C. That Defendants Uber and Lyft breached the contract with Plaintiff, by misleading Plaintiff of the unlawful purpose of the contract to evade and avoid federal transportation prohibitions, laws and regulations;

D. That defendants breached the contract is for performing services as a business which is prohibited or requires mandatory compliance with federal law which Defendants do not have rendering it a contract for unlawful purposes unenforceable by a Court of law

E. That because the Defendants unilaterally created contracts are for an unlawful purpose, Plaintiff is entitled to recover for his lawful labor property and expenses lest Defendants be unjustly enriched for their unlawful purposes.

F. That Defendants intentionally and unlawfully took Plaintiff's property, namely, fee commissions, the value of vehicle, money for expenses, lease or rental vehicle fees, Workmen's compensation, wages, overtime, and insurance deductibles, smartphone and services.

G. That Plaintiff was harmed and is entitled to the restoration of his property and money by disgorgement, and reimbursement.

COMPLAINT- 225

H. That Defendants conduct was willful, wanton, malicious, or oppressive, and further justifies the awarding of exemplary and punitive damages.

I. Such other and further relief as the Court deems proper.

## COUNT TWENTY-SEVEN – LEGAL MALPRACTICE

(Legal Malpractice against Defendants Lichten & Liss-Riordan P.C, Shannon Liss-Riordan, Adelaide Pagano, Anne Kramer)

726. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows.

727. Defendants and each of them had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possesses and exercises, in providing legal services to Plaintiff herein.

728. The conduct of the Defendants, and each of them, in doing the acts and omissions herein alleged directly resulted in damages and harm to Plaintiff as set out herein.

729. In doing the things herein alleged, Defendants intentionally put their own financial interests and the gain realized by a full blown litigation of the O'Connor v. Uber case, ahead of the interests of their client in avoiding litigation and the attendant legal fees by failing to raise Plaintiff's (and the

COMPLAINT- 226

other drivers) statutory right to be exempt from arbitration potentially

avoiding 6 years of litigation. As a direct and proximate result of Defendants

actions, as alleged herein, Plaintiff incurred substantial adverse court

decisions, unnecessary class counsel attorney's fees and costs, loss of his

property, labor, and rights, all subject to proof.

730. The relationship between Plaintiff and Defendants Uber and Lyft was a

critical issue which should have been the subject of thorough discovery and

investigation given the magnitude of the numbers of drivers, (some 300,000)

in lost labor and expenses and tips claims. A number that has grown above a

billion dollars against Defendant Uber alone. Defendants however failed to

adequately or even bother do either.

731. In doing all of the above described acts and omissions, Defendants, and each

of them, repeatedly and intentionally put their own financial interests ahead

of the interests of their client in avoiding any effective full blown arbitration

and transportation litigation case.  It should be well known to the Defendant

attorneys that there are considerable cross related transportation and labor

issues which effect employees and independent contractors alike. Both the

U.S. Secretary of Labor and the U.S. Secretary of Transportation have

COMPLAINT- 227

jurisdiction over transportation workers, their safety and hours requiring some relevant inquiry.

732. The FMCSA has attorneys on staff to answer questions, at no charge, regarding what is and is not interstate commerce and what intrastate commerce is also "part of interstate commerce and federally regulated, yet not once did the Defendants raise interstate commerce or exemption, but their billing grew by the days weeks, months and years.

733. Defendants, and each of them, failed to exercise reasonable care and skill in their representation of Plaintiff by negligently and carelessly doing all of the acts and omissions as herein alleged. Among other things, Defendants failed to exercise reasonable care and skill and were negligent in failing to properly prepare for, present, and preserve Plaintiff's (and the other drivers) exemption from arbitration in 6 years of district court hearings and multiple appeals, they did in their other cases and even into the appellate courts, why not for this Plaintiff, and the previously approved other hundreds of thousands of members of the class, the failure is a catastrophic disaster, and injuring Plaintiff's right to have the force and weight of the members to bring about justice and preserve rights;

734. Defendants are attorneys who have the experience to bring Declaratory and Injunctive relief actions, their failure to raise the illegal conduct of Uber and

COMPLAINT- 228

Lyft who operate a business, arranging and selling passenger transportation

to private vehicles for compensation as a regular business, which is

specifically prohibited by federal law, 49 U.S.C. §13506(b)(2) and clearly

spelled out in the operating regulation, 49 CFR§372.101, could have brought

both Uber and Lyft to a complete stop of their abusive labor practices.

735. The worst part is that since 2013 and continuing to this day, 9 drivers have

been driven into insolvency and committed suicide, the media reports, more

than 100 women have been raped or sexually assaulted, and uncountable

assaults have occurred.  The Uber and Lyft business is per se illegal. The

Defendant attorneys' are silent!

736. The Defendant attorneys have no reasonable justification for failing to use

well published laws and superior court authorities, and free federal

government FMCSA resources, and the transportation law's provisions for

legal fees to enforce federal laws, like 49 U.S.C. §14704 to stop the

unauthorized and illegal Uber and Lyft business operations, which abuse

their labor force.

## COUNT TWENTY-EIGHT – Breach of Fiduciary Duty

(Breach of Fiduciary Duty against Defendants Lichten & Liss-Riordan P.C,

Shannon Liss-Riordan, Adelaide Pagano, Anne Kramer)

737. Defendants, and each of them, owed Plaintiff, an unnamed member of the class action case O'Connor v, Uber, case #13-cv-03826-EMC, a fiduciary duty to act at all times in good faith and in Plaintiff's best interests, and had a duty, among other things, to perform the services for which they assumed as class counsel with reasonable care and skill, to act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to any unnecessary risk or peril. This fiduciary and confidential relationship was never repudiated by Defendants at any time herein mentioned.

738. Defendants, and each of them, had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise, in providing legal services to Plaintiff herein.

739. Defendants failed to use care or honor their fiduciary duty to the Plaintiff. This case involves transportation workers arguably regulated by federal transportation law. All drivers, (TNC or TCP) including the Plaintiff are drivers which California calls prearranged transportation providers, and so

COMPLAINT- 230

too does federal law call it prearranged transportation under 49 U.S.C. §14501(d).

740. The drivers are driving all around the country in 2013, crossing State lines, with Uber in 2016 offering nationally advertised ABC, NBC, CBS, coverage of an Uber Passport passenger service from San Diego, CA across the U.S.-Mexican border, which is federally regulated transportation in foreign commerce, all of which require compliance with federal transportation law. Plaintiff and other drivers were entitled to have the federal laws enforced as well as the related labor issues. The Defendants however did nothing.

741. Plaintiff even had email communications directly with Defendant Shannon Liss-Riordan explaining the interstate nature of the drivers work. This included, his own work entirely within California that is "part of the flow of interstate commerce" and should result in exemption from arbitration. Plaintiff used information he secured from the FMCSA to report these findings to Ms. Liss-Riordan. Ms. Liss-Riordan responded to Plaintiff with cases that appeared to be contrary authority, which were in fact clearly distinguishable to a layman.

742. The Defendants have other very similar labor cases, regarding employee versus independent contractor disputes and adhesive arbitration contracts, in courts around the United States.

COMPLAINT- 231

743. The Defendants raised "exemption from arbitration" in at least 5 of those cases for drivers who deliver food, packages, courier and janitor services, none of which is directly regulated by federal law, as Plaintiff (and the other drivers ) performing passenger transportation are, yet they raised the issue in those cases and appealed them to the appropriate appellate court.

744. In this case, there is one important federal law 49 U.S.C. §13506(b)(2) with its supporting regulation 49 CFR §372.101and one U.S. Supreme Court case, from 1949 and still standing *California v. Zook*, 336 U.S.725 (1949) easily accessible which would have been all Defendants needed to secure direct relief for the drivers and Plaintiff they represent.

745. Even better within *California v. Zook*, are several references to *California v. Thompson*, 313 U.S. 109 (1941) that would have explained why California's 2013 CPUC enactment of a TNC permit and the California's 2014 legislation supporting the CPUC DECISION were ripe for preemption. This would or could have stopped the illegal passenger transportation of Uber and Lyft in their tracks, years ago.

746. Yet, Defendants never even tried, in any form, and in fact showed a surprising lack of candor before every Court they appeared in for the O'Connor class by not raising the exemption to arbitration that Congress

COMPLAINT- 232

provided. Plaintiff himself was forced to opt-out from an unlawful

arbitration contract of Defendants Uber and Lyft.

747. In January 2019, the U.S. Supreme Court decided *New Prime v. Oliveira*,

585 U.S. ___(Jan. 2019) which the Defendants cited in their briefs in their

other cases, yet again with a pending motion to compel by Uber still waiting

for a determination, in the O'Connor case, which Plaintiff is a member, they

did nothing.

748. The significance of *New Prime* is that it clarified in a unanimous 8-0

decision that any class of workers included "independent contractors" as

well as employees. Still nothing from the Defendants and the motion to

compel remains pending. Uber's counsel Mr. Theodore Boutrous, in the

O'Connor case argued the New Prime case before the U.S. Supreme Court,

yet he has not withdrawn his improper motion to compel arbitration. The

defendants have done nothing!

749. The Defendants have caused several adverse decisions in the district court,

caused the district court to decide issues without all the readily available

known facts within the Defendants possession or available without legal

discovery, including one adverse decision in the Ninth Circuit Court of

Appeals, in Mohamed v. Uber, 848 F.3d 1201 (9th Cir. 2016). Damaging

Plaintiff ability to a recovery for his injuries.

750. The fact is anyone using the Uber or Lyft smartphone application can order a car to take them as far as the limits of their credit card will allow. This combined with the fact that everyone knows that Uber and Lyft operate in all 48 States is enough proof that Uber and Lyft are operating and providing interstate transportation to warrant limited discovery as to for example how many Uber and Lyft cars travel from Los Angeles, CA to Las Vegas, NV, in a given week. Plaintiff has himself traveled across the middle California from Elk Grove CA, to the Reno-Tahoe International Airport a distance over 160 miles for Uber and Lyft. That is interstate transportation, and would exempt every driver, the Defendant have done nothing!

751. According to U.S. Supreme Court Justice Ruth Bader Ginsberg, and attorney is supposed to investigate the law and the facts before forming a strategy, here the Defendants appear to have ignored the facts and the law, increased their billing time, from 2103 to 2019 in their interest and left Plaintiff (and other drivers) to the wolves of Uber and Lyft. Plaintiff is now out of business and his 30 plus career of his chosen profession as a livery driver. The Defendants refuse to act, where they have the law on their side designed to stop unauthorized and illegal passenger transportation, 49 U.S.C. §§14707, 14704, yet they do nothing!

COMPLAINT- 234

752. It is beyond comprehension and all rational justification why the Defendants have reached a preliminarily approved settlement with Uber as bad as or worse than the one they previously achieved with Lyft, for 27 million and millions in attorney's fees. At least the Lyft settlement put money in their pockets to be able to carry on the Uber case. Alas, they appear to have no real interest in Plaintiff (or the other hundreds of thousands of drivers in California) they claim to represent the best interests of.

753. Furthermore, in doing all of the above described acts and omissions constituting Defendants' breach of their fiduciary duties owed to Plaintiff, Plaintiff sustained damages, including but not limited to, extreme delays in the litigation, adverse decisions in the district court and Ninth Circuit Court of Appeals, the failure to raise the federal Statutory right to be exempt from Arbitration caused the loss of the comraderies of the previous class members of the suit, a loss of the true value of his labor and property to Lyft settlement, the loss of his TCP license, loss of his labor and property to Uber and Lyft's continued illegal operations, legal fees and expenses incurred to prosecute his own case, in the least.

754. The acts and omissions constituting breach of Defendants' fiduciary duties were committed with oppression, fraud and/or malice within the meaning of Civil Code Section 3294. As a result, Plaintiff, in addition to actual

COMPLAINT- 235

damages, may recover exemplary damages for the sake of example and by way of punishing Defendants.

**WHEREFORE,** Plaintiff prays for judgment against Defendant Attorneys, and each of them, as set forth below;

## FOR COUNT TWENTY-SEVEN

1. For actual damages according to proof;
2. For interests as allowed by law;
3. For the costs of suit incurred herein;
4. For such other and further relief as the Court deems just and proper

## FOR COUNT TWENTY-EIGHT

1. For actual damages according to proof;
2. For interests as allowed by law;
3. For the costs of suit incurred herein;
4. For such other and further relief as the Court deems just and proper

## PLAINTIFF REQUESTS A TRIAL BY JURY

COMPLAINT- 236

## IX.   **CONCLUSION**

### IT'S A SIMPLE PROBLEM:

The passenger transportation business, interstate and intrastate, is regulated by Congress.

Uber and Lyft have violated Federal law since their very inception by selling transportation to private vehicles under 49 U.S.C. 13506(b)(2) which is very clearly spelled out in the supporting federal regulation, 49 CFR§372.101. Uber and Lyft violate numerous federal laws, regulations and codes as shown above and yet the regulators have totally ignored the problem.

Uber and Lyft have violated California state law since the beginning. Claiming drivers are independent contractors not employees under California Law (IWC No. 9) and yet they control everything; rates (max pricing), working hours, routes (follow the map no matter the circumstance) and limiting services (meet and greet). They even control which hours I must work and how long to be profitable. Uber and Lyft violate numerous other laws, regulations and codes and yet the State regulators have unlawfully aided and abetted Uber and Lyft's illegal business.

Uber and Lyft are continuing to operate in interstate and intrastate commerce, a federally prohibited passenger transportation business.

COMPLAINT- 237

Federal law requires 49 U.S.C. §13506(b)(2) that passenger brokers, like Uber and Lyft, only sell or arrange passenger transportation to authorized State and Federal motor carriers 49 U.S.C.§14501(d) and requires passenger brokers who sell transportation to also register as motor carriers 49 U.S.C.§13904(d) in interstate and intrastate commerce. Uber and Lyft don't.

There is no exemption for Uber and Lyft's passenger transportation sales to private motor vehicles business, 49 U.S.C. §13506(b)(2).

I am in front of a federal Court of Law, where I have a federal statutory right to enforce the law, 49 U.S.C. §§14704, 14707.  The media reports the continuing murders, rape, and assaults; and drivers, like plaintiff being ripped off of their labor and property, it's a daily occurrence.

The drivers' strike across the nation and the world, yet we can't stop Uber and Lyft's per se illegal Federal and State operations or the theft of my labor and property or ensure my safety.  The Regulators should have long ago and ignored the problem.  The court now being aware and informed has a duty, an obligation to remedy the problem and should force Uber and Lyft to comply, not to mention the regulators whose duty, like Plaintiff, is to enforce and abide by the laws of this great nation.

COMPLAINT- 238

Plaintiff requests a Statement of decision.

Respectfully submitted;
DATED: JUNE 7, 2018

S. Patrick Mendel

COMPLAINT- 239

## **VERIFICATION**

I, S. Patrick Mendel, declare:

I am the plaintiff in this action. I have read the foregoing complaint and know its contents.  The matters stated in the foregoing complaint are true of my own knowledge, or are stated on my information and belief and I believe them to be true.

Executed on June 7, 2019, in San Leandro, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


_____
S. Patrick Mendel

COMPLAINT- 240